# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE +1 (202) 458 1534  |  FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## C E R T I F I C A T E

**QATAR NATIONAL BANK (Q.P.S.C.)**

**v.**

**REPUBLIC OF SOUTH SUDAN AND BANK OF SOUTH SUDAN**

**(ICSID CASE NO. ARB/20/40)**

I hereby certify that the attached document is a true copy of the Tribunal's Award dated May 7, 2024.

Meg Kinnear
Secretary-General

Washington, D.C., May 7, 2024

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**QATAR NATIONAL BANK (Q.P.S.C.)**

Claimant

and

**REPUBLIC OF SOUTH SUDAN AND BANK OF SOUTH SUDAN**

Respondents

**ICSID CASE NO. ARB/20/40**

---

# AWARD

---

***Members of the Tribunal***
Dr. Ucheora Onwuamaegbu, President of the Tribunal
Mr. Peter Rees KC, Arbitrator
Professor Hélène Ruiz Fabri, Arbitrator

***Secretary of the Tribunal***
Mr. Govert Coppens

*Date of dispatch to the Parties*:

7 May 2024

### REPRESENTATION OF THE PARTIES

*Representing Qatar National Bank (Q.P.S.C.)*:

*Representing Republic of South Sudan and Bank of South Sudan*:

Sir Geoffrey Cox KC
Thomas More Chambers
7 Lincoln's Inn Fields
London WC2A 3BP
United Kingdom

and

Mr. Hussein Haeri KC
Dr. Robert Kovacs
Ms. Clàudia Baró Huelmo
Mr. Giacomo Gasparotti
Ms. Christina Liew
Mr. Christopher Birks
Withers LLP
20 Old Bailey
London EC4M 7AN
United Kingdom

and

Mr. David O'Sullivan
Qatar National Bank (Q.P.S.C.)
Sikkat Alwadi Street
Mshereib Downtown
Building No: 4 Street No: 800
Zone No: 03
P.O. Box 1000
Head Office
Corniche
Doha
State of Qatar

and

Mr. Samuel Yohannes
Horizon Legal Associates
Juba Office, Juba
Republic of South Sudan

Hon. Lawrence Korbandy Kodis
Mr. Dengtiel Ayuel Kur
South Sudan Associated Advocates
Plot 1139, Block 4
Hai Jabel
Juba
Republic of South Sudan

and

Ms. Jane S. Mwangi
Ms. Chepchirchir Sego
Mr. Kelvin Mbogo
Mr. Cleophas Kiprotich
Robson Harris & Co. Advocates
Transnational Plaza, 6th and 9th floors
City Hall Way
P.O. Box 67845-00200
Nairobi
Republic of Kenya

and

Hon. Biong Pieng
Government of the Republic of South Sudan

Table of Contents

I.    BACKGROUND TO THIS AWARD AND PROCEDURAL HISTORY ........................... 1

II.   CALCULATION OF DAMAGES ................................................................. 3

  A.  Amount Due under the Facility Agreement .................................. 3

  B.  Interest ............................................................................... 6

  C.  Costs .................................................................................... 7

    (1)  The Claimant's Position............................................................ 7

    (2)  The Respondents' Position ..................................................... 10

    (3)  The Tribunal's Decision on Costs.......................................... 12

III.  AWARD .................................................................................................... 15

APPENDIX 1

APPENDIX 2

TABLE OF ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings (2006) |
| C-[#] | Claimant's Exhibit |
| Cl. Mem. | Claimant's Memorial dated 29 November 2021 |
| Cl. Reply | Claimant's Reply dated 18 August 2022 |
| Cl. SoC | Claimant's Submission on Costs dated 2 February 2023 |
| Cl. Updated SoC | Claimant's Updated Submission on Cost dated 11 March 2024 |
| CL-[#] | Claimant's Legal Authority |
| Decision on Jurisdiction and Liability | Tribunal's Decision on Jurisdiction and Liability dated 5 January 2024 |
| Facility Agreement | Facility Agreement between Qatar National Bank (Q.P.S.C.), the Bank of South Sudan, and the Republic of South Sudan dated 5 April 2018 (Exhibit C-0001) |
| Hearing | Hearing on Jurisdiction and the Merits held on 17–19 January 2023 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| The Loan | Funds made available under the Facility Agreement |
| R-[#] | Respondents' Exhibit |
| Resp. C-Mem. | Respondents' Counter-Memorial dated 28 April 2022 |
| Resp. Rej. | Respondents' Rejoinder dated 9 November 2022 |
| Resp. SoC | Respondents' Submission on Costs dated 2 February 2023 |

| RL-[#] | Respondents' Legal Authority |
|---|---|
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 24 March 2021 |

## I.    BACKGROUND TO THIS AWARD AND PROCEDURAL HISTORY[1]

1.    This Award is the final stage in the proceedings in the case of *Qatar National Bank (Q.P.S.C.) v. Republic of South Sudan and Bank of South Sudan* (ICSID Case No. ARB/20/40).  It follows from the Tribunal's Decision on Jurisdiction and Liability dated 5 January 2024 ("**Decision on Jurisdiction and Liability**"), which is incorporated into this Award by reference, and attached as **Appendix 1**.

2.    In the Decision on Jurisdiction and Liability, the Tribunal set out the procedural history and factual background to this case, as they stood at the time, as well as its decisions on jurisdiction and liability.

3.    The Tribunal, in the Decision on Jurisdiction and Liability, also rejected the objections of the Respondents to the jurisdiction of the Centre and of the Tribunal over the claims filed. The Tribunal also found that the Respondents had breached the Facility Agreement and are liable to the Claimant for damages, and that the compensation was to be calculated in accordance with the provisions of the Facility Agreement.  The *Dispositif* of the Decision on Jurisdiction and Liability reads:

> *For the reasons set forth above, the Tribunal decides as follows:*
>
> *(1)  The Tribunal rejects the objections of the Respondents to the jurisdiction of the Centre and of this Tribunal.*
>
> *(2)  The Tribunal finds that the Respondents have breached the Facility Agreement and are liable to the Claimant for damages.*
>
> *(3)  The Tribunal finds that the Claimant has not waived its right to full and immediate repayment of the outstanding balance under the Facility Agreement.*
>
> *(4)  The Tribunal finds that the Claimant is entitled to compensation for the Respondents' breach to be calculated in accordance with the provisions of the Facility Agreement for:*
>
> > *a.  the outstanding Loan amount;*

---

[1] A summary of the procedural history up to 5 January 2024, the date when the Tribunal's Decision on Jurisdiction and Liability was issued, can be found in paras. 14-48 of the Decision on Jurisdiction and Liability.

> b. *interest on the Loan amount calculated in accordance with Clauses 8.1 and 8.3 of the Facility Agreement; and*
>
> c. *the Management Fee.*
>
> (5) *In order to facilitate the Tribunal's deliberations on the quantification of damages by the date of any Award that will follow this Decision, the Tribunal:*
>
> a. *directs the Parties jointly to calculate the sums due under the Facility Agreement, as at two months from the date of this Decision, and monthly thereafter for six months. Such calculation should be submitted to the Tribunal within six weeks from the date of this Decision; and*
>
> b. *in the event of disagreement between the Parties with regard to 5(a) above, the Tribunal directs the Parties jointly to submit, by the same six-week deadline, a document that sets out their respective calculations and briefly explains, in table format, the points and reasons for the differences. The Tribunal will thereafter determine if any additional submissions will be required.*
>
> (6) *The Tribunal directs the Parties to submit their respective updated Statements of Costs within two weeks of the final submissions under the preceding paragraphs.(7) The Tribunal reserves its decision on Costs.*[2]

4.  Pursuant to paragraph 350(5)(a) of the Decision on Jurisdiction and Liability, the Parties' joint calculation of the sums due under the Facility Agreement was to be submitted to the Tribunal by 16 February 2024.  On 16 February 2024, this deadline was at the request of the Parties extended to 19 February 2024.

5.  By email of 19 February 2024, the Respondents advised the Tribunal that the Claimant would shortly forward the Tribunal the "joint position" of the Parties.  This was followed by an email on the same day from the Claimant conveying the following documents on behalf of both sides, pursuant to paragraph 350(5)(a) of the Decision on Jurisdiction and Liability:

a.  Agreed Calculations;

b.  Updated LIBOR Data;

---

[2] Decision on Jurisdiction and Liability, para. 350.

c.   the account statement showing partial repayments between 12 February 2019 and 5 January 2023; and

d.   the account statement showing no repayments have been made between 6 January 2023 and 17 January 2024.

6.   By another email on 20 February 2024, the Respondents confirmed that the Claimant's email and attachments "[reflect] the Parties' agreement."

7.   On 27 February 2024, the Tribunal, for its ease of reference, requested from the Parties a joint document of not more than two or three pages introducing the different documents submitted by the Parties on 19 February 2024, which documents should be annexed to the document.

8.   In response the Claimant, on 11 March 2024, submitted the requested memorandum, attaching as annexes the same documents that had already been submitted on 19 February 2024.[3]

9.   The Parties having been allowed additional time to do so, pursuant to paragraph 350(6) of the Decision on Jurisdiction and Liability, on 11 March 2024, the Claimant filed its updated Submission on Costs.  The Respondents did not file an updated submission on costs.

10.  The proceedings were closed on 29 March 2024.

## II.   CALCULATION OF DAMAGES

### A.   AMOUNT DUE UNDER THE FACILITY AGREEMENT

11.  In its Decision on Jurisdiction and Liability, the Tribunal concluded:

> *that the Respondents are, and continue to be, liable to the Claimant for any outstanding amounts owed under the Facility Agreement. The Claimant, having properly invoked the Acceleration Clause, is entitled to immediate repayment in full of the outstanding sums under the Facility Agreement.*[4]

---

[3] While the Respondents did not reply to invitations by the Claimant, and later by the Tribunal, to confirm their agreement with the submission, the Tribunal notes that except for the memorandum, the documents and information are the same as were submitted on 19 February 2024, which the Respondents twice confirmed.  It is also noted that the memorandum does not contain any new information, but only presents already provided information in a form that aids ease of reference.

[4] Decision on Jurisdiction and Liability, para. 334.

12.     The consequence, the Tribunal noted:

> *is that the Respondents are jointly and severally liable to compensate the Claimant for the damages due. Under English law, such damages shall be calculated such as to make the Claimant whole in accordance with the contract that has been breached. In this case, to make the Claimant whole, damages must be calculated in accordance with provisions of the Facility Agreement.*[5] (footnotes omitted)

13.     The Parties each relied on calculations of amounts that were, according to their respective Experts, due under the Facility Agreement.  The Tribunal, in its Decision on Jurisdiction and Liability, noted that the differences in the figures presented by the Parties arose from the different ways in which each side interpreted and applied the relevant provisions of the Facility Agreement. The Tribunal found, in particular, that the experts had adopted different approaches with regard to their treatment of: (i) default interest penalty; (ii) number of days of accrued interest; and (iii) treatment of partial repayments.

14.     In the Decision on Jurisdiction and Liability, following its analysis of the respective positions of the Parties, the Tribunal:

a.      considered it reasonable to adopt the Respondents' approach with regard to the number of days of accrued interest as that would ensure that the Respondents are not charged interest for more days than they are liable for, while at the same time not unduly prejudicing the Claimant's entitlement to be made whole.

b.      found the calculation method adopted by the Claimant in the treatment of partial repayments to be more in keeping with the Facility Agreement as it ensured that the Respondents are not charged interest on sums already paid.

c.      accepted the approach of the Claimant's experts by which interest is calculated on the entire amount owed from the moment payment was accelerated by operation of the Acceleration Clause, finding this to be consistent with Clause 8.3 of the Facility Agreement, which provides that the default interest accrues on "any amount payable."[6]

---

[5] Decision on Jurisdiction and Liability, para. 340.
[6] Decision on Jurisdiction and Liability, paras. 343-349.

15.    Thus, in submitting the joint calculation of the Parties on 19 February 2024, it was noted that:

> *The attached calculations account for the Tribunal's determinations in the Decision as follows:*
>
> i.    *For the number of days of accrued interest, the* [P]*arties have adopted the Respondents' approach.*
>
> ii.   *For partial payments, the* [P]*arties have adopted the Claimant's approach.*
>
> iii.  *For the default interest penalty, the* [P]*arties have adopted the Claimant's approach.*
>
> iv.   *Please note that, in extending the calculations past the current date to 5 September 2024, the* [P]*arties have assumed that: (1) the USD 3-month LIBOR, for the purpose of calculating the accrued interest from 28 March 2024 (the start of the next Interest Period) to 5 September 2024, remains the same as that of the latest Quotation Day of 27 December 2023; and (2) the Respondents do not make any further partial repayments.*[7]

16.    From the joint calculations, the amount owed by the Respondents to the Claimant as at 5 March 2024 was USD 998,723,836 being USD 659,814,830 (principal); USD 409,727,522 (accrued interest); and USD 300,000 (management fee); less USD 71,118,516 (repayments made).[8]  Using the same formula, the Parties have calculated the sum that would be due each month until September 2024 as set out in the table below.

| Date | Sum due under the Facility Agreement (USD) |
| --- | --- |
| 5 March 2024 | 998,723,836 |
| 5 April 2024 | 1,009,866,775 |

---

[7] Email of 19 February 2024, from the Claimant's counsel on behalf of both sides, confirmed by the Respondents' counsel.

[8] Summary table of sums due under the Facility Agreement, Updated Calculations of FTI Consulting, submitted by the Parties on 19 February 2024, and on 11 March 2024.  This Summary Table is attached as **Appendix 2** to this Award.  See also Memorandum on the sums due under the Facility Agreement, dated 4 March 2024, p. 2.

| 5 May 2024 | 1,021,282,210 |
|---|---|
| 5 June 2024 | 1,033,078,160 |
| 5 July 2024 | 1,044,204,714 |
| 5 August 2024 | 1,056,406,473 |
| 5 September 2024 | 1,068,608,231 |

17.    There being no dispute between the Parties as to these calculations, the Tribunal accepts the figures as agreed between them as accurate for the intended purpose of determining compensation due under the Facility Agreement as at the date of this Award.

**B.    INTEREST**

18.    As noted in the Decision on Jurisdiction and Liability, the compensation due to the Claimant includes interest on the outstanding Loan amount.[9]  The joint calculation submitted by the Parties, as shown in the Table above, already incorporates interest accrued as of each stated date, calculated pursuant to the default interest rate payable under Clause 8.3 of the Facility Agreement.  The Tribunal also finds that the Claimant is entitled to, and is hereby awarded, post-Award interest.  In their joint calculation, the Parties have not specifically addressed the Post-Award interest rate to be applied in respect of a damages Award.[10]  On the basis of the Parties' agreement to calculate interest on the outstanding Loan amount prior to the Award using the default interest rate, the Tribunal considers it reasonable that Post-Award

---

[9] Decision on Jurisdiction and Liability, para. 350.

[10] In its written submissions, the Claimant had argued that it is entitled to Post-Award interest from the date of the Award until date of payment, calculated as per Clause 8.3 of the Facility Agreement (Decision on Jurisdiction and Liability, para. 336; Cl. Memorial, para. 130 *et seq.*; Cl. Reply, paras. 224-225). The Respondents did not address post-Award interest rate with regard to the Loan but did not dispute the Facility Agreement as basis for calculation of any compensation due (Decision on Jurisdiction and Liability, para. 336).

interest shall also be calculated on the same basis as the Parties have applied in jointly calculating interest on the Loan.[11]

## C.    COSTS

### (1)    The Claimant's Position

19.    The Claimant, having in its pleadings sought an award of costs, set out arguments in support of the ensuing submissions on costs. In its first costs submission dated 2 February 2023, the Claimant stated that the Tribunal has the power to award costs, which is derived from Article 61(2) of the ICSID Convention and Rules 28(2) and 47(1)(j) of the applicable 2006 ICSID Arbitration Rules. That power, according to the Claimant, should be exercised in its favor, if successful, in keeping with recent practice of ICSID tribunals.[12] If on the other hand, it is not successful, the Claimant argued that each party should bear its own costs "given the circumstances of the case."[13]

20.    The Claimant further asserted that, should it be successful, it is entitled to be awarded all costs incurred in the arbitration for the following reasons:

a.    The cost award would restore the Claimant to the position it would have been in but for the Respondents' breaches of the Facility Agreement.[14]

b.    The Claimant had afforded the Respondents ample opportunity to remedy their breaches of the Facility Agreement as evidenced "for example (following earlier restructurings), in the change to defer the repayment schedule and the time the Claimant waited to commence this arbitration (22 September 2020) following the first event of default (31 March 2019)."[15] (footnotes omitted.)

c.    The principle of cost recovery has been adopted by the majority of ICSID tribunals.

---

[11] The Tribunal notes that, although provided for in the Facility Agreement, LIBOR which has since been phased out, is used by the Parties in their joint calculations submitted to the Tribunal and on the basis of which the Tribunal's award on interest is based.

[12] Cl. SoC, paras. 1, 2.

[13] Cl. SoC, FN 3.

[14] Cl. SoC, para. 4.

[15] Cl. SoC, para. 5.

d.   The Claimant's fees and costs are reasonable in light of the circumstances, which the Claimant articulates thus:

> *the Claimant has conducted the case efficiently, including in addressing the Respondents' late applications to admit new evidence into the record. The Claimant did not waste costs by objecting to these applications. The Claimant was also successful in objecting to the Respondents' application to bifurcate proceedings. Therefore, the Claimant's legal fees and costs should be awarded in full.*[16] (footnotes omitted)

21.   In its updated submission on costs dated 11 March 2024, the Claimant notes that the Respondents in their earlier cost submission identified the extent of success of a party's case as a relevant factor and accepted the principle that the successful party ought to recover its reasonable costs.  According to the Claimant, this approach is consistent with English law and is provided for under the Indemnity Clauses of the Facility Agreement:[17]

> **14.4 Indemnity to the Security Agent**
>
> *(a) The Borrower must indemnify the Security Agent and each Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:(i) any failure by the Borrower to comply with its obligations under Clause 16 (Costs and expenses);*
>
> *(ii) acting or relying on any notice, request or instruction which the Security Agent, Receiver or Delegate reasonably believes to be genuine, correct and appropriately authorised;*
>
> *(iii) the taking, holding, protection or enforcement of the Security Interests under the Security Documents;*
>
> *(iv) the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent, Receiver or Delegate by the Finance Documents or by law;*
>
> *(v) any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or*

---

[16] Cl. SoC, para. 7.

[17] Cl. Updated SoC, paras. 4, 5, referring to Clauses 14.3(c); and 14.4(a)(iii)-(vi) of the Facility Agreement.  See also, Memorial, para. 143; Reply, para. 79.

> *(vi) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement.*[18]

22.    Referring to the Decision on Jurisdiction and Liability, the Claimant argues that it should "as the successful party, [...] be awarded the full amount of its costs of the arbitration."[19]

23.    The Claimant rejects the Respondents' contention that the Tribunal should take into account the fact that the Respondents continued to repay the loan facility while defending the arbitration.  According to the Claimant:

> *the Respondents were not "continuing to repay the loan facility", which was by that stage already in default. It was only following the commencement of these proceedings that the Respondents made partial repayments (for a fraction of the outstanding sums), which were not continued, and which have been factored into the Claimant's quantum analysis. In these circumstances, the Respondents cannot reasonably invoke such partial repayments as a relevant consideration regarding the Claimant's recovery of its costs.*[20]

24.    The Claimant again argued that its legal fees and costs incurred in these proceedings are reasonable, noting that they are less than a third of the Respondents' legal costs and expenses.[21]  These costs, according to the Claimant, "are reasonable in the context of this case and proportionate to the amount in dispute between the Parties."[22]

25.    The Claimant breaks down its costs as follows:

|       | Description          | Costs (GBP)   |
|-------|----------------------|---------------|
| 1.    | Withers' legal fees  | 867,485.08    |

---

[18] **C-0001**, Facility Agreement, Clause 14.4. The Claimant also cites the following part of Clause 14.3(c): "The Borrower must indemnify the Facility Agent against any cost, loss or liability incurred by the Facility Agent as a result of: [...] (c) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement." See, Cl. Updated SoC, para. 5.

[19] Cl. Updated SoC, para. 9.

[20] Cl. Updated SoC, para. 10.

[21] Cl. Updated SoC, para. 11.

[22] Cl. Updated SoC, para. 13.

| | | |
|---|---|---|
| 2. | Counsel's legal fees (Sir Geoffrey Cox KC) | 55,000.00 |
| 3. | Costs and expenses | 11,844.70 |
| 4. | FTI's fees | 65,000.00 |
| | **Total Cost** | **999,329.78** |

26.    The Claimant requests that the Tribunal order the Respondents to pay interest on the sum it is awarded for costs "at the rate of LIBOR + 6% compounded quarterly (which corresponds to the interest rate payable under clause 8.1 of the Facility Agreement), running from the date of the Tribunal's [d]ecision" on costs.[23]

27.    The Claimant also requests that the Tribunal "apply the same principles of cost recovery for the Claimant with respect to the Tribunal's fees and expenses, as well as ICSID's fees (and transcription fees)" and "award the Claimant interest on these costs at the same rate and based on the same compounding period" as requested in respect of its legal fees and costs.[24]

### (2)    The Respondents' Position

28.    The Respondents request the Tribunal to award them "the costs associated with these proceedings, including all legal and arbitration costs as well as ICSID and Tribunal costs and any expenses."[25]  Arguments in support are then provided in the ensuing submission on costs dated 2 February 2023.

29.    They observe in their submission on costs that by virtue of Article 61(2) of the Convention, ICSID arbitral tribunals can determine and allocate costs at their discretion, unless otherwise agreed by the parties.[26]

30.    They note that there are two approaches adopted by ICSID tribunals, namely that some tribunals apportion costs equally and rule that each party bear its own costs, while others

---

[23] Cl. SoC, para. 8; Cl. Updated SoC, para. 13.

[24] Cl. SoC, para. 11; Cl. Updated SoC, para. 15.

[25] Resp. C-Mem., para. 126(d); Resp. Rej., para. 103(d).

[26] Resp. SoC, para. 1.

apply the principle of "costs follow the event" thereby "making the losing party [bears] all or part of the costs of the proceedings, including those of the prevailing party."[27]   The Respondents further argue that they ought to recover their reasonable costs "in the circumstances where no part of the Claimant's endeavor in commencing these proceedings has been successful."[28]

31.   According to the Respondents, among the factors that the Tribunal has to consider in exercising its discretion under Article 61(2) of the Convention are "the conduct of the parties and the merits of claims or the extent of success of a party's case."[29]

32.   They argue that the Tribunal should take into account the fact that Respondents "defended this claim while still continuing to repay the loan facility subject of these proceedings through an Off-Taker Oil Purchase Agreement."[30]

33.   The Claimant "has compiled and convoluted series of events not relevant to the dispute" "in a bid to build a case for investment for purposes of arbitration before ICSID."[31]   The Claimant did this "knowing very well that the nature of the dispute is term loan facility."[32]

34.   The Respondents break down their costs as follows:

|   | Description | Costs (USD) |
|---|---|---|
| 1. | Costs for the Respondents' Counsel | 3,610,000 |
| 2. | Costs for the Expert Witness and his team | 149,544 |
| 3. | Costs for the Respondents' witness and Representatives | 60,000 |
|   | **Total Cost** | **3,819,544** |

---

[27] Resp. SoC, para. 2.

[28] Resp. SoC, para. 4.

[29] Resp. SoC, para. 3.

[30] Resp. SoC, para. 5.

[31] Resp. SoC, para. 5.

[32] Resp. SoC, para. 5.

35.    The Respondents request that the Tribunal award them the above costs "with interest till date of payment."[33]

### (3)    The Tribunal's Decision on Costs

36.    The Tribunal recalls that it had in its decision on the Respondents' application for bifurcation of the proceedings, deferred its decision on the costs of that application.  Hence, those costs shall be deemed included in the discussions below and the ensuing Tribunal's analysis and decision.

37.    As stated in the procedural history in the Decision on Jurisdiction and Liability (see para. 45 of the Decision) and in this Award (see para. 3), the Parties were invited to each file a submission on costs after the hearing, and an updated cost submission after their joint calculation of damages following the Decision on Jurisdiction and Liability.

38.    The Tribunal received one, out of the two allowed, submission on costs from the Respondents which was submitted prior to the Decision on Jurisdiction and Liability and two from the Claimant.  The Claimant's second submission addressed issues raised in the Respondent's earlier submission on costs.  The Respondents, in not filing a second costs submission, have not presented any arguments in reply to those raised in the Claimant's initial submission.

39.    In their respective submissions, the Parties each acknowledge the Tribunal's discretion under Article 61(2) of the Convention with regard to costs.  The Parties, citing examples of decisions thereon, equally acknowledge the practice in some ICSID cases of tribunals adopting the approach of "costs follow the event."[34]

40.    Regarding the factors that the Tribunal should consider in exercising its discretion under Article 61(2) of the Convention, the Respondents suggest that they would include the conduct of the parties and the merits of the claim or the extent of success of a party's case. The Claimant agrees with this in its second costs submission.

---

[33] Resp. SoC, para. 5.

[34] See, for example, Cl. SoC, para. 3, and Resp. SoC, paras. 2-3.

41.     The Tribunal has carefully considered all of the arguments presented by the Parties and taken them into account in arriving at its conclusions.

42.     Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

43.     Thus, subject to any agreement by the Parties in that regard, this provision gives the Tribunal the discretion to decide how, between the Parties, the burden of the costs incurred in connection with the arbitration is to be borne.  This discretion of the Tribunal is not affected by any provisions of the Facility Agreement, especially the Indemnity provisions in Article 14(3), which the Claimant argues are consistent with English law and the practice of ICSID tribunals.[35]

44.     The Tribunal notes, as stated by the Parties in their respective submissions, that the trend in ICSID cases is for costs to follow the outcome.  The Tribunal acknowledges that such an approach ensures that a prevailing party is, as much as possible, put in the position it would have been had it not been required to pursue or defend the arbitration.

45.     The Tribunal also acknowledges that there could be instances warranting a departure from the approach of costs following the event.  These would include cases that involve conduct by the prevailing party that caused undue delay or otherwise resulted in additional costs and expenses in the proceeding.  They would in the Tribunal's view also include instances in which the tribunal considers it reasonable to make such a departure for reasons that would be peculiar to the facts of the case.

46.     The Respondents argue that their conduct of continuing to repay the loan even after proceedings had started, should be considered in their favor.  They also posit that the Claimant's arguments in establishing the existence of an investment under the Convention

---

[35] See para. 22 above.

should be considered against the Claimant. The Claimant in its second submission on costs refutes these positions advanced by the Respondents.

47. The Tribunal notes that the Claimant has been able to prove the existence of an investment under the Convention. Thus, its arguments in so doing cannot be considered a factor against the Claimant on the issue of costs. The Tribunal also fails to see how the fact that the Respondents continued to repay the loan after the proceedings had started should be used as a basis for reducing the Respondents' liability for costs. The Respondents by such repayments were only meeting their obligations under the Facility Agreement.

48. As noted by the tribunal in *Unión Fenosa v. Egypt* in addressing the "loser pays" principle applied by the majority of ICSID tribunals to compensate a successful claimant for the expenses of bringing a meritorious claim against a respondent, "[w]ithout such compensation, a successful claimant would be penalised for resorting to ICSID arbitration."[36]

49. The Tribunal agrees with the analysis and observations of the *Unión Fenosa* tribunal. Like that tribunal, in the present case, the Tribunal sees no reason to depart from the general approach that the party that has prevailed in the arguments be reimbursed its reasonable costs.

50. Consequently, the Tribunal in the exercise of its discretion under Article 61(2) of the Convention has decided that the Respondents shall reimburse the Claimant the costs of its legal representation and related expenses which, at not up to a third of the Respondents' corresponding expenses, the Tribunal considers reasonable, as well as its contribution to the costs of the arbitration.

51. The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to:

| Description | USD |
|---|---|
| Arbitrators' Fees and Expenses of the Tribunal | 302,185.93 |

---

[36] **CL-0097**, Unión Fenosa Gas, S.A. v. Arab Republic of Egypt, ICSID Case No. ARB/14/4, Award, 31 August 2018 ("***Unión Fenosa v. Egypt***" or "***Unión Fenosa***"), para. 12.15.

| ICSID's Administrative Fees | 178,000.00 |
|---|---|
| Direct Expenses | 52,669.44 |
| **TOTAL** | **532,855.37** |

52.    The above costs have been paid out of the advances made by the Parties in equal parts. The Respondents shall reimburse the Claimant its share of the costs of arbitration, amounting to USD 266,427.68, i.e., half of the total arbitration costs of USD 532,855.37, in proportion to both Parties' equal share of the advances on costs paid throughout the arbitration.  The amount remaining after payment of all costs will be refunded to the Parties.

53.    Both Parties request interest on any award of costs to them.  The Claimant argues that interest on the costs awarded should be calculated like the compensation under the Facility Agreement.  The Respondents do not provide any basis for the calculation of interest.

54.    The Tribunal, while finding that an award of costs to the Claimant would, to the extent possible, ensure that the Claimant as the prevailing party is put in a situation it would have been in if it did not have to bring the proceedings, does not consider it appropriate that interest should be calculated on the cost award on the same basis as the outstanding Loan amount. The rate in the Facility Agreement was a negotiated rate representing a significant percentage above LIBOR and compounded quarterly. The Tribunal considers that such an interest rate on a costs award would be excessive. The Claimant having put forward no alternative basis for the calculation, and in exercise of its discretion pursuant to Article 61(2) of the ICSID Convention, the Tribunal denies the claim for interest on the costs award.

## III.    AWARD

55.    Incorporating the Decision on Jurisdiction and Liability into this Award, and for the reasons set forth above and in that Decision, the Tribunal:

(1)    REITERATING its Decision on Jurisdiction and Liability:

  a.    Rejects the objections of the Respondents to the jurisdiction of the Centre and of this Tribunal;

b.   Finds that the Respondents have breached the Facility Agreement and are liable to the Claimant for damages;

c.   Finds that the Claimant has not waived its right to full and immediate repayment of the outstanding balance under the Facility Agreement;

d.   Finds that the Claimant is entitled to compensation for the Respondents' breach to be calculated in accordance with the provisions of the Facility Agreement for:

    i.   the outstanding Loan amount;

    ii.   interest on the Loan amount calculated in accordance with Clauses 8.1 and 8.3 of the Facility Agreement; and

    iii.   the Management Fee.

(2)   ORDERS the Respondents to pay to the Claimant Compensation of

a.   **USD 1,021,282,210** being the amount due under the Facility Agreement as of 5 May 2024, comprising USD 659,814,830 (Principal), USD 432,285,896 (accrued interest), USD 300,000 (Management Fee), less USD 71,118,516 (repayments made to date);

b.   Post-Award interest, only on the payment to be made under (2)(a) above, of 6% + 2% + USD 3-month LIBOR (as applicable on the latest Quotation Day of 27 December 2023), as calculated in accordance with the Parties' agreed calculation methods in Appendix 2. Post-Award interest shall be payable from the date of dispatch of the Award up to the payment of the Award;

c.   **GBP 999,329.78** in respect of the Claimant's cost of representation; and

d.   **USD 266,427.68**, the share of the costs paid by the Claimant towards the costs of the Centre and of the Tribunal.

(3)   ORDERS that the Respondents shall be jointly and severally liable to make all the payments in the preceding paragraphs.

56.   Except as set forth above, all other claims of the Parties are dismissed.

_____
Mr. Peter Rees KC
Arbitrator

Date:   MAY 0 7 2024

_____
Professor Hélène Ruiz Fabri
Arbitrator

Date:   MAY 0 7 2024

_____
Dr. Ucheora Onwuamaegbu
President of the Tribunal

Date:   MAY 0 7 2024

17

**APPENDIX 1**

**Decision on Jurisdiction and Liability dated 5 January 2024**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**QATAR NATIONAL BANK (Q.P.S.C.)**

Claimant

and

**REPUBLIC OF SOUTH SUDAN AND BANK OF SOUTH SUDAN**

Respondents

**ICSID CASE NO. ARB/20/40**

---

# DECISION ON JURISDICTION AND LIABILITY

---

*Members of the Tribunal*
Dr. Ucheora Onwuamaegbu, President of the Tribunal
Mr. Peter Rees KC, Arbitrator
Professor Hélène Ruiz Fabri, Arbitrator

*Secretary of the Tribunal*
Mr. Govert Coppens

*Date of dispatch to the Parties*: 5 January 2024

### REPRESENTATION OF THE PARTIES

*Representing Qatar National Bank (Q.P.S.C.)*:

*Representing Republic of South Sudan and Bank of South Sudan*:

| | |
|---|---|
| Sir Geoffrey Cox KC | Hon. Lawrence Korbandy Kodis |
| Thomas More Chambers | Mr. Dengtiel Ayuel Kur |
| 7 Lincoln's Inn Fields | South Sudan Associated Advocates |
| London WC2A 3BP | Plot 1139, Block 4 |
| United Kingdom | Hai Jabel |
| | Juba |
| and | Republic of South Sudan |
| | |
| Mr. Hussein Haeri | and |
| Dr. Robert Kovacs | |
| Ms. Clàudia Baró Huelmo | Ms. Jane S. Mwangi |
| Mr. Giacomo Gasparotti | Ms. Chepchirchir Sego |
| Ms. Christina Liew | Mr. Kelvin Mbogo |
| Mr. Christopher Birks | Mr. Cleophas Kiprotich |
| Withers LLP | Robson Harris & Co. Advocates |
| 20 Old Bailey | Transnational Plaza, 6th and 9th floors |
| London EC4M 7AN | City Hall Way |
| United Kingdom | P.O. Box 67845-00200 |
| | Nairobi |
| and | Republic of Kenya |
| | |
| Mr. David O'Sullivan | and |
| Qatar National Bank (Q.P.S.C.) | |
| Sikkat Alwadi Street | Hon. Biong Pieng |
| Mshereib Downtown | Government of the Republic of South Sudan |
| Building No: 4 Street No: 800 | |
| Zone No: 03 | |
| P.O. Box 1000 | |
| Head Office | |
| Corniche | |
| Doha | |
| State of Qatar | |
| | |
| and | |
| | |
| Mr. Samuel Yohannes | |
| Horizon Legal Associates | |
| Juba Office, Juba | |
| Republic of South Sudan | |

TABLE OF CONTENTS

I.    SUMMARY ............................................................................................................. 6

II.   INTRODUCTION AND PARTIES ...................................................................... 8

III.  PROCEDURAL HISTORY .................................................................................. 8

IV.   APPLICABLE LAW ........................................................................................... 14

V.    FACTUAL BACKGROUND .............................................................................. 15

      A.   The Claimant's Alleged Investment In South Sudan ............................. 15

           (1)   Prior to the Facility Agreement ................................................... 15

                 a.    Establishment in South Sudan – License and Juba Branch ........... 15

                 b.    Establishment in South Sudan – Capital Injection ....................... 16

                 c.    Provision of Credit Facilities ...................................................... 16

           (2)   The Facility Agreement ................................................................ 18

                 a.    Government Approval of the Facility Agreement ......................... 19

                 b.    Off-Take Agreement ................................................................... 20

      B.   Alleged Breach(es) of the Facility Agreement ........................................ 22

      C.   Partial Payment ......................................................................................... 24

VI.   THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ........................... 25

VII.  JURISDICTION .................................................................................................. 28

      A.   Does the Dispute Arise Directly Out of an Investment as Required by Article 25(1)
           of the ICSID Convention? ......................................................................... 29

           (1)   Criteria for Defining Investment – Effect of the ICSID Arbitration Clause of the
                 Facility Agreement ...................................................................... 30

           (2)   Criteria for Defining Investment – the Salini Test ...................... 32

                 a.    Investor's Participation in the Risks of the Transaction ................ 34

                 b.    Contributions by the Investor ..................................................... 41

                 c.    Contribution to the Economic Development of the Host State ..... 45

                 d.    A Certain Duration of Performance of the Contract ..................... 49

           (3)   The Tribunal's Analysis – Does the Dispute Arise out of an Investment? ........... 51

                 a.    Legal Dispute ............................................................................ 51

                 b.    Subject Matter of the Dispute ..................................................... 52

                 c.    Is the Facility Agreement an Investment for Purposes of the ICSID
                       Convention? ............................................................................... 53

      B.   Is the Second Respondent Subject to ICSID Jurisdiction? ........................ 63

           (1)   The Parties' Main Arguments ..................................................... 63

(2) The Tribunal's Analysis ......................................................................... 66

    a. Is the Second Respondent a Constituent Subdivision or Agency of the State? ................................................................................................. 67

    b. Has the Second Respondent been Designated to the Centre? ...................... 67

    c. Has the Second Respondent Provided Written Consent to ICSID Arbitration? ...................................................................................... 76

    d. Conclusion ....................................................................................... 83

VIII. LIABILITY .......................................................................................................... 84

  A. The Claimant's Position on Liability ............................................................ 84

  B. The Respondents' Position on Liability ....................................................... 87

  C. The Tribunal's Analysis ............................................................................. 90

    (1) Breach of Contract ................................................................................. 92

    (2) Acceleration Clause .............................................................................. 95

IX. DAMAGES ......................................................................................................... 100

  A. The Parties' Respective Positions on Calculation of Damages .................... 100

  B. The Tribunal's Analysis ........................................................................... 102

    (1) Number of Days of Accrued Interest ..................................................... 102

    (2) Treatment of Partial Repayments ........................................................... 103

    (3) Default Interest .................................................................................... 103

X. DECISION OF THE TRIBUNAL AND DIRECTIONS TO THE PARTIES ................. 105

TABLE OF ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings in force as of 10 April 2006 |
| BSS | Bank of South Sudan |
| C-[#] | Claimant's Exhibit |
| CL-[#] | Claimant's Legal Authority |
| Cl. Mem. | Claimant's Memorial dated 29 November 2021 |
| Cl. WR | Claimant's Written Responses to the Tribunal's Questions at the Hearing dated 26 January 2023 |
| Cl. Reply | Claimant's Reply dated 18 August 2022 |
| Cl. Reply WR | Claimant's Reply to the Respondents' Written Response dated 14 February 2023 |
| Cl. SoC | Claimant's Submission on Costs dated 2 February 2023 |
| Facility Agreement | Facility Agreement between Qatar National Bank (Q.P.S.C.), the Bank of South Sudan, and the Republic of South Sudan dated 5 April 2018 (Exhibit C-0001) |
| FTI ER1 | Expert Report of Mr. Noel Matthews and Mr. Henry Pannell of FTI Consulting dated 29 November 2021 |
| FTI ER2 | Second Expert Report of Mr. Noel Matthews and Mr. Henry Pannell of FTI Consulting dated 17 August 2022 |
| Hearing | Hearing on Jurisdiction and the Merits held on 17–19 January 2023 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| Kepler ER | Expert Report of Mr. Emmanuel Johannes and Mr. Marero Stephen Wanjara of Kepler Associates (undated) |
| LCIA | London Court of International Arbitration |
| the Loan | Funds made available under the Facility Agreement |
| Mok WS | Witness Statement of Mr. Chan Andrea Mok dated 20 December 2022 |
| R-[#] | Respondents' Exhibit |
| Resp. C-Mem. | Respondents' Counter-Memorial dated 28 April 2022 |
| Resp. WR | Respondents' Written Responses to the Tribunal's Questions at the Hearing dated 2 February 2023 |
| Resp. Rej. | Respondents' Rejoinder dated 9 November 2022 |
| Resp. SoC | Respondents' Submission on Costs dated 2 February 2023 |
| RL-[#] | Respondents' Legal Authority |
| QNB | Qatar National Bank (Q.P.S.C.) |
| Tr. Day [#], [page:line] | Transcript of the Hearing |
| Tribunal | Arbitral Tribunal constituted on 24 March 2021 |

## I.    SUMMARY

1.    Shortly after attaining independence in 2011, the Government of South Sudan, through its Central Bank, engaged with QNB to provide facilities with which businesses that were approved by the Government would finance essential imports.

2.    In the ensuing period, the economy of South Sudan was negatively impacted by various events including the halting of the critical oil exports—the Government's main source of foreign exchange—owing to a dispute with Sudan through which the necessary pipelines transited, a civil war and natural disasters. The initial agreement between QNB and BSS was rescheduled over time, and in 2018, the Facility Agreement was entered into by which QNB provided funds to repay the loan under the existing agreements, and to support the balance of payments of South Sudan.

3.    Contrasting with the earlier agreements, which were between QNB and BSS alone, the Government was a party to the Facility Agreement with primary responsibility for the repayment obligations. BSS was the guarantor and liable in the event of default by the Government. Among its various provisions, the Agreement anticipates the possibility of repayment being financed through dedicated oil exports. It also includes provisions by which the parties agree to submit any disputes to ICSID arbitration and if ICSID were to decline jurisdiction, then to LCIA arbitration for final determination.

4.    The Government failed to make payment on the first and subsequent due dates under the agreed schedule for repayments. QNB eventually declared a breach of the Facility Agreement and demanded immediate repayment of the entire outstanding loan amount and commenced this arbitration. The Government has since begun repaying the debt in instalments financed through an oil sales arrangement.

5.    In this arbitration, the Respondents have raised two objections to jurisdiction, the first being that the dispute does not arise out of an investment. Secondly, they argue that two necessary conditions under the ICSID Convention have not been met for BSS, a non-State entity, to be a party to this arbitration, namely, that BSS has neither been designated to the Centre nor has it provided consent to arbitration that has been approved by the Government. The

Respondents argue that under the Agreement, disputes involving BSS can only be submitted to LCIA arbitration.

6.   The Tribunal rejected the first objection to jurisdiction on the basis that, applying the test accepted by the Parties as appropriate for the purpose, the Facility Agreement bears all the hallmarks of an investment as intended by the architects of the ICSID Convention. The Tribunal rejected the second objection on the basis that the Government entered into the Agreement alongside BSS, with no reservations expressed regarding the ICSID arbitration provision, nor was there any such reservation in the course of the various high-level government approvals of the Agreement. Thus, the Government had designated BSS to the Centre for purposes of any ICSID arbitration arising from the Agreement and approved the consent to ICSID arbitration that BSS provided in the Agreement.

7.   On the merits, the Respondents initially argued that the Agreement has not been breached because (i) the funds advanced by QNB have been deployed judiciously as intended; (ii) non-payment was due to economic difficulties; and (iii) repayment has commenced, even if not on the agreed schedule. Late in the course of the proceeding, the Respondents argued that the Agreement had been breached but QNB was not entitled to immediate repayment in full of the entire outstanding sum because it continued to accept repayment in instalments.

8.   The Tribunal finds that the Agreement has been breached and the reasons provided by the Respondents are not among the prescribed excuses in the Agreement, nor are they exculpatory under English law, which the parties selected as the law applicable to the Agreement and disputes arising therefrom. The Tribunal also finds that QNB did not, by reason of accepting repayments by instalments after having declared a breach, lose its right to immediate repayment in full of the amount due under the Agreement.

9.   For expedience and the convenience of the Parties, the Tribunal is issuing this Decision on its findings on jurisdiction and the merits, with an Award to follow after receipt of the relevant information, now being requested of the Parties, on which a determination on damages can be authoritatively based. The Tribunal's decision on costs is deferred to the Award.

## II.     INTRODUCTION AND PARTIES

10.     This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of: (i) the Facility Agreement made between the Republic of South Sudan, the Bank of South Sudan, and Qatar National Bank (Q.P.S.C.) and dated 5 April 2018 (the "**Facility Agreement**");[1] and (ii) the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

11.     The Claimant is Qatar National Bank (Q.P.S.C.) ("**QNB**" or the "**Claimant**"), a company incorporated under the laws of the State of Qatar, and part of the QNB Group, which is headquartered in Doha, Qatar. The Claimant provides banking and financial services, including to corporations and governments with operations in Africa, Europe and Asia, among other jurisdictions.

12.     The Respondents are the Republic of South Sudan ("**South Sudan**," the "**Government**" or the "**First Respondent**") and the Bank of South Sudan ("**BSS**" or the "**Second Respondent**") (together, the "**Respondents**"). South Sudan gained statehood from the Republic of the Sudan and became an independent State on 9 July 2011. Thereafter, BSS was established as the Central Bank of South Sudan in 2011.

13.     The Claimant and the Respondents are collectively referred to as the "**Parties**." The Parties' representatives and their addresses are listed above on page (i).

## III.     PROCEDURAL HISTORY

14.     On 22 September 2020, ICSID received a Request for Arbitration of the same date from Qatar National Bank (Q.P.S.C.) against the Republic of South Sudan and the Bank of South Sudan (the "**Request**"), together with Exhibits C-0001 through C-0019 and Legal Authorities CL-0001 through CL-0007.

15.     On 7 October 2020, the ICSID Secretary-General registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In

---

[1] **C-0001**, Facility Agreement between the South Sudan and QNB dated 5 April 2018 ("**Facility Agreement**").

the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

16.  Clause 40.3 of the Facility Agreement contains the agreement between the Parties in relation to the constitution of the Tribunal. According to the Facility Agreement, the Tribunal is to consist of three arbitrators, one appointed by the Claimant, one appointed jointly by the Respondents, and the third, presiding arbitrator appointed by ICSID.

17.  On 6 November 2020, the Claimant appointed Mr. Peter Rees KC, a national of the United Kingdom, as arbitrator. By letter of 9 November 2020, ICSID invited the Parties to provide certain clarifications as to the method of constitution, after which it would proceed to seek Mr. Rees' acceptance of his appointment. The Claimant responded by letter of 11 November 2020. No response was received from the Respondents.

18.  On 12 November 2020, ICSID acknowledged receipt of the Claimant's letter of the previous date and invited the Respondents to comment thereon. ICSID also informed the Parties that it would seek Mr. Rees' acceptance of his appointment; Mr. Rees subsequently provided his acceptance.

19.  By letter of 19 November 2020, the Claimant informed ICSID that it had not received a response from the Respondents in relation to ICSID's 9 November request for clarification. ICSID acknowledged receipt of this correspondence by letter of 20 November 2020, wherein it, *inter alia*, reminded the Parties that "the current step is now for the Respondents to jointly appoint an arbitrator."

20.  By letter of 8 January 2021, the Respondents appointed Professor Hélène Ruiz Fabri, a national of France, as arbitrator; Professor Ruiz Fabri subsequently accepted her appointment.

21.  By letter of 22 February 2021, the Claimant requested that the Chair of the ICSID Administrative Council appoint the arbitrator not yet appointed and designate him or her to be the President of the Tribunal in this case, pursuant to Article 38 of the ICSID

Convention and Rule 4 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**").

22.    Following an unsuccessful ballot procedure, on 16 March 2021, ICSID informed the Parties of its intention to propose to the Chair of the ICSID Administrative Council the appointment of Dr. Ucheora Onwuamaegbu, a dual national of the Federal Republic of Nigeria and the United Kingdom, designated to the ICSID Panel of Arbitrators by the Federal Republic of Nigeria, as the presiding arbitrator. On 24 March 2021, the Chair of the ICSID Administrative Council appointed Dr. Onwuamaegbu as President of the Tribunal pursuant to Article 38 of the ICSID Convention.

23.    On 24 March 2021, the ICSID Secretary-General, in accordance with ICSID Arbitration Rule 6(1), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Aïssatou Diop, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal; Ms. Diop was succeeded by Mr. Govert Coppens, ICSID Legal Counsel, on 6 October 2021.

24.    Following the Parties' agreement, the 60-day deadline to hold the first session provided for in ICSID Arbitration Rule 13(1) was extended by the Tribunal. The Tribunal subsequently held a first session with the Parties on 26 May 2021, by video conference.

25.    Following the first session, on 27 May 2021, the Tribunal issued Procedural Order No. 1 ("**PO 1**") recording the agreements of the Parties on procedural matters and the Tribunal's ruling on points of disagreement. PO 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of proceeding would be London, England. PO 1 also sets out the Parties' agreed timetable should the Respondents request bifurcation of the proceeding.

26.    Pursuant to the timetable established in PO 1, on 9 June 2021, the Respondents filed a "**Request for Bifurcation**," together with Legal Authorities RL-0001 through RL-0019. On 23 June 2021, the Claimant filed a response to the Request for Bifurcation, together with Exhibits C-0020 through C-0056 and Legal Authorities CL-0008 through CL-0042.

27.    On 29 July 2021, the Tribunal issued its Decision on Bifurcation wherein it denied the Respondents' Request for Bifurcation.

28.    Following the agreement of the Parties, on 8 August 2021, the Tribunal confirmed the procedural calendar for the remainder of the proceeding.

29.    Pursuant to the agreed procedural calendar, on 29 November 2021, the Claimant filed its Memorial (the "**Claimant's Memorial**"), together with: Exhibits C-0057 through C-0109; Legal Authorities CL-0043 through CL-0056; and the Expert Report of Mr. Noel Matthews and Mr. Henry Pannell of FTI Consulting dated 29 November 2021 ("**FTI ER1**"), with Exhibits FTI-0001 through FTI-0005.

30.    On 3 April 2022, the Respondents requested that the Tribunal extend the deadline for the filing of their Counter-Memorial by sixty days; upon invitation from the Tribunal, on 6 April 2022, the Claimant provided its comments on this request.

31.    On 7 April 2022, the Tribunal: (i) granted the Respondents an extension of one month to file their Counter-Memorial (i.e., by 29 April 2022); and (ii) invited the Parties to confer and agree on a revised procedural calendar for the remainder of the written submissions while maintaining the hearing dates.

32.    Further to the Tribunal's 7 April instructions, on 28 April 2022, the Respondents filed their Counter-Memorial (the "**Respondents' Counter-Memorial**").

33.    Following exchanges between the Parties and the Tribunal, on 21 July 2022, the Tribunal confirmed the revised procedural calendar as agreed by the Parties.

34.    Pursuant to the revised procedural calendar, on 18 August 2022, the Claimant filed its Reply (the "**Claimant's Reply**"), together with: Exhibits C-0110 through C-0126; Legal Authorities CL-0057 through CL-0077; and the Second Expert Report of Mr. Noel Matthews and Mr. Henry Pannell of FTI Consulting dated 17 August 2022 ("**FTI ER2**"), with Exhibits FTI-0006 and FTI-0007.

35.    On 12 December 2022, the Respondents filed their Rejoinder (the "**Respondents' Rejoinder**"), together with: Exhibits R-0001 through R-0003; and the Expert Report of

Mr. Emmanuel Johannes and Mr. Marero Stephen Wanjara of Kepler Associates (undated) ("**Kepler ER**").

36.     On 16 December 2022, the Respondents requested leave from the Tribunal to file an additional witness statement; upon invitation from the Tribunal, on 19 December 2022, the Claimant commented on the Respondents' request and noted that it did not object provided that the witness statement "would not 'introduce any new evidence.'" Later that same date, the Tribunal informed the Parties that the Respondents' request was granted.

37.     Further to the Tribunal's 19 December communication, on 20 December 2022, the Respondents filed the Witness Statement of Mr. Chan Andrea Mok dated 20 December 2022 ("**Mok WS**").

38.     Also on 20 December 2022, the Tribunal held a pre-hearing organizational meeting with the Parties by video conference.

39.     On 22 December 2022, the Tribunal issued Procedural Order No. 2 ("**PO 2**") concerning the organization of the upcoming hearing.

40.     A Hearing on Jurisdiction and the Merits was held at the International Dispute Resolution Centre in London, England, from 17 to 19 January 2023 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal*:
  Dr. Ucheora Onwuamaegbu               President
  Mr. Peter Rees KC                     Arbitrator
  Professor Hélène Ruiz Fabri           Arbitrator

*ICSID Secretariat*:
  Mr. Govert Coppens                    Secretary of the Tribunal

*For the Claimant*:
  *Counsel*:
  Sir Geoffrey Cox KC                   Thomas More Chambers
  Mr. Hussein Haeri                     Withers LLP
  Dr. Robert Kovacs                     Withers LLP
  Ms. Clàudia Baró Huelmo               Withers LLP
  Mr. Christopher Birks                 Withers LLP
  Mr. Giacomo Gasparotti                Withers LLP

| | |
|---|---|
| Ms. Natalie Tsang | Withers LLP |
| *Parties*: | |
| Mr. David O'Sullivan | Qatar National Bank (Q.P.S.C.) |
| *Experts*: | |
| Mr. Noel Matthews | FTI Consulting |
| Mr. Charlie Colthorpe | FTI Consulting |

*For the Respondents*:
| | |
|---|---|
| *Counsel*: | |
| Ms. Jane S. Mwangi | Robson Harris Advocates LLP |
| Ms. Chepchirchir Sego | Robson Harris Advocates LLP |
| Mr. Kelvin Mbogo | Robson Harris Advocates LLP |
| Mr. Cleophas Kiprotich | Robson Harris Advocates LLP |
| Mr. Lawrence Korbandy | South Sudan Associates |
| Mr. Abu Asega Noah Darios | South Sudan Associated Advocates |
| *Parties*: | |
| Mr. Arop Biong Pieng Kuol | Respondents' Representative |
| Mr. Amasek Wani Buyu Dyori | Respondents' Representative |
| Mr. Riak Angok Daniel Chol | Respondents' Representative |
| *Witness and Experts*: | |
| Mr. Chan Andrea Mok | Respondents' Witness |
| Mr. Emmanuel Johannes | Kepler Associates |
| Mr. Wanjara Marero Stephen | Kepler Associates |

| | |
|---|---|
| *Court Reporter*: | |
| Ms. Claire Hill | Claire Hill Realtime Reporting |

41.   During the Hearing, the following persons were examined:

*On behalf of the Claimant*:
| | |
|---|---|
| Mr. Noel Matthews | FTI Consulting |

*On behalf of the Respondents*:
| | |
|---|---|
| Mr. Emmanuel Johannes | Kepler Associates |
| Mr. Chan Andrea Mok | Respondents' Witness |

42.   During the Hearing, the Claimant filed Legal Authority CL-0078.

43.   On Day 2 of the Hearing, the Tribunal sent the Parties questions in writing to be answered in their Closing Statements (the "**Tribunal's Questions**"). On Day 3 of the Hearing, each Party asked to provide a response to one of the Tribunal's Questions in writing after the Hearing. The transcript and audio files of the Hearing were made available to the Parties shortly after the conclusion of the last day of the Hearing.

44.   Upon invitation from the Tribunal, on 18 January 2023, the Parties jointly submitted an agreed "**Combined Chronology of Events**."

45.   At the end of the Hearing, as recorded in its letter dated 20 January 2023, the Tribunal provided the Parties instructions for the post-Hearing arrangements, including a schedule for the submission of the Parties' Written Responses to the Tribunal's Questions. In addition, the Tribunal invited the Parties to submit their respective Submissions on Costs and corrections to the transcript of the Hearing by 2 February 2023.

46.   The Claimant filed its Written Response to the Tribunal's Questions on 26 January 2023 (the "**Claimant's WR**"); and the Respondents filed their Written Response to the Tribunal's Questions and their Reply to the Claimant's Written Response on 2 February 2023 (the "**Respondents' WR**"). On 6 February 2023, the Claimant requested leave to reply to the Respondents' Written Response. Having been granted leave to do so by the Tribunal, the Claimant submitted its Reply on 14 February 2023 (the "**Claimant's Reply WR**"); the Claimant also filed Legal Authorities CL-0100 through CL-0116.

47.   On 2 February 2023, the Parties submitted their agreed corrections to the transcript of the Hearing.

48.   Also on 2 February 2023, the Parties filed their Submissions on Costs (the "**Claimant's SoC**" and the "**Respondents' SoC**"); with its Submission, the Claimant also filed Legal Authorities CL-0079 through CL-0099. Upon invitation from the Tribunal and following the submission of its Reply WR, on 17 February 2023, the Claimant updated its SoC.

## IV.   APPLICABLE LAW

49.   In addition to the ICSID Convention, this arbitration is conducted under English law, which the Parties have selected as applicable to the Facility Agreement and disputes arising therefrom.

50.   Clause 39 of the Facility Agreement provides:

> *This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.*[2]

51.     Clause 40.1 specifies:

> *This Clause 40* [which contains the arbitration clause] *shall be governed by English law.*[3]

## V.     FACTUAL BACKGROUND

52.     In this section, the Tribunal summarises the facts that are largely uncontested concerning the Claimant's alleged investment in South Sudan and the alleged breaches of the Facility Agreement by the Respondents. The summary is not intended to be exhaustive of all the points raised and, to the extent relevant, additional points may be addressed in the Tribunal's analyses.

53.     The Tribunal has carefully considered all of the arguments and evidence presented by the Parties and, although it may not address all such arguments and evidence in full detail in its analyses and reasonings below, the Tribunal has nevertheless considered and taken them into account in arriving at its conclusions.

### A.     THE CLAIMANT'S ALLEGED INVESTMENT IN SOUTH SUDAN

#### (1)     *Prior to the Facility Agreement*

##### a.     **Establishment in South Sudan – License and Juba Branch**

54.     On 24 June 2011, QNB leased from a South Sudanese individual premises that would become QNB's new branch in Juba. It later registered as a foreign company and, having on 1 November 2011 obtained a banking license from BSS to carry out banking activities in South Sudan, it hired local employees and became operational in 2012.[4]

---

[2] **C-0001**, Facility Agreement, Clause 39.
[3] **C-0001**, Facility Agreement, Clause 40.1.
[4] Combined Chronology of Events, p. 2; Cl. Mem., paras. 15-16; Resp. C-Mem., para. 7. The foreign company registration with the Ministry of Justice, Office of Chief Registrar, was renewed annually at least until 16 July 2021. Also, the Juba Branch premises lease continued to be extended at least for the period ending on 30 June 2021.

### b.  Establishment in South Sudan – Capital Injection

55.  In the period between its establishment and 2016, the Claimant injected about USD30 million into the Juba Branch, by way of paid-up share capital, made up of USD15,000,000 in 2011; USD5,000,000 in January 2014, USD5,000,000 in December 2014; and USD5,000,000 in January 2016.[5] This was not peculiar to QNB but simply a "risk-based capital requirement" under the Basel Framework for protection of customers and banks; hence, the amount increases as the business grows.[6]

### c.  Provision of Credit Facilities

56.  In July 2012, the Claimant entered into an agreement with BSS to provide a USD 100 million credit facility to finance imports by South Sudanese trading companies nominated by BSS (the "**2012 Credit Facility**"). The 2012 Credit Facility was documented in a guarantee agreement dated 29 June 2012, but executed on 3 July 2012, between BSS and the Claimant (the "**2012 Guarantee**"), and an irrevocable reimbursement undertaking dated and executed by BSS on 3 July 2012 (the "**2012 IRU**").[7]

57.  The 2012 Credit Facility was provided through Letters of Credit (the "**LCs**"), up to a total of USD100 million, which QNB issued to trading companies nominated by BSS for importation of "strategic goods" into South Sudan.[8] Such goods were stated to be "fuel, food stuffs, medicines or building materials."[9] The process was coordinated through the Juba Branch of QNB.[10] By the 2012 Guarantee, BSS assumed the obligation to stand as guarantor for the amounts provided under the LCs including the payment of late payment charges.[11]

58.  In mid-December 2013, a civil war broke out in South Sudan between the Sudan People's Liberation Movement and the opposition, the Sudan People's Liberation Movement-in-

---

[5] Cl. Mem., para. 23.
[6] *See* Kepler Report, p. 4; *see also* Tr. Day 2, p. 34:2-7.
[7] Cl. Mem., paras. 26-27.
[8] Cl. Mem., para. 28.
[9] **C-0031**, Bank of South Sudan, Letters of Credit Guidelines to QNB (undated).
[10] Cl. Mem., para. 31.
[11] Cl. Mem., para. 35.

Opposition, cutting South Sudan's oil output by about one-third.[12] This led to South Sudan requesting additional funds, which the Claimant provided by a further credit facility of USD 250 million in 2014 (the "**2014 Credit Facility**").[13]

59.    BSS and the Claimant entered into a guarantee agreement dated 17 February 2014, but executed on 7 April 2014, in relation to the 2014 Credit Facility (the "**2014 Guarantee**") and an irrevocable reimbursement undertaking (the "**2014 IRU**") reflecting the terms of the 2014 Credit Facility. Save for the amount of credit provided, the terms of these agreements were substantially the same as for the 2012 Credit Facility.[14]

60.    As part of the 2014 Credit Facility package, BSS executed a new guarantee in March 2015 (the "**2015 Guarantee**") and a new irrevocable reimbursement undertaking in March 2015 (the "**March 2015 IRU**"), both dated 18 March 2015, but executed on 23 March 2015.[15]

61.    Between April 2014 and May 2015, South Sudan (acting through its Ministries and a "Technical Committee for Letter of Credit") selected trading companies, which BSS endorsed and communicated to the Claimant's Juba Branch, for the issuance of LCs under the 2014 Credit Facility. The selected companies submitted LC applications to the Claimant. With the involvement of the Juba Branch, the Claimant issued a number of LCs.[16]

62.    On 10 November 2015, the Claimant, acting through the Juba Branch, and BSS executed a deed (the "**Amendment Deed**"), which amended the March 2015 Guarantee and an annexed list of guaranteed LCs. The Amendment Deed was dated 9 November 2015, but executed on 10 November 2015.[17] Alongside the Amendment Deed, BSS executed, in November 2015, a new irrevocable reimbursement undertaking (the "**November 2015**

---

[12] Cl. Mem., para. 38.
[13] Cl. Mem., para. 37.
[14] Cl. Mem., para. 39
[15] Cl. Mem., para. 39.
[16] Cl. Mem., para. 39, fn. 60.
[17] Cl. Mem., para. 40.

IRU") which replaced the March 2015 IRU. The November 2015 IRU was dated 9 November 2015, but executed on 10 November 2015.[18]

63.    On 3 February 2016, the Claimant and BSS executed a new "deed of irrevocable reimbursement undertaking – exchange rate commitment" (the "**2016 IRU-ERC**") which amended certain provisions of the Amendment Deed, including a new list of LCs for which the Claimant had not been reimbursed, annexed to the 2016 IRU-ERC as Appendix 1.[19] In the 2016 IRU-ERC, BSS acknowledged that the total outstanding amount to be paid by it under the exchange rate commitment was USD 631,548,941.64 (the "**Outstanding**").[20] Between 3 February 2016 and 4 January 2017, BSS made partial repayments under the 2016 IRU-ERC. No further payments were received from BSS thereafter.[21]

### *(2)    The Facility Agreement*

64.    On 5 April 2018, QNB and South Sudan (acting through the Ministry of Finance and Economic Planning (the "**Ministry of Finance**")) and BSS entered into a facility agreement (the "**Facility Agreement**") for the provision by the Claimant of a USD 700 million term loan facility to South Sudan. The Facility Agreement was signed by QNB as the "Arranger," "Original Lender," "Facility Agent" and "Security Agent," and by South Sudan as the "Borrower," and BSS as the "Guarantor."[22]

65.    South Sudan's repayment obligations under the Facility Agreement require it to repay the Loans by the instalments and on the repayment, dates specified in Schedule 8 (Repayment Schedule), and in any event, South Sudan must fully repay any loan granted under the Facility Agreement within fifteen years from the signing of the Facility Agreement.[23] By an Addendum No.1, executed on 30 November 2018, Schedule 8 of the Facility Agreement was amended to provide that the quarterly repayment shall be USD 20 million starting

---

[18] Cl. Mem., para. 41.
[19] Cl. Mem., para. 46.
[20] Cl. Mem., para. 47.
[21] Cl. Mem., para. 49.
[22] Cl. Mem., paras. 50-51.
[23] Cl. Mem., para. 55.

31 March 2019, until outstanding amounts under the Facility Agreement are repaid in full (the "**Amended Repayment Schedule**").[24]

66.    Under Clause 11 of the Facility Agreement, South Sudan further undertook to pay the Claimant a management fee in the amount and manner agreed in a fee letter. South Sudan (acting through the Ministry of Finance) signed this letter on 15 November 2018. The letter recorded the undertaking to pay the amount of USD 300,000 to the Claimant as a management fee (the "**Management Fee**").[25] In addition to repaying all loans in accordance with the Amended Repayment Schedule and paying the Management Fee, the Facility Agreement requires South Sudan to indemnify the Claimant for costs, losses or liabilities incurred in connection with various events.[26]

67.    Obligations of BSS under the Facility Agreement include "to irrevocably and unconditionally […] guarantee[] […] punctual performance by [South Sudan] of all [its] obligations under the [Agreement]" and to "immediately on demand" pay any amount not paid by South Sudan.[27]

### a.    Government Approval of the Facility Agreement

68.    <u>Technical Loan Committee, Office of the President</u>. The Senior Presidential Advisor and Special Envoy, Supervisor of the Technical Loan Committee, Republic of South Sudan (constituted within the Office of the President of South Sudan), in a 6 April 2018 document stated his intention to

> *assure and approve* [the] *Facility Agreement as per the recommendation from the Chairperson of the Technical Loan Committee and do hereby authorize the Ministry of Finance and Planning, Ministry of Petroleum, Ministry of Justice and the Bank of South Sudan to take the necessary measures to present the Facility Agreement to both the Council of Ministers and the Transitional National Legislative Assembly for approval and to*

---

[24] Cl. Mem., para. 56; **C-0001**, Facility Agreement, Clause 6.
[25] Cl. Mem., para. 59.
[26] Cl. Mem., para. 60; **C-0001**, Facility Agreement, Clauses 14, 16.
[27] Cl. Mem., para. 61; **C-0001**, Facility Agreement, Clauses 17.1(a)-(b).

*sign, execute, and deliver the Facility Agreement and all related financial documents that the borrower is part of it* [*sic*].[28]

69.   <u>Council of Ministers</u>. Also, by its Resolution of 6 April 2018, the Council of Ministers of South Sudan resolved to approve the Facility Agreement and Finance Documents, stating that "[t]he Ministry of Cabinet Affairs, Office of the President, Ministry of Justice and Constitutional Affairs, Ministry of Finance and Planning, Ministry of Petroleum and the Bank of South Sudan shall take the necessary measures to implement this resolution after the approval of the Transitional Legislative Assembly."[29]

70.   <u>National Legislative Assembly</u>. By its Resolution of 10 April 2018, the Transitional Legislative Assembly resolved to approve the Facility Agreement and Finance Documents, stating that "[t]he Ministry of Finance and Planning, Ministry of Petroleum and the Bank of South Sudan shall take the necessary measures to implement this resolution and to sign, execute, and deliver the Facility Agreement and all related Finance Documents."[30]

71.   <u>The President</u>. On 27 April 2018, the President of South Sudan (H.E. Salva Kiir Mayardit) issued (i) an instrument ratifying the Facility Agreement and (ii) a Republican Order ratifying the Finance Documents.[31]

**b.    Off-Take Agreement**

72.   Schedule 2 of the Facility Agreement lists five categories of documents as "Conditions Precedent." Among the five documents identified as "Finance Documents" are "the Off-take Assignment Agreement" and "the Off-take Guarantee Assignment Agreement." Included among "Other documents and evidence" is "[a] copy of the Off-take Agreement duly entered into by the parties to it."[32]

---

[28] **C-0052**, Republic of South Sudan, Office of the President, Technical Loan Committee, "Approval of the Facility Agreement," 6 April 2018.

[29] **C-0053**, Republic of South Sudan, Ministry of Cabinet Affairs, Transitional Government of National Unity Resolutions of the Council of Ministers, Resolution No. 23/2018, 6 April 2018.

[30] **C-0054**, Republic of South Sudan, National Legislative Assembly, Resolution No. 20/2018, 10 April 2018.

[31] **C-0055**, Republic of South Sudan, The President, "Instrument of Ratification of the Republic of South Sudan of the Master Facility Agreement between the Government of the Republic of South Sudan and Qatar National Bank (Q.P.S.C.)," 27 April 2018. *See also* **C-0056**, Republic of South Sudan, The President, Republican Order No. 3/2018, 27 April 2018 (relating to the approval of the "Finance Documents" (as defined in Clause 1.1 of the Facility Agreement)).

[32] **C-0001**, Facility Agreement, Schedule 2, Secs. 2(c)-(d), 5(a).

73. The Facility Agreement defines "Off-take Agreement" as "the agreement for the purchase and sale of crude oil between the Republic of South Sudan (acting through the Ministry of Petroleum and Mining) as seller and the Off-taker as buyer of the crude oil."[33] "Off-take Guarantee Assignment Agreement" is defined as "an assignment agreement dated on or about the date of this Agreement between, among other, the Republic of South Sudan (acting through the Ministry of Petroleum) and the Security Agreement in respect of any guarantee entered into by the Off-taker in respect of its obligations under the Off-take Agreement."[34] "Off-take Proceeds Assignment Agreement" is defined as "an assignment agreement dated on or about the date of this Agreement between, among others, the Republic of South Sudan (acting through the Ministry of Petroleum and Mining) and the Security Agent in relation to the Off-take Agreement."[35]

74. Thus, among the requirements for the provision of a loan under the Facility Agreement was South Sudan (acting through the Ministry of Petroleum) entering into (i) an "Off-take Agreement" with an "Off-taker" approved by the Claimant; and into (ii) an "Off-take Assignment Agreement" with QNB.[36] To draw down funds on the Facility Agreement, South Sudan was required to submit a "Utilisation Request."[37]

75. The Supervisor of the Technical Loan Committee wrote to South Sudan's Minister of Petroleum on 12 June 2018, directing the Minister to sign an oil "Supply and Purchase Agreement" and "award a QNB-designated off-taker, the earliest available Oil Cargo before the end of this year [i.e., 2018]."[38] Further, sometime in 2018, South Sudan, acting through the Ministry of Petroleum, entered into an assignment agreement with the Claimant, whereby it agreed to assign "absolutely, subject to a proviso for re-assignment

---

[33] **C-0001**, Facility Agreement, p. 7.
[34] **C-0001**, Facility Agreement, p. 7.
[35] **C-0001**, Facility Agreement, p. 8.
[36] **C-0001**, Facility Agreement, Schedule 2, Secs. 1(f), 2(c), 5(a), read in conjunction with Clause 1.1 (definitions of "Off-taker," "Off-take Agreement" and "Off-take Proceeds Assignment Agreement"). The purpose of the Off-take arrangement was to ensure that South Sudan's revenues deriving from oil sales, which the Facility Agreement required to be not less than 600,000 barrels of oil per quarter, would be used to secure South Sudan's repayment obligations under the Facility Agreement: Cl. Mem., para. 66.
[37] **C-0001**, Facility Agreement, Clause 5.1.
[38] **C-0105**, Letter from the Technical Loan Committee to the Minister of Petroleum, 12 June 2018.

on redemption, all of its rights in respect of each Assigned Contract [i.e., an Off-take Agreement and a Payment Undertaking in favor of the Claimant]."[39]

## B.    ALLEGED BREACH(ES) OF THE FACILITY AGREEMENT

76.    In the following paragraphs, the Tribunal recalls the facts of the developments surrounding the Claimant's allegation that the Facility Agreement has been breached, which is rejected by the Respondents. These are facts contained in the Parties' agreed chronology of events.

77.    On 30 November 2018, QNB, South Sudan (acting through the Ministry of Finance) and BSS signed Addendum No. 1 to the Facility Agreement to amend the Repayment Schedule set out in Schedule 8 of the Facility Agreement. Thereafter, on 21 January 2019, South Sudan submitted a Utilisation Request to QNB for a drawdown of USD 700 million. On 18 February 2019, QNB credited to South Sudan the sum of USD659,814,830.07, with a "value date" of 11 February 2019.[40]

78.    QNB did not receive payment as scheduled under the revised repayment schedule, starting from the first instalment on 31 March 2019. On 16 July 2019, QNB wrote to South Sudan (the Ministry of Finance and Planning), copying BSS, declaring a breach of the Facility Agreement and demanding immediate repayment of all sums due under the Agreement.[41] Given its relevance to certain arguments of the Parties, the Tribunal considers it useful to set out the body of the letter:

> ***Re: The Republic of South Sudan (acting through the Ministry of Finance and Planning) (the "Borrower") - USD700,000,000 Facility Agreement provided by Qatar National Bank (Q.P.S.C.) as amended by addendum no1. In November 2018 (the "Agreement").***
>
> *We refer to the Agreement and in particular to your utilization thereunder on 20 December 2018. Terms defined in the Agreement shall have the same meaning herein.*
>
> *We would like to highlight that:*

---

[39] **C-0106**, Assignment Agreement between the Republic of South Sudan (acting through the Ministry of Petroleum) and Qatar National Bank (Q.P.S.C.), 2018, Clause 2.2.
[40] Combined Chronology of Events, p. 14.
[41] Combined Chronology of Events, p. 15.

> *-The current outstanding as at 15 July 2019 is USD684,381,855.06 (the '**Total Due Amount**').*
>
> *-The first repayment of USD20 million was due on 31 March 2019 and the second repayment of USD20m was due on 30 June 2019 and neither have been paid.*
>
> *-The Offtake Agreement providing for the sale and purchase of at least 600,000 barrels of oil per quarter has still not been signed.*
>
> *Accordingly, the Borrower is currently in default under the Agreement and the Total Due Amount is therefore declared to be due. **We hereby demand <u>the immediate repayment of the Total Due Amount</u>** and reserve our rights, without further notice, to exercise any and all rights, remedies and powers (including taking legal proceedings) pursuant to the terms of this Agreement and the Finance Documents as defined therein.*[42]

79. This was followed by a letter dated 10 September 2019 demanding repayment of the outstanding first two instalments and the third falling due on 30 September 2019.[43] Next was a letter dated 9 October 2019, worded similarly to the 16 July letter but amended to include reference to the instalment that fell due on 30 September but remained unpaid.[44] A letter of 26 January 2020 was addressed to BSS, copying the Minister of Finance and Minister of Justice, again referring to unpaid instalments and the yet to be implemented off-take agreement, and demanding from BSS, as Guarantor, "the immediate repayment of the Total Due Amount" (not only the missed instalments).[45]

80. QNB sent another demand letter dated 13 May 2020 to South Sudan's Minister of Finance and to the Governor of BSS, copying South Sudan's Minister of Justice, noting that none of the first, second, third, fourth or fifth loan repayments had been made by the due date, that the off-take agreement had still not been signed, and demanding immediate repayment

---

[42] **C-0007**, Letter from QNB to the Ministry of Finance and Planning (with BSS in copy), 16 July 2019 [emphasis original].

[43] **C-0008**, Letter from QNB to the Ministry of Finance and Planning, 10 September 2019.

[44] **C-0009**, Letter from QNB to the Ministry of Finance and Planning (with BSS in copy), 9 October 2019.

[45] **C-0010**, Letter from QNB to BSS (with the Ministry of Finance and Planning and the Ministry of Justice in copy), 26 January 2020.

of the Total Due Amount by 28 May 2020. The letter was also said to be a "Dispute Notice for the purposes of the Clause 40.2 of the [Facility] Agreement."[46]

## C.    PARTIAL PAYMENT

81.    On 3 July 2020, South Sudan (acting through the Ministry of Petroleum) entered into an off-take agreement (the "**Off-take Agreement**") with Euro American International Energy LLC ("**Euro American**").[47] The Off-take Agreement provided for shipments of oil cargos of 600,000 barrels each to be made according to the following schedule: "One cargo to be delivered during September 2020 and December 2020. Thereafter, one cargo to be delivered every six month[s]for [the] duration of 15 years starting June 2021."[48]

82.    On 25 November 2020, Euro American made a payment of EUR 14,261,744.97 into a bank account held by QNB in the names of BSS and South Sudan's Ministry of Petroleum. QNB converted the amount into US Dollars (USD 17,135,487) and applied it to the Loan (with 3 December 2020 as the value date).[49]

83.    Euro American made another payment of EUR 19,065,460.85 on 22 April 2021, which QNB converted to US Dollars (USD 22,878,552) and applied to the Loan (with 27 April 2021 as the value date).[50]

84.    On 19 April 2022, Euro American made a payment of USD 21,104,477.20 into the BSS and South Sudan account at QNB and QNB applied it to the Loan (with 19 April 2022 as the value date).[51] Similarly, on 8 May 2022, Euro American made a payment of

---

[46] **C-0011**, Letter from QNB to the Ministry of Finance and Planning and BSS (with the Ministry of Justice in copy), 13 May 2020. On 22 September 2020, QNB filed its Request for Arbitration with ICSID, which was registered by the Centre on 7 October 2020, the date on which the proceeding is deemed to have been instituted under ICSID Institution Rule 6.
[47] Combined Chronology of Events, p. 17.
[48] **C-0108**, Sale and Purchase Agreement between the Government of the Republic of South Sudan (Ministry of Petroleum) and Euro American International Energy LLC dated 3 July 2020, p. 1. On 24 July 2020, the Governor of BSS wrote to QNB, copying the Ministers of Finance and of Petroleum, attaching a copy of the Off-take Agreement and referring, *inter alia*, to "the various 'guarantors' of the Government of South Sudan [i.e., BSS]" having worked collectively to "ensure the documentations are put together to meet our national obligation towards the 'Facility Agreement:'" **C-0122**.
[49] Combined Chronology of Events, p. 18.
[50] Combined Chronology of Events, pp. 18-19.
[51] Combined Chronology of Events, p. 19.

USD 10,000,000 into the same bank account, which QNB applied to the Loan (with 8 May 2022 as the value date).[52]

## VI.    THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF

85.    In its Reply, the Claimant requests that the Tribunal:

> a) *Declare that the Tribunal has jurisdiction over the dispute;*
>
> b) *Declare that, for the reasons set out in the Claimant's Memorial and Reply, the Respondents have breached the Facility Agreement;*
>
> c) *Award the Claimant compensation in an amount which – as of 18 August 2022 – totals no less than USD 824,952,613 (inclusive of pre-award interest up to 18 August 2022);*
>
> d) *Award the Claimant pre-award interest for the period from 19 August 2022 to the date of the Award and post-award interest to the date of payment, both at the rate calculated in accordance with clause 8.3 of the Facility Agreement;*
>
> e) *Order the Republic of South Sudan to pay the Claimant the amounts under letters c) and d) above;*
>
> f) *Order the Bank of South Sudan to pay the Claimant an amount which is equivalent to any sums the Republic of South Sudan is ordered to pay to the Claimant;*
>
> g) *Award the Claimant the costs associated with these proceedings, including all legal and arbitration costs as well as ICSID and Tribunal costs and expenses, and order the Respondents to pay such amounts to the Claimant; and*
>
> h) *Award the Claimant such other and further relief as the Tribunal deems appropriate in the circumstances.*
>
> *For the avoidance of doubt, it is intended that payment by one of the Respondents of any amount that they are ordered to pay pursuant to ¶¶ 234.c) to 234.g) above shall reduce the liability of the other Respondent by the amount so paid.[53]*

---

[52] Combined Chronology of Events, p. 19. The Tribunal notes that it is possible that payments to QNB have continued since the last payment recorded in the Parties' Combined Chronology of Events dated 18 January 2023 and submitted to the Tribunal at the time of the Hearing.

[53] Cl. Mem., paras. 234-235.

86.   In its Written Response to the Tribunal's Questions dated 26 January 2023, the Claimant specifies its request for relief to be that the Tribunal:

a)   *Declares that it has jurisdiction over the dispute, including in respect of both Respondents;*

b)   *Determines that the Respondents have breached the Facility Agreement;*

c)   *Awards the Claimant compensation in the form of damages of:*

   i.   *Principal of USD 659,814,830, plus*

   ii.   *Accrued interest up to the date of the Award of: [to be calculated by FTI on the request of the Tribunal with an indication of the date of the Award], plus*

   iii.   *Management Fee of USD 300,000, minus*

   iv.   *Repayments of USD 71,118,516, [plus any additional repayments evidenced to have been received by the Claimant prior to the issuance of the Award], plus*

   v.   *Post-Award interest of 6% + 2% + USD 3-month LIBOR for interest periods, as applicable, up to the payment of the Award.*

d)   *Orders the Respondents, on a joint and several basis, to pay the Claimant the amounts under paragraph c) above.*

e)   *Awards costs, including all legal and arbitration costs as well as ICSID and Tribunal costs and expenses in the amount of [to be determined following submissions on costs], and orders the Respondents to pay such amount to the Claimant on a joint and several basis.*[54]

87.   In their Rejoinder, the Respondents request that the Tribunal:

(a)   *Declare that the Tribunal and the Centre lacks [sic] jurisdiction over the dispute;*

(b)   *Declare that, for the reasons set out in this Rejoinder, the Respondent [sic] is not in breach of the Facility Agreement;*

---

[54] Cl. WR.

> (c) *Declare that, the Claimant is not entitled to any compensation whatsoever for the reason that there is in existence, an Off-taker Agreement between the parties that is being implemented; and*
>
> (d) *Award the Respondents the costs associated with these proceedings, including all legal and arbitration costs as well as ICSID and Tribunal costs and any expenses.*[55]

88.    In their Written Response to the Tribunal's Questions dated February 2, 2023, the Respondents specify their request for relief:

> *The final orders of the Tribunal are as follows:*
>
> a) *The Center* [sic] *and the Tribunal has* [sic] *NO jurisdiction to here* [sic] *and determine the dispute herein.*
>
> b) *Even if the Tribunal had the requisite jurisdiction to hear and determine the dispute, the Center* [sic] *and the Tribunal has* [sic] *NO jurisdiction over the Bank of South Sudan.*
>
> c) *The Respondents are awarded the costs amounting to **USD 3,819,544** associated with these proceedings as submitted in the cost submissions, together with all ICSID and Tribunal costs and expenses incurred by the Respondents.*
>
> **In the event the Tribunal finds it has jurisdiction.**
>
> d) *The Respondent* [sic] *is **NOT** in breach of the Facility Agreement.*
>
> e) *The Claimant is not entitled to any compensation whatsoever save for the performance of the Facility Agreement dated 5th April, 2018 as per the repayment schedule outlined in Addendum No. 1 of the Facility Agreement and the Off-taker Agreement between the parties that is being implemented; and;*
>
> f) *No orders as to costs.*[56]

---

[55] Resp. Rej., para. 103.
[56] Resp. WR, para. 2.2 [emphasis original].

## VII.    JURISDICTION

89.    The Respondents object to the jurisdiction of the Centre and of the Tribunal on the grounds that the dispute does not arise directly out of a qualifying "investment." They also argue that the Second Respondent, BSS, is not subject to ICSID jurisdiction, as the requirements under Article 25 of the ICSID Convention for non-State parties have not been met.

90.    The objections were first raised in the application of the Respondents for bifurcation of the proceedings, in which they stated:

> *This dispute does not arise "directly out of an investment" as required by Article 25 of the ICSID Convention. At issue here is an ordinary commercial loan that does not have the characteristics of an investment within the meaning of Article 25. It is not 'linked with a process of creation of value,' it does not 'contribute to an economic venture consisting of an investment,' and it does not involve an investment or operational risk as opposed to ordinary commercial or business risk.*[57]

> [...]

> *The Second Respondent is not subject to ICSID jurisdiction. ICSID has no jurisdiction in matters brought against an entity other than a Contracting State unless the State designated to the Centre that entity as a constituent subdivision or agency and approved the entity's consent to ICSID arbitration. In this case, South Sudan has neither designated the Second Respondent nor approved the Second Respondent's consent to ICSID arbitration.*[58] [footnotes omitted]

91.    These objections require interpretation of Article 25 of the ICSID Convention, as well as the instrument of consent to arbitration in this case, namely the Facility Agreement, for which the Tribunal has applied the rules of interpretation laid down in the Vienna Convention on the Law of Treaties (1969) ("**VCLT**")[59] and English law, respectively.[60]

---

[57] Resp. Request for Bifurcation, p. 1.
[58] Resp. Request for Bifurcation, p. 3.
[59] **CL-0076**, Vienna Convention on the Law of Treaties (1969), 1155 U.N.T.S. 331. The canons of interpretation under Articles 31 and 32 of the Vienna Convention on the Law of Treaties can be summarised as: natural and ordinary meaning, context, object and purpose, and, where necessary to resolve ambiguity, reference to preparatory documents – all under good faith.
[60] As provided under Clauses 39 and 40 of the Facility Agreement, English law is the governing law of the Agreement and the applicable law to any dispute arising therefrom.

92.    The Tribunal, having carefully considered the arguments of the Parties, as well as relevant jurisprudence, has found that the Respondents' objections to jurisdiction are without merit.

93.    In the sections that follow, the Tribunal recounts the arguments of the Parties concerning the Respondents' objections. These are followed by the Tribunal's findings in respect to each objection.

A.    DOES THE DISPUTE ARISE DIRECTLY OUT OF AN INVESTMENT AS REQUIRED BY ARTICLE 25(1) OF THE ICSID CONVENTION?

94.    The Respondents assert that the dispute before this Tribunal does not arise directly out of an investment as required by Article 25(1) of the Convention. They submit that the object of the dispute is the Facility Agreement, which is no more than a loan instrument. According to the Respondents,

> the subject loan does not satisfy the elements set out in the '[S]alini criteria.' Consequently, the dispute does NOT arise out of an investment and for this reason alone, the Centre and the Tribunal does not [sic] have Jurisdiction to arbitrate over the dispute.[61]

95.    The Claimant counters that the dispute arises out of an investment, arguing, first, that the different activities of QNB in South Sudan together constitute investment; and, second, that even if taken alone the Facility Agreement qualifies as an investment. According to the Claimant,

> [T]he Facility Agreement was part of a long-standing economic relationship and investment by QNB in South Sudan. This investment not only included hundreds of millions of USD in credit and loans to support the economy, but also involved the establishment of the Juba Branch. […] Between its establishment in 2011 and 2016, QNB injected around USD 30 million worth of capital into the Juba Branch in South Sudan. The Juba Branch also leased premises and employed a significant number of personnel based in South Sudan.[62]

96.    In the following sections, the Tribunal first determines the criteria for establishing whether an investment exists for purposes of the ICSID Convention. Next the Tribunal applies the

---

[61] Resp. C-Mem., para. 98.
[62] Cl. Mem., para. 93.

criteria to the facts of this case to respond to the question as it applies to this case and the dispute between the Parties.

### (1) Criteria for Defining Investment – Effect of the ICSID Arbitration Clause of the Facility Agreement

97. The Facility Agreement provides in Clause 40.3, in relevant part, as follows:

> (a) *Subject to paragraph (b) below, any dispute, claim, difference or controversy arising out of, relating to or having any connection with this Agreement, including any dispute as to its existence, validity, interpretation, performance, breach or termination or the consequences of its nullity and any dispute relating to any non-contractual obligations arising out of or in connection with it (for the purpose of this Clause 40, a* **Dispute***), shall be referred to and finally resolved by arbitration under the Arbitration Rules of the International Centre for Settlement of Investment Disputes (***ICSID***) by three arbitrators appointed in accordance with such Arbitration Rules.*

> (b) *The Parties hereby agree that if for any reason whatsoever ICSID or any Tribunal appointed pursuant to paragraph (a) above should decline to accept jurisdiction to hear any Dispute referred to them, then such Dispute shall be finally settled by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this Clause 40 if this paragraph (b) applies.*[63]

98. On the one hand, the Respondents generally argue that the ICSID arbitration provision in Clause 40.3(a) above is of little import in determining whether an investment exists, since parties cannot by agreement confer on the Centre jurisdiction that it does not have under the Convention.[64] The Claimant, while not disputing that parties cannot confer jurisdiction on the Centre by their agreement beyond the limits set in the Convention, on the other hand, argues that the contractual provision is and must be a material fact in any consideration of ICSID jurisdiction in this case.[65]

---

[63] **C-0001**, Facility Agreement, Clauses 40.3(a)-(b).
[64] Resp. C-Mem., paras. 28, 41-46.
[65] Cl. Request for Arbitration, para. 33; Cl. Reply, para. 88.

99.     Thus, with neither Party arguing that the ICSID arbitration clause alone is conclusive of the inquiry, the main issue of contention between them in this regard is the extent to which the consent of the Parties in Clause 40.3(a) of the Facility Agreement can be taken into account in determining whether an investment exists.

100.    The Tribunal agrees with the Parties that the agreement of parties alone is not enough to determine what qualifies as 'investment' for the purposes of Article 25(1) of the ICSID Convention. The Tribunal notes that jurisprudence of ICSID cases abounds which affirms this position.[66]

101.    Regarding the possible impact on the analysis of contractual provisions of parties, the Tribunal considers that such provisions could serve as an indication of the intention of the contracting parties from which necessary inferences can be drawn. If on an objective assessment, it is found that the subject matter of the dispute qualifies as an investment under Article 25 of the ICSID Convention, such a finding could be supported by the agreement between the disputing parties in that regard. If, on the other hand, a tribunal were to conclude that the subject matter of a dispute does not qualify as an investment under the ICSID Convention, such a finding would not be changed by the fact that the parties described or identified it as an investment in their contract.

102.    In the present case, the Tribunal notes that while the Respondents have advanced arguments that Clause 40.3(a) was not intended to apply to the Second Respondent, there is no controversy that the Clause is otherwise in any way defective. The Tribunal, thus, accepts Clause 40.3(a) of the Facility Agreement as proof that the Parties considered their transaction to be an investment which is capable of being the subject of a dispute before the Centre. This is regardless of whether or not the provision was meant, as the Respondents posit, to apply to only two out of the three parties to the Agreement.

---

[66] *See, for example*, **RL-0002**, *Joy Mining Machinery Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award, 6 August 2004 ("***Joy Mining v. Egypt***"), paras. 49-50; **RL-0003**, *Mr. Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on Annulment, 1 November 2006 ("***Mitchell v. DRC***"), paras. 25, 31; **RL-0001**, *Standard Chartered Bank (Hong Kong) Limited v. United Republic of Tanzania*, ICSID Case No. ARB/15/41, Award, 11 October 2019 ("***SCB v. Tanzania***"), para. 94.

103.    The Tribunal must, first, determine whether on an objective assessment, the present dispute arises out of an investment for purposes of Article 25(1) of the ICSID Convention, considering the object and purpose of the Convention.

104.    Whether or not, in the analysis, the Tribunal should draw any inferences from Clause 40.3(a), or what weight, if any, should be attached to it, will depend on what issues the Tribunal encounters in its objective analysis of the existence or not of an investment. Recourse to the Parties' reference to ICSID arbitration could be relevant in circumstances in which there is some uncertainty about the existence or not of an investment. As explained below, the Tribunal does not consider this to be one such case.

### *(2)    Criteria for Defining Investment – the Salini Test*

105.    The Parties are generally in agreement that an objective assessment is required to determine whether there is an investment for purposes of the ICSID Convention. The Claimant states:

> *As investment tribunals have noted, the ICSID Convention intentionally does not define the meaning of "investment" for the purposes of Article 25. As a result, arbitral tribunals have taken a pragmatic approach when considering the meaning of investment. For example, the tribunal in Biwater v Tanzania, held that:*
>
>> *"[...] a more flexible and pragmatic approach to the meaning of 'investment' is appropriate, which takes into account the features identified in Salini, but along with all the circumstances of the case, including the nature of the instrument containing the relevant consent to ICSID."*[67]

On their part, the Respondents state that the term "investment" not being defined in the Convention, the Tribunal is invited to interpret the term in a manner so as to give effect to the objects and purpose of the Convention.[68]

---

[67] Cl. Mem., para. 92; **CL-0044**, *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 ("***Biwater v. Tanzania***"), para. 316.
[68] Resp. C-Mem., para. 37.

106. For such objective assessment, the Parties acknowledge the criteria that have been applied by different ICSID tribunals;[69] most notably, as identified in the decision on jurisdiction in *Salini v. Morocco*, which exercise has over time developed into "what is now referred to as '*Salini test*' or '*Salini Criteria*'."[70] Both sides, indeed, present arguments based on the application of those criteria to the facts of this case.

107. The *Salini* tribunal, referring to a scholarly work of Emmanuel Gaillard, stated that

> *investment infers: contributions, a certain duration of performance of the contract and a participation in the risks of the transaction* […] *In reading the Convention's preamble, one may add the contribution to the economic development of the host State of the investment as an additional condition.*[71]

108. Thus, in applying the *Salini* test to determine whether an investment exists, tribunals have considered whether there was contribution by the alleged investor, if the enterprise in question was for some duration, if the enterprise involved some risk on the part of the alleged investor, and in some cases, whether the alleged investment contributed to the economic development of the host State.

109. The Tribunal agrees with previous tribunals, and indeed the Parties in this case, that the *Salini* test is not prescriptive.[72] For example, in *CSOB v. Slovakia* the tribunal noted that

---

[69] *See, for example*, Resp. C-Mem., para. 56, referring to **RL-0005**, *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015 ("*Poštová banka v. Greece*"). *See also* Cl. Reply, paras. 103 *et seq.*

[70] Resp. Rej., paras. 57-58.

[71] **RL-0006**, *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction ("*Salini v. Morocco*"), para. 52, citing the commentary by E. Gaillard, in Journal du droit international (1999), pp. 278 *et seq.*, citing, in turn, *Alcoa Minerals of Jamaica, Inc. v. Jamaica*, ICSID Case No. ARB/74/2, Decision on Jurisdiction, 6 July 1975, as well as several other authors.

[72] *See, for example*, Cl. Reply, paras. 103 *et seq.* The Claimant cites several authorities in this regard, including **RL-0001**, *SCB v. Tanzania*, para. 200; **CL-0043**, *M.C.I. Power Group L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award, 31 July 2007 ("*M.C.I. v. Ecuador*"), para. 165; **CL-0045**, *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010 ("*Inmaris v. Ukraine*"), para. 129; **CL-0040**, *Abaclat and others v. Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, 4 August 2011 ("*Abaclat v. Argentina*"), para. 364; **CL-0039**, *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 ("*Ambiente Ufficio v. Argentina*"), para. 479; **CL-0046**, *Philip Morris Brand Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction, 2 July 2013 ("*Philip Morris v. Uruguay*"), para. 206; **CL-0061**, *Mabco Constructions SA v. Republic of Kosovo*, ICSID Case No. ARB/17/25, Decision on Jurisdiction, 30 October 2020 ("*Mabco v. Kosovo*"), paras. 296-297; **CL-0044**, *Biwater v. Tanzania*, paras. 312-313.

the elements of risk and returns on investment, "while they tend as a rule to be present in most investments, are not a formal prerequisite for the finding that a transaction constitutes an investment as that concept is understood under the Convention."[73] Similarly, in *MNSS v. Montenegro*, the tribunal stated that "the elements of the *Salini* test need to be considered flexibly and as a whole in the context of the specific facts of an investment operation."[74]

110.    Indeed, in the present case, the Respondents "contend with the Jurisdiction of the Centre on three (3) [of the four] grounds under the '*Salini Criteria*' being: *investor's participation in the risks of the transaction; a substantial contribution by the investor; and a significant contribution to the host state's economic development*."[75] They do not address the element of a "certain duration of time" in written pleadings and only mentioned it briefly at the Hearing.[76]

111.    In the following sections, the Tribunal first sets out the main arguments of the Parties on the different elements of the *Salini* test as they apply to this case. Although the arguments have been reproduced in some detail, the following sections are not exhaustive of the positions advanced by the Parties, which have all been considered by the Tribunal. It is only the arguments that are most relevant for context in the Tribunal's analysis that are included. The Tribunal considers it necessary to reiterate this fact, which in any event applies to the entire Decision, given the details in the section, relative to other parts of the Decision.

### a.    Investor's Participation in the Risks of the Transaction

112.    The Respondents argue that the risks attaching to the Facility Agreement were ordinary commercial risks that come with an ordinary loan agreement and not an investment risk. They state that for an investment risk to exist, returns on investment are not certain and are dependent on the success or failure of the venture, or of any projects in which the funds

---

[73] **CL-0003**, *Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction, 24 May 1999 ("*CSOB v. Slovak Republic*"), para. 90. *See also* **CL-0039**, *Ambiente Ufficio v. Argentina*, para. 479.

[74] **RL-0012**, *MNSS B.V. and Recupero Credito Acciaio N.V v. Montenegro*, ICSID Case No. ARB(AF)/12/8, Award, 4 May 2016 ("***MNSS v. Montenegro***"), para. 189.

[75] Resp. C-Mem., para. 62.

[76] Tr. Day 3, 73:8-14.

might be utilized. Such risk does not exist under the Facility Agreement, as there is an obligation on the borrower to repay on specified dates in the repayment schedule. Repayment is further assured by the Off-take arrangement.

113.    On its part, QNB argues that commercial risk and/or political risk are sufficient to satisfy the risk element of the *Salini* test, but in addition, the Claimant also faced operational risks. It cites to the risks involved in setting up operations in 2011 following the country gaining independence and providing hundreds of millions of US Dollars in credit over many years, all in the context of South Sudan's challenging operating, political, security and economic situation. This included strained neighbour relations with Sudan in connection with border and oil transit fee disputes, growing scarcity of foreign currency, and uncertainties surrounding the Off-take arrangement. The risk element must be understood in the broader context of the ICSID Convention, and the risks faced by the Claimant should be considered holistically and not in isolation as argued by the Respondents.

### (i)    The Respondents' Position

114.    The Respondents argue that while the different criteria of the *Salini* test must not always be present for there to be an investment under the ICSID Convention, the element of risk is one that cannot be dispensed with and must always be present. They state:

> *We concede as Respondents that various tribunals have applied this test with modifications at various times. However, the centrality of the element of investment risk involved has stood through and through. No matter which decision, the centrality of the issue of investment risk has stood.*[77]

115.    According to the Respondents, one of the key elements that differentiate between a commercial transaction and an investment is "the nature of risk, and participation of the investor in such transaction."[78] They state that in the present case, the dispute arises out of

---

[77] Tr. Day 3, 69:4-9. The Respondents cite, in support of this contention, authorities including **RL-0007**, *Raymond Charles Eyre and Montrose Developments (Private) Limited v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/16/25, Award, 5 March 2020 ("***Eyre v. Sri Lanka***"), para. 293; **CL-0068**, E. Gaillard, "Review of Arbitral Awards" in 1 Journal du Droit International 273 (1999) (excerpt), pp. 292-293; **RL-0009**, *Romak S.A. v. Republic of Uzbekistan*, PCA Case No. AA280, Award, 26 November 2009 ("***Romak v. Uzbekistan***"), paras. 229-230: *see* Tr. Day 3, 69:10–71:9.

[78] Tr. Day 1, 121:22-23.

a normal commercial loan agreement and lacks the type of risk that is required for an investment.[79] The arguments advanced in support of their position include the following points.

a.    All transactions are associated with some form/element of risk, but not all forms of risks qualify a transaction as an investment since risk is inherent in life. Some risks are purely commercial and form part of the risk of doing business generally and are not considered when distinguishing an investment from a commercial transaction.[80]

b.    The transaction in the present case "only involves the ordinary commercial or business risk" and not "the necessary element of investment or operational risk."[81]

c.    An "'investment risk' entails a different kind of *alea*, a situation in which the investor ***cannot be sure of a return on his investment, and may not know the amount he will end up spending, even if all relevant counterparties discharge their contractual obligations***" (emphasis original).[82] The tribunal in *Romak v. Uzbekistan* found that the risk assumed by the claimant in that case "was circumscribed to the possible non-payment of the wheat delivery, which is an ordinary commercial or business risk assumed by all those who enter into a contractual relationship and thus did not involve the risk normally associated with an investment.[83]

d.    ICSID cases in which tribunals distinguish between an ordinary commercial risk and investment risk[84] signify "a consistent thread to the effect that for a transaction to qualify as an investment, the investor must assume an investment risk which has

---

[79] Resp. C-Mem., paras. 78, 80. In their Request for Bifurcation, the Respondents acknowledge that "some tribunals have found that certain types of loans might qualify as investments:" *see* Resp. Request for Bifurcation, para. 2, first bullet.

[80] Resp. C-Mem., paras. 65-66, citing **RL-0005**, *Poštová banka v. Greece*, paras. 367, 369-370; **RL-0009**, *Romak v. Uzbekistan*, para. 229.

[81] Resp. C-Mem., para. 63.

[82] Resp. C-Mem., para. 67.

[83] Resp. C-Mem., para. 67.

[84] Resp. C-Mem., paras. 68-70, referring to **RL-0002**, *Joy Mining v. Egypt*, para. 57; **RL-0010**, *Nova Scotia Power Incorporated v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/1, 30 April 2014, Award (excerpt) ("***Nova Scotia Power v. Venezuela***"), para. 105; **RL-0011**, *Global Trading Resource Corp. and Clobex International, Inc. v. Ukraine*, ICSID Case No. ARB/09/11, Award, 1 December 2010, paras. 55-57.

been distinguished from the ordinary risk that is associated with running a business."[85]

e.  Investment risk has been characterized as one in which the returns of a transaction are not ascertainable but are rather dependent on the success or failure of the said venture. However, under the Facility Agreement, the returns and the repayment dates are certain, and the only risk involved is that of non-payment—an ordinary risk which any bank involved in the business of lending money encounters.[86]

f.  In the present case, the returns of the transaction are "derived from [the] Respondents' performance of the Facility Agreement through repayment of the loan. The repayment is not dependent on any event/ occurrence. Neither is it dependent on the success or failure of any project that the funds might be utilized in."[87] The Borrower is under an obligation to repay the loans by the instalments and on the repayment dates specified in the repayment schedule.[88] There is also an option of an "off-take Assignment Agreement" under which the First Respondent could "repay the loan by way of quarterly shipment of 600,000 barrels of crude oil."[89] Even under the subsequently executed Addendum to the Facility Agreement, "the initial repayment schedule was substituted with another repayment schedule which equally stated the repayment installment and the repayment dates with certainty."[90]

### (ii)  The Claimant's Position

116.  According to the Claimant, the risk involved in QNB's investment in South Sudan—through setting up operations in 2011 following the country gaining independence and providing hundreds of millions of US Dollars in credit over many years, all in the context of South Sudan's challenging operating, political, security and economic situation—is readily apparent. In order to satisfy the element of risk, tribunals have generally analysed

---

[85] Resp. C-Mem., para. 71.
[86] Resp. C-Mem., paras. 72, 76.
[87] Resp. C-Mem., para. 73.
[88] Resp. C-Mem., para. 74, referring to **C-0001**, Facility Agreement, Schedule 8.
[89] Resp. C-Mem., para. 75.
[90] Resp. C-Mem., para. 77. *See also* Tr. Day 1, 116:24–117:2.

investments holistically and have considered that, depending on the circumstances, different types of risk would be sufficient.[91]

117.    The risk element, the Claimant argues, must be understood in the broader context of the ICSID Convention. As noted in *L.E.S.I. v. Algeria*:

> With respect to risk: this requirement is also understandable, in light of the objectives of the Convention. The idea was, indeed, to offer a particular guarantee of jurisdiction to firms seeking to invest in another country. It would be too restrictive to limit its application to contracts containing a risk element, as in the case of insurance contracts, or more broadly for certain loan contracts. The risk in question can in fact apply to any contract that implies increased risk for the contracting party.[92]

118.    The Claimant observes that in *Alpha v. Ukraine*, the tribunal agreed with the claimant that

> [w]hile not critical to the Tribunal's finding that Alpha's investments were subject to risk, events subsequent to the initial investment proved the dangers facing the project. The continual renegotiation of the terms of the deal, including the 2000 suspension of the monthly payments due under the 1998 JAA and the reinvestment in 2003, substantiate the point.
>
> [...]
>
> Many contracts, including typical loan agreements, have fixed payment terms. Indeed, as explained above, loan agreements can be a form of investment. The fact that a party is owed a fixed amount by the terms of a contract does not mean that all risk for that party has been eliminated, as the risk of default may remain at elevated levels. Removing all fixed payment contracts from the scope of investment protection would lead to a substantial loophole in the

---

[91] Cl. Reply, para. 130.

[92] Cl. Reply, para. 132, citing **CL-0064**, *Consorzio Groupement L.E.S.I.-DIPENTA v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/03/8, Award, 10 January 2005, Sec. II, para. 14(iii). *See also* Cl. Reply, para. 133, fn. 252, citing **CL-0037**, *OKO Pankki Oyj, VTB Bank (Deutschland) AG and Sampo Bank Plc v. Republic of Estonia*, ICSID Case No. ARB/04/6, Award, 19 November 2007, para. 206; **CL-0003**, *CSOB v. Slovak Republic*, paras. 90-91; **CL-0065**, *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award, 31 March 2011, para. 152; **CL-0066**, *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007, para. 117; **CL-0063**, *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012 ("***Deutsch Bank v. Sri Lanka***"), para. 301; **RL-0010**, *Nova Scotia Power v. Venezuela*, para. 84.

*ICSID Convention, and Respondent has provided no convincing evidence that this was the intent of the drafters.*[93]

119.    According to the Claimant, the authorities relied on by the Respondents demonstrate that commercial risk and/or political risk are sufficient to satisfy the risk element. For example, in *Nova Scotia Power v. Venezuela*, the tribunal noted how commercial and political risk could satisfy this element. The tribunal found that "[h]ad NSPI established lasting infrastructure in Venezuela that was at the mercy of the government, political risk may be more determinative."[94]

120.    In relation to political risk, the Claimant argues that the South Sudan Business Plan prepared by QNB in relation to the Juba Branch identified, *inter alia*, the following threats:

    a.    strained neighbour relations with Sudan in connection with border and oil transit fee disputes;

    b.    growing scarcity of foreign currency as oil production and export is affected by political disputes with Sudan; and

    c.    stagnating foreign investments pending the country political stabilization.[95]

121.    An example of political risk faced by the Claimant's investment, it notes, is the halting in 2012 of oil production by South Sudan when a dispute arose with Sudan over oil transit fees. This led to a warning by a senior World Bank official in a confidential document that "South Sudan's economy could go bankrupt as early as July due to the depletion of its foreign currency reserves."[96] Another example of political risk is the civil war that broke out in December 2013 in South Sudan which, in turn, had repercussions on South Sudan's monetary stability.[97]

---

[93] Cl. Reply, para. 134, citing **CL-0038**, *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, paras. 321, 323.
[94] Cl. Reply, para. 135, citing **RL-0010**, *Nova Scotia Power v. Venezuela*, para. 111.
[95] Cl. Reply, para. 136, referring to **C-0063**, QNB, "Business Plan QNB-South Sudan (QNBSS)," slide 2.
[96] Cl. Reply, para. 137, citing **C-0030**, "Qatar to loan South Sudan $100 million: official," *Sudan Tribune*, 10 May 2012.
[97] Cl. Reply, para. 138.

122.    The Claimant argues that, in addition to political risks, QNB assumed commercial risk, which is confirmed in practice by the Respondents' repeated defaults on their repayment obligations to QNB. QNB took on significant risks, equivalent to those which have been recognised by previous tribunals as satisfying the risk element.[98]

123.    It argues that the tribunal in *Fedax v. Venezuela* concluded that "the very existence of a dispute as to the payment of the principal and interest evidences the risk that the holder of the notes has taken." The same is true in the present case.[99]

124.    The Claimant states that it invested in South Sudan, during a period of allegedly great political, legal and commercial uncertainty. The Claimant contends that QNB agreed to restructure (and extend) its investment on multiple occasions, including by signing the Facility Agreement in April 2018 for the purpose of, *inter alia*, restructuring that debt for a second time. Accordingly, the Claimant argues QNB's investment was subject to both political and (non-ordinary) commercial risk, which amply fulfils the risk criterion for purposes of Article 25 of the ICSID Convention.[100]

125.    In addition to the political and commercial risks, according to the Claimant QNB's investment in South Sudan involved significant operational risk. The setting up of the Juba Branch involved operational risk for QNB. This is evident in the Juba Branch's financial statements which identify the following categories of risks to which the Branch was exposed: "a) credit risk[;] b) liquidity risk[;] c) market risks[; and] d) operational risks."[101]

126.    According to the Claimant, considering the investment as a whole, it was subject to risk, including commercial, political and operational risk. In addition to the commercial risk

---

[98] Cl. Reply para. 139, citing **CL-0002**, *Fedax N.V. v. Republic of Venezuela*, ICSID Case No. ARB/96/3, Decision on Jurisdiction, 11 July 1997 ("***Fedax v. Venezuela***"), paras. 41-42.
[99] Cl. Reply, para. 140, citing **CL-0002**, *Fedax v. Venezuela*, para. 40. Reference is further made to **CL-0063**, *Deutsche Bank v. Sri Lanka*, paras. 309-310; **RL-0001**, *SCB v. Tanzania*, para. 223: *see* Cl. Reply, paras. 141-142.
[100] Cl. Reply, para. 143.
[101] Cl. Reply, paras. 145-146, referring to **C-0022**, Qatar National Bank - Juba Branch, Annual Report and Financial Statements for the Year Ended 31 December 2013, 14 April 2014, pp. 25, 33; **C-0023**, Qatar National Bank - Juba Branch, Annual Report and Financial Statements for the Year Ended 31 December 2014, 31 March 2015, pp. 29, 38; **C-0024**, Qatar National Bank - Juba Branch, Annual Report and Financial Statements for the Year Ended 31 December 2015, 25 April 2016, pp. 29, 38; **C-0112**, Qatar National Bank - Juba Branch, Annual Report and Financial Statements for the Year Ended 31 December 2016, 2 May 2017, pp. 30, 40; **C-0113**, Qatar National Bank - Juba Branch, Annual Report and Financial Statements for the Year Ended 31 December 2018, 31 May 2019, pp. 48, 62.

intrinsic to the various transactions entered into by the Claimant as part of its long-standing economic relationship with South Sudan, QNB's investment was exposed to significant political risk. Such political risk derived, *inter alia*, from South Sudan's unsettled political, economic, monetary and security environment. Additionally, QNB undertook operational risk, such as in connection with the Juba Branch, which was key to the operation of the Facility Agreement. It furthermore acquired an interest in South Sudan's oil production under the Off-take Agreement, which was connected to the Facility Agreement. Accordingly, any reasonable analysis of QNB's investment in South Sudan shows that it entailed considerable risk and, so argues the Claimant, enough to meet the risk element in the *Salini* factors.[102]

127.   On the issue of whether a loan is automatically not an investment because of the certainty of returns, the Claimant notes that ICSID tribunals have accepted loans as qualifying as investments for the purpose of Article 25 of the ICSID Convention, and gives as examples, *Fedax v. Venezuela*, *CSOB v. Slovakia*, *CDC v. Seychelles* and *Tulip v. Turkey* as cases in which loans were accepted as qualifying investments by the tribunals.[103]

### b.    Contributions by the Investor

### (i)    The Respondents' Position

128.   The Respondents argue that "the Loan does not contribute to an economic venture" and, consequently, "does not qualify as an investment under Article 25 of the Convention" depriving the Centre of jurisdiction.[104] The Respondents' arguments include the following points.

129.   According to the Respondents, a loan in itself is not an investment: "To be considered an investment, it must contribute to an economic venture consisting of an investment."[105]

---

[102] Cl. Reply, para. 149.
[103] Cl. Request for Arbitration, para. 32, referring to **CL-0002**, *Fedax v. Venezuela*, para. 29; **CL-0003**, *CSOB v. Slovak Republic*, paras. 90-91; **CL-0004**, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Award, 17 December 2003, para. 6; **CL-0005**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award, 10 March 2014, para. 203.
[104] Resp. C-Mem., paras. 81, 85.
[105] Resp. C-Mem., para. 82.

Referring to *MNSS v. Montenegro*, they assert that "[t]his has been recognized in the Salini doctrine and in ICSID case law."[106]

130.    The Respondents recount that under Clause 3.1 of the Facility Agreement, the purpose of the Loan is stipulated as:

    a.    first, prepaying or repaying all outstanding amounts owing by the Guarantor, under the Existing Facility; and

    b.    thereafter payments:

        i.    to support the management of the balance of payments of South Sudan; and

        ii.    of fees, costs and expenses pursuant to the Finance Documents.[107]

131.    They note that in *Poštová banka v. Greece*, the tribunal stated, *inter alia*:

> *An investment, in the economic sense, is linked with a process of creation of value, which distinguishes it clearly from a sale, which is a process of exchange of values or a subscription to sovereign bonds which is also a process of exchange of values i.e. a process of providing money for a given amount of money in return.* […]
>
> […]
>
> *[I]t appears that the funds were used for Greece's budgetary needs, and particularly for repaying its debts* […].
>
> […]
>
> *[I]n cases where the financial instruments were not linked with an economic venture, ICSID tribunals have not considered them as investments on their own, like for example in Joy Mining v. Egypt, where a bank guarantee which was not linked with a contract that could qualify as an investment was not considered an investment, or in Alps Finance v. Slovak Republic, where the tribunal decided that, because the underlying contract having given rise to some*

---

[106] Resp. C-Mem., para. 82, referring to **RL-0012**, *MNSS v. Montenegro*, para. 196.
[107] Resp. C-Mem., para. 83.

> *receivables was not an investment, the receivables themselves could not be considered as investments.*[108]

132.    The Respondents, against the above backdrop, "submit that the Loan does not contribute to an economic venture and therefore does not qualify as an investment under Article 25 of the Convention. The Centre is thus bereft of jurisdiction."[109]

### (ii)    The Claimant's Position

133.    The Claimant rejects the contention of the Respondents that "loans or debt financing 'must contribute to an economic venture consisting of an investment.'" Rather, they argue, "if a loan contributes to an economic venture, there is no reason why it cannot be an investment."[110]

134.    The Claimant asserts that the Facility Agreement both

> *contributed to QNB's own economic venture of establishing an operating banking business in South Sudan (which in any event was not a loan), and underpinned the economic venture of importing various strategic good*[s] *and products into South Sudan over many years to support its economic development.*[111]

135.    It further asserts that the "establishment of the Juba Branch alone (with the associated employment, lease and over USD 30 million in direct investment) would be sufficient to meet the contribution element, as well as – should it be needed – the economic venture dimension."[112]

136.    The Claimant states that

> *through the 2012 and 2014 Credit Facilities, QNB injected a significant amount of foreign currency into South Sudan's economy. The 2012 Credit Facility amounted to USD 100 million. The 2014 Credit Facility amounted to USD 250 million, initially. Subsequently, the parties increased the limit to USD 622 million through the Facility Agreement. This amount was deployed, as*

---

[108] Resp. C-Mem., para. 84, citing **RL-0005**, *Poštová banka v. Greece*, paras. 361, 363, 365.
[109] Resp. C-Mem., para. 85.
[110] Cl. Reply, para. 115.
[111] Cl. Reply, para. 115.
[112] Cl. Reply, para. 116.

> *confirmed by the lists of LCs annexed to the Amendment Deed as Schedule 2.*
>
> *These contributions were used by multiple businesses for importing "strategic goods" and undeniably contributed to an economic venture.*[113] [footnotes omitted]

137.   The Claimant distinguishes the facts of this case from *Poštová Banka v. Greece* in which the tribunal found that the Greek government bonds at issue did not qualify as an investment under the Slovakia-Greece BIT, without considering the question in the context of the ICSID Convention. That tribunal, according to the Claimant, in any event "made clear that the loans and bonds are distinct financial products," noting how "unlike creditors in a loan, the creditors of bonds may change several times in a matter of days or even hours, as bonds are traded" and that "loans involve contractual privity between the lender and the debtor, while bonds do not involve contractual privity."[114]

138.   QNB's investment in South Sudan was, according to the Claimant, linked with the process of creation of value. Among other things, it underpinned LCs that enabled the importation of hundreds of millions of dollars of goods and products into South Sudan over several years, including, *inter alia*, food, medicines and building supplies. This, according to the Claimant, satisfies the test for an investment, applying the reasoning of the tribunal in *Poštová banka v. Greece*, which stated: "An investment, in the economic sense, is linked with a process of creation of value, which distinguishes it clearly from a sale, which is a process of exchange of values or a subscription to sovereign bonds which is also a process of exchange of values *i.e.* a process of providing money for a given amount of money in return."[115]

139.   The Claimant refers to a published statement by the BSS Governor, Mr. Kornelio Koriom Mayik, in September 2014, that "South Sudan is using a $250-million Qatar National Bank credit line to fund food and fuel purchases after civil cut crude output, a key source of state revenue," contrasting this with the factual circumstances in *Poštová banka v. Greece*,

---

[113] Cl. Reply, paras. 117-118. Schedule 2, which is submitted by the Claimant as **C-0037**, consists of lists of LCs issued by QNB annexed to the Amendment Deed executed by the Bank of South Sudan on 10 November 2015.
[114] Cl. Reply, para. 119; referring to **RL-0005**, *Poštová banka v. Greece*, paras. 337-338.
[115] Cl. Reply, paras. 120-121, citing **RL-0005**, *Poštová banka v. Greece*, para. 361.

where the claimant did not even argue that the money paid for the bonds "was used for economically productive activities."[116]

140.  The Claimant further distinguishes the facts and circumstances of this case from those in the following cases.

- *SCB v. Tanzania*, where the tribunal noted that the claimant paid to take over loans. Consequently, there was no need to seek alternative funding to allow the facility to continue operating. In the tribunal's view, this amounted to a contribution, both to the project and to Tanzania.[117]

- *Eyre v. Sri Lanka*, where the claimant argued it had an investment in the form of a planned hotel project on a piece of land. The tribunal decided that "[t]here must have been substantive commitments and arrangements entered into, involving specific commitments and financial costs, all of which would entail both certain risks as well as possible benefits." The tribunal found that there was no evidence that the claimants paid or made any contributions towards the purchase of the land.[118]

- *MNSS v. Montenegro*, where the tribunal, applying the holistic approach, had "no difficulty" finding that the acquisition of an entity's shares, together with the loans to it, entailed a contribution and qualified as an investment under the ICSID Convention.[119]

### c.  Contribution to the Economic Development of the Host State

### (i)  The Respondents' Position

141.  The Respondents assert that the transaction subject of these proceedings does not qualify as an investment under the *Salini* criteria because it is an ordinary commercial loan and

---

[116] Cl. Reply, para. 122, citing **C-0083**, M. Ngor, "South Sudan Gets $250 Million From Qatar Bank as Oil Output Cut," *Bloomberg*, 16 September 2014; **RL-0005**, *Poštová banka v. Greece*, para. 363.
[117] Cl. Reply, para. 123, referring to **RL-0001**, *SCB v. Tanzania*, para. 235.
[118] Cl. Reply, para. 124(a), referring to **RL-0007**, *Eyre v. Sri Lanka*, paras. 274, 298-301.
[119] Cl. Reply, para. 124(b), referring to **RL-0012**, *MNSS v. Montenegro*, para. 202.

does not contribute significantly to the economic development of the First Respondent.[120] Their arguments include the following.

142.    Under the *Salini* criteria, for an activity or transaction to qualify as an investment under Article 25 of the ICSID Convention, the said activity must have made significant contribution to the host State's development; therefore, in the instant proceedings, the loan must have made significant contribution to the economic development of South Sudan.[121]

143.    In *Nations Energy v. Panama*, the tribunal, *inter alia*, stated its belief that "the existence of a certain contribution towards the economy of the country and an assumption of risks by the investor are relevant elements – among others – for the identification of an investment."[122] Reference is also made to *SCB v. Tanzania*, in which the tribunal stated that "loans without any link to an economic venture intended to provide for the improvement of the State's development would not be considered an 'investment.'"[123]

144.    The Respondents reject any contention by the Claimant that the Facility Agreement contributed significantly to the economic development of South Sudan. They "acknowledge the long standing relationship with the Claimant" but argue that "the subject of these proceedings is the Facility Agreement […] as opposed to the longstanding relationship. The Claimant has submitted this dispute pursuant to the provisions of the said Facility Agreement and alleges breaches of its terms by the Respondents."[124] According to the Respondents, "the parties' longstanding relationship and the history therein; the funds injected into the Claimant's Juba Branch; and the employment of staff based in South Sudan [are] irrelevant in this case."[125]

---

[120] Resp. C-Mem., para. 86.
[121] Resp. C-Mem., para. 87.
[122] Resp. C-Mem., para. 89; **RL-0013**, *Nations Energy Corporation, Electric Machinery Enterprises Inc. and Jaime Jurado v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010, para. 429.
[123] Resp. C-Mem., para. 90; **RL-0001**, *SCB v. Tanzania*, para. 220.
[124] Resp. C-Mem., para. 93.
[125] Resp. C-Mem., para. 94.

145.    They recount "the purpose of the Loan pursuant to Clause 3.1 of the Facility Agreement" concluding that it does not include "an economic activity that significantly contributes to the development of the South Sudan."[126]

146.    Citing *SCB v. Tanzania*, the Respondents argue that "[o]ther than relying on history, the Claimant cannot point to any economic contribution of that loan to the host State." In other words, the Claimant, aware that the Facility Agreement alone does not contribute to the economy of the host State, and thus not an investment, has sought to include other activities in the assessment.[127]

147.    According to the Respondents, the Facility Agreement is no more than an ordinary commercial loan bereft of at least three of the criteria under the Salini test.

### (ii)    The Claimant's Position

148.    The Claimant asserts that the Respondents misinterpret the requirement for the economic development of the host State. It is not a criterion on its own, but rather a consequence of an investment.[128] This was affirmed by the tribunal in *Saba Fakes v. Turkey,* which stated that

> *while the economic development of a host State is one of the proclaimed objectives of the ICSID Convention, this objective is not in and of itself an independent criterion for the definition of an investment. The promotion and protection of investments in host States is expected to contribute to their economic development. Such development is an expected consequence, not a separate requirement, of the investment projects carried out by a number of investors in the aggregate. Taken in isolation, certain individual investments might be useful to the State and to the investor itself; certain might not. Certain investments expected to be fruitful may turn out to be economic disasters. They do not fall, for that reason alone, outside the ambit of the concept of investment.*[129]

---

[126] Resp. C-Mem., paras. 95-96.
[127] Tr. Day 3, 72:11–73:3, citing **RL-0001**, *SCB v. Tanzania*, para. 220; Tr. Day 3, 74:8-17.
[128] Cl. Reply, para. 150.
[129] Cl. Reply, para. 151, referring to **RL-0004**, *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, para. 111; **RL-0012**, *MNSS v. Montenegro*, paras. 189-190. *See also* Cl. Reply, para. 152, referring to **RL-0001**, *SCB v. Tanzania*, paras. 240, 243, 245; **CL-0063**, *Deutsche Bank v. Sri Lanka*, para. 295; **CL-0070**, *KT*

149.    The Claimant further argues that, even if considered an independent, indispensable requirement, the element of contribution to economic development of the host State is clearly met in this case, because the Claimant contributed hundreds of millions of dollars to South Sudan which contributed to South Sudan's economic development.[130]

150.    QNB, the Claimant argues, did not merely contribute to an isolated project. It contributed to numerous ventures and to the development of South Sudan's economy as a whole by providing, *inter alia*, South Sudanese traders with essential international finance for the purchase of "strategic goods" over a period of years. This was in addition to the establishment of the Juba Branch, which included the injection of over USD 30 million worth of capital, the leasing of local premises and the employment of a significant number of personnel who were based in South Sudan.[131]

151.    Moreover, the Claimant argues, QNB's 2012 and 2014 Credit Facilities were fundamental in supporting South Sudan following the political upheaval that posed a threat to South Sudan's economic and financial stability during that period.[132]

152.    Also, according to the Claimant, the Respondents are misguided in two respects in arguing that the "purpose of the Loan pursuant to Clause 3.1 of the Facility Agreement does not include an economic activity that significantly contributes to the development of South Sudan."[133] The Claimant makes the following arguments.

a.    An investment is to be considered as a whole and cannot sensibly be limited to the indicated and summarized purpose of the Facility Agreement.

---

*Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013, paras. 171-172; **CL-0071**, *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, para. 285; **CL-0072**, *Krederi Ltd. v. Ukraine*, ICSID Case No. ARB/14/17, Award, 2 July 2018 (excerpt), para. 237; **CL-0061**, *Mabco v. Kosovo*, paras. 296-297; **CL-0073**, *Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012, para. 220; **CL-0038**, *Alpha v. Ukraine*, para. 312.

[130] Cl. Reply, paras. 152-153, referring to, *inter alia*, **CL-0003**, *CSOB v. Slovak Republic*, para. 88.
[131] Reply, para. 154.
[132] Reply, para. 155.
[133] Cl. Reply, para. 158, referring to Resp. C-Mem., para. 96.

b. The Respondents are wrong in implying that the Facility Agreement, on its own, did not contribute to South Sudan's economy.

i. By the time it entered into the Facility Agreement in April 2018, BSS' outstanding debt to QNB under the 2016 IRU amounted to around USD 614,595,342.310 (including interest accrued up until then). BSS had stopped making the due repayments for over a year. Instead of commencing recovery actions against BSS, QNB allowed BSS to refinance its outstanding debt. South Sudan was added as the main obligor, and it was allowed to repay the outstanding amounts in quarterly instalments over a fifteen-year-term.

ii. The Facility Agreement also provided for the ability of South Sudan to use its oil revenues for repayment of the debt through the Off-take Agreement mechanism.[134]

153. The Claimants also points out that. as can be seen from contemporaneous reports in the press, the contribution of QNB's investment to South Sudan's development was recognized by officials of South Sudan and BSS at the time.[135]

d.    **A Certain Duration of Performance of the Contract**

(i)    <u>**The Respondents' Position**</u>

154. The Respondents did not argue this element in written pleadings, choosing only to "contend with the Jurisdiction of the Centre on three (3) [of the four] grounds under the '*Salini Criteria*' being: *investor's participation in the risks of the transaction; a substantial*

---

[134] Cl. Reply, para. 158.
[135] Cl. Reply, para. 159, citing **C-0030**, "Qatar to loan South Sudan $100 million: official," *Sudan Tribune*, 10 May 2012 (quoting South Sudan's Deputy Finance Minister Marial Awou Yol's announcement that QNB would provide the 2012 Credit Facility); **C-0080**, M. Ngor, "South Sudan pound rises after Qatari bank import deal," *Reuters*, 6 September 2012 (quoting declarations from South Sudan's Commerce Minister Garang Diing Akuong on the positive impact of the 2012 Credit Facility); **C-0083**, M. Ngor, "South Sudan Gets $250 Million from Qatar Bank as Oil Output Cut," *Bloomberg*, 16 September 2014 (quoting declaration from BSS' Governor Kornelio Koriom Mayik announcing the 2014 Credit Facility).

*contribution by the investor; and a significant contribution to the host state's economic development.*"[136]

155.    At the Hearing, the Respondents' counsel stated: "The third criteria or the third element under the Salini test is: ascertain minimum duration. Under this, we concede that tribunals have found duration to be a key factor, but without the first two elements, duration alone does not matter, especially where the degree of certainty is predictable into what I will term foreseeable future."[137]

### (ii)    The Claimant's Position

156.    The Claimant notes that "duration can indeed be a relevant factor in a holistic consideration of investment."[138] Thus, it seeks to show that its investment satisfies that criterion by putting forward the arguments that follow.

157.    QNB's investment in South Sudan had a significant duration. It started in 2011, when QNB acquired its license to carry out banking activities in South Sudan, and continued through the Facility Agreement in 2018, whose term, in turn, stretched for a further 15 years.[139]

158.    The 2012 Credit Facility had no fixed term, the subsequent 2014 Credit Facility was to be for a year on a revolving basis but lasted for approximately two years, and the 2016 IRU stretched for over three-and-a-half-years minimum.[140]

159.    According to the Claimant, it is undisputed that the Facility Agreement was set to last 15 years. The fact that the Respondents defaulted on their obligations does not affect the analysis. As set out by the tribunal in *Deutsche Bank v. Sri Lanka*:

> *The Arbitral Tribunal is persuaded that the duration criterion is satisfied in this case. The Hedging Agreement commitment was for twelve months. Moreover, Deutsche Bank had already spent two years negotiating the Agreement. The fact that it was terminated after 125 days is irrelevant. As pointed out by the Tribunal in L.E.S.I. S.p.A. and Astaldi S.p.A. v. People's Democratic Republic*

---

[136] Resp. C-Mem., para. 62.
[137] Tr. Day 3, 73:8-14.
[138] Cl. Reply, para. 126.
[139] Cl. Reply, para. 127.
[140] Cl. Reply, para. 128.

> of Algeria, *"the fact that the contract was suspended and then terminated prematurely changes nothing; in order to judge the importance of the contribution, it is necessary to focus on the duration that was agreed in the contract, which determines the nature of the contribution".* In other words, it is the intended duration period that should be considered to determine whether the criterion is satisfied.[141]

### (3)    The Tribunal's Analysis – Does the Dispute Arise out of an Investment?

160.    Having set out, in some detail, the arguments of the Parties on the issue, the Tribunal now proceeds to analyse and decide the question whether the dispute before it arose out of an investment as required under Article 25(1) of the Convention to establish jurisdiction.

161.    It is common ground among the Parties that in assessing the existence of an investment, the objective criteria articulated in *Salini v. Morocco* are at least a useful guide.[142] The Tribunal agrees with this, acknowledging that various other tribunals have similarly affirmed the usefulness of, and the non-prescriptive nature of, the *Salini* criteria.[143]

### a.    Legal Dispute

162.    Article 25 of the ICSID Convention limits the jurisdiction of the Centre, *inter alia*, to legal disputes arising directly out of an *investment*. Consequently, before proceeding to the question whether the dispute arose out of an investment, the Tribunal first has to establish that the dispute before it is of a "legal" nature.

163.    In this regard, the Tribunal first notes that there is no question between the Parties in this case that a dispute exists between them and that the dispute is of a legal nature.

---

[141] Cl. Reply, para. 128, citing **CL-0063**, *Deutsche Bank v. Sri Lanka*, para. 304.

[142] Over time, a set of objective criteria articulated in *Salini v. Morocco* have emerged and been applied by different tribunals in determining the existence of an investment for purposes of the ICSID Convention. Citing, in particular, the commentary by E. Gaillard, in Journal du droit international (1999), pp. 278 *et seq*., who in turn cites the decision on jurisdiction issued in 1975 in *Alcoa Minerals v. Jamaica* as well as several other authors, the *Salini* tribunal listed the elements required for an investment as: a contribution by the investor, a certain duration, the assumption of risk, as well as possibly a contribution to the host State's development as an additional condition; *see* **RL-0006**, *Salini v. Morocco*, para. 52. Applying such criteria to the facts of the case before it is what the Tribunal herein refers to as the "*Salini* test."

[143] **RL-0001**, *SCB v. Tanzania*, para. 200; **CL-0043**, *M.C.I. v. Ecuador*, para. 165; **CL-0045**, *Inmaris v. Ukraine*, para. 129; **CL-0040**, *Abaclat v. Argentina*, para. 364; **CL-0039**, *Ambiente Ufficio v. Argentina*, para. 479; **CL-0046**, *Philip Morris v. Uruguay*, para. 206; **CL-0061**, *Mabco v. Kosovo*, paras. 296-297; **CL-0044**, *Biwater v. Tanzania*, paras. 312-313.

164.    The Tribunal agrees. The disagreement between the Parties, which is the subject of this arbitration, concerns legal rights and obligations flowing from the Facility Agreement.[144] Indeed, the dispute concerns the assertion by the Claimant of its legal rights under the Facility Agreement and enforcement of obligations of the Respondents under the Agreement.[145] Thus, the dispute is a legal dispute as required under Article 25 of the ICSID Convention.

### b.    Subject Matter of the Dispute

165.    The Parties disagree on what should be the subject matter on which the *Salini* test should be applied. The Respondents contend that only the Facility Agreement should be considered in the analysis, noting that there is no dispute attaching to the other activities that the Claimant has identified. On its part, the Claimant argues that, as a matter of fact and law, its various investment-related activities in South Sudan must be aggregated and considered together in determining whether the dispute before the Tribunal arose out of an investment.

---

[144] *See Alcoa Minerals of Jamaica, Inc. v. Jamaica*, ICSID Case No. ARB/74/2, Decision on Jurisdiction, 6 July 1975, as reported by J. Schmidt, "Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in *Alcoa Minerals of Jamaica Inc v. Government of Jamaica*" in 17 Harvard International Law Journal (1976), pp. 98-99; *Kaiser Bauxite v. Jamaica*, ICSID Case No. ARB/74/3, Decision on Jurisdiction, 6 July 1975, para. 16; *Cable Television of Nevis Ltd. and Cable Television of Nevis Holdings, Ltd. v. Federation of St. Christopher (St. Kitts) and Nevis*, ICSID Case No. ARB/95/2, Award, 13 January 1997, para. 5.03 (available at: https://www.italaw.com/sites/default/files/case-documents/italaw6349.pdf); *American Manufacturing & Trading, Inc. v. Republic of Zaire*, ICSID Case No. ARB/93/1, Award, 21 February 1997, para. 5.06 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0028.pdf); **CL-0002**, *Fedax v. Venezuela*, paras. 15-16; *Zhinvali Development Ltd. v. Republic of Georgia*, ICSID Case No. ARB/00/1, Award, 24 January 2003, para. 290.

[145] Other tribunals have considered this to be basis for a finding of the existence of legal dispute: *see* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 89, citing various cases, including **CL-0007**, *Noble Energy, Inc. and MachalaPower Cia. Ltda. v. Republic of Ecuador and Consejo Nacional de Electricidad*, ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008 ("***Noble Energy v. Ecuador***"), paras. 121-124 ; **CL-0038**, *Alpha v. Ukraine*, paras. 246-249 ; **CL-0040**, *Abaclat v. Argentina*, para. 255; *M. Meerapfel Söhne AG v. Central African Republic*, ICSID Case No. ARB/07/10, Award, 12 May 2012, paras. 233-236 (available at: https://www.italaw.com/sites/default/files/case-documents/italaw1193_0.pdf); *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012, para. 62 (available at: https://www.italaw.com/sites/default/files/case-documents/ita1082.pdf); *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, para. 119 (available at: https://www.italaw.com/sites/default/files/case-documents/italaw1090.pdf).

166.    The Tribunal notes that, while the Claimant insists that the various activities must be aggregated for purposes of this analysis, it also advances arguments in the alternative.[146] It argues that even if considered alone, the Facility Agreement, in any event, qualifies as an investment under Article 25(1) of the ICSID Convention, which the Respondents dispute.

167.    The Tribunal, thus, finds it more expedient to start its analysis by first considering whether the Facility Agreement on its own qualifies as an investment under Article 25(1) of the Convention.

### c.    Is the Facility Agreement an Investment for Purposes of the ICSID Convention?

168.    For reasons set out in the paragraphs and sections that follow, the Tribunal finds that, on an objective assessment considering the context and in light of the object and purpose of the ICSID Convention, the Facility Agreement qualifies as an investment under Article 25(1) of the Convention. The object of the ICSID Convention is to establish a neutral forum for the resolution of qualifying disputes for the purpose of encouraging cross border flow of capital into those jurisdictions which wish to attract it—it being recognised that such flow of capital is necessary for a country's economic development. The Tribunal draws this conclusion from various sources, including the preparatory documents of the ICSID Convention and the Report of the Executive Directors of the World Bank with which the Convention was submitted to Member Countries for approval.

169.    For its objective analysis, the Tribunal applies the *Salini* test, which is accepted by the Parties as the applicable standard, and draws inspiration from decisions of tribunals before it, which have extensively analysed the issue.

170.    The Tribunal notes that the *Salini* test is not prescriptive such that each element thereof must exist for there to be an investment. Nevertheless, the Tribunal finds that viewed in the light of the object and purpose of the ICSID Convention, the Facility Agreement, indeed, meets each criterion of that test, all of which are addressed below, starting with the "risk" element, on which the Parties have presented the most extensive arguments.

---

[146] *See* Cl. Reply, para. 161. *See also* Tr. Day 1, 13:13–15:11; Tr. Day 3, 6:23 *et seq*.

### (i)    Participation in Risks of the Transaction

171.    The Tribunal acknowledges, as does each Party, that there are risks attaching to the Facility Agreement. The issue is whether such risks are of the nature that accompany an investment, rather than any ordinary commercial transaction, as the Respondents allege. The Tribunal is not convinced that such distinction alone is necessarily decisive of the inquiry as indeed every business enterprise is accompanied by risks. A similar risk could apply to an investment and to a commercial transaction. An example of this is the risk related to payment by one party, either untimely, insufficiently, or not at all.

172.    The Tribunal notes that ICSID tribunals have in the past approached this issue in different ways, with some tribunals adopting a more flexible approach, as argued by the Claimant, than others that take a stricter approach, which is what the Respondents advocate.[147] In considering the issue, the Tribunal recalls the object and purpose for which the Centre was established, as can be deciphered from various sources including the following:

a.    The Preamble to the ICSID Convention, which begins with "Considering the need for international cooperation for economic development, and the role of private international investment therein."

b.    The Report of the Executive Directors of the World Bank with which the Convention was submitted to Member States for approval, which states, *inter alia*,

i.    "The creation of an institution designed to facilitate the settlement of disputes between States and foreign investors can be a major step toward promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it."[148]

---

[147] *See* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), paras. 254-256.

[148] Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (available at: https://icsid.worldbank.org/sites/default/files/Report_Executive_Directors.pdf) ("Report of the Executive Directors"), para. 9.

ii. "[A]dherence to the Convention by a country would provide additional inducement and stimulate a larger flow of private international investment into its territories, which is the primary purpose of the Convention."[149]

iii. "[T]he broad objective of the Convention is to encourage a larger flow of private international investment."[150]

173. The object and purpose of the ICSID Convention was also succinctly articulated by Professor Schreuer *et al* as being "to provide for a dispute settlement mechanism that could address, among others, political risk in the form of disputes arising out of a sovereign's interference with investments."[151]

174. Thus, the Tribunal considers the inquiry to be simply to determine whether the risk that attaches to the enterprise or transaction in question to be the type that makes it eligible, or ineligible, to benefit from the facilities available under the ICSID Convention for resolution of disputes.

175. From the facts and evidence before it, the Tribunal can conclude that the Facility Agreement was not devoid of risk. As further explained below, the risks which included commercial and political risks, as well as those that could be described as operational, are sufficient to meet the relevant criterion in the *Salini* test.

*Risks Attaching to the Facility Agreement for QNB*

176. The Tribunal considers that there were various risks attaching to the Facility Agreement which, potentially individually, and certainly together would satisfy the risk criterion in the present objective analysis.

177. First, the fact of this arbitration alone is testament to the risks associated with the Facility Agreement. The fact that the risk is commercial in nature does not mean that the transaction to which it attaches is not of a type intended to be the subject of a dispute for which the

---

[149] Report of the Executive Directors, para. 12.
[150] Report of the Executive Directors, para. 13.
[151] C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 257.

ICSID Convention provides a forum. In this regard, the Tribunal recalls the statement by the tribunal in *Fedax v. Venezuela* that "the very existence of a dispute as to the payment of the principal and interest evidences the risk that the holder of the notes has taken."[152] The same is true in the present case.

178. Further, the Tribunal notes that the Facility Agreement came about as a result of the restructuring of previous facilities. The need for such restructuring is itself proof of the commercial risk attaching to the Facility Agreement and preceding ones.

179. The Tribunal also accepts that there were risks from an uncertain political situation in South Sudan in the lead up to and following the entering into of the Facility Agreement.[153]

180. Regarding the suggestion that the existence of a guarantee removes the element of risk such that the enterprise would not qualify as an investment, the Tribunal accepts that the effect of the guarantee incorporated into the Facility Agreement was to reduce the main risk in the transaction, which is the risk of non-payment/non-repayment. However, it is the nature of business that a prudent investor takes all possible steps to minimize any risks that come with the investment. Despite those cautionary steps however, the Parties have found themselves in a situation in which a dispute has arisen, which is now before this Tribunal for determination. This development, as previously stated, is itself proof of the risk that attaches to the Facility Agreement. Indeed, as noted by Professor Schreuer *et al*, "[n]either advance, guaranteed, or fixed payments to the investor under a contract, nor performance of due diligence by the investor are able to exclude risk."[154]

---

[152] **CL-0002**, *Fedax v. Venezuela*, para. 40. *See also* **CL-0063**, *Deutsche Bank v. Sri Lanka*, paras. 309-310; **RL-0001**, *SCB v. Tanzania*, para. 223.

[153]

[154] C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 254, citing *Saipem S.p.A. v. People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, para. 109 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0733.pdf); *Toto Construzioni Generali S.p.A. v. Republic of Lebanon*, Decision on Jurisdiction, 11 September 2009, paras. 78-79 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0869.pdf); **CL-0038**, *Alpha v. Ukraine*, paras. 322-323.

181. Similarly, the Tribunal accepts that the Off-take arrangement, while providing another layer of comfort on how the loan would be repaid, also came with risks being "dependent on South Sudan's oil operations, as well as global oil prices" as noted by the Claimant.[155]

182. Regarding the position of the Respondents concerning the risks that are associated with loan agreements that may not meet the requirement for investments, especially owing to the certainty of repayment, the Tribunal agrees with the *Alpha v. Ukraine* tribunal that such an interpretation that excludes loans from the category of investments covered under the ICSID Convention would indeed create a loophole in the Convention. The *Alpha* tribunal stated:

> *Many contracts, including typical loan agreements, have fixed payment terms. Indeed, as explained above, loan agreements can be a form of investment. The fact that a party is owed a fixed amount by the terms of a contract does not mean that all risk for that party has been eliminated, as the risk of default may remain at elevated levels. Removing all fixed payment contracts from the scope of investment protection would lead to a substantial loophole in the ICSID Convention, and Respondent has provided no convincing evidence that this was the intent of the drafters.*[156]

183. In the present case, in any event, the returns on QNB's investment have by no means been certain. The sum to be received by the lender under the Facility Agreement depends on if and when payment is made. For instance, as penalty interest accrues on sums not repaid on schedule, it is impossible to determine at the time of the transaction how much would be paid in every conceivable scenario.

184. While not purporting to have identified all manner of risk that could attach to the Facility Agreement, the Tribunal can conclude from the preceding examples alone that there were risks attached to the Facility Agreement which were assumed by the Claimant in entering into the Agreement.

---

[155] Cl. Reply, para. 161(c).
[156] **CL-0038**, *Alpha v. Ukraine*, para. 323.

*Were the Facility Agreement Risks Investment Risks?*

185.    The Tribunal considers that significant risks ordinarily exist when credit facilities in significant sums are advanced to a sovereign. Such risks would be different in each case and cannot be considered ordinary risks of doing business as to exclude the object transaction from cover of the ICSID Convention.

186.    In this case, the Claimant has established to the satisfaction of the Tribunal that there were commercial, political, and operational risks, which created uncertainty as to when and how much the Claimant could obtain in returns on its capital outlays.

187.    Bearing in mind the object and purpose of the ICSID Convention in establishing the Centre, the Tribunal does not consider that the types of business ventures to which these identified risks attach are the ones that the drafters of the Convention intended to exclude from the Forum so established.

188.    To the contrary, these are risks attaching to the Facility Agreement which would qualify as investment risks intended to be covered under the convention, being risks—as described by Professor Schreuer *et al*—"resulting from the non-synallagmatic nature of the activity […] where the foreign national places assets under the host State sovereign authority and only recoups its (expected) return over time."[157]

189.    The Tribunal, thus, concludes that the "risk" element of the objective test is established in this case.

### (ii)    Contribution by the Investor

190.    The Tribunal notes the Respondents do not argue that there was no contribution by the Claimant. Their main contention in this regard, however, is that "to be considered as an investment, [a loan] must contribute to an economic venture consisting of an investment."[158]

---

[157] *See* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 257.
[158] Resp. C-Mem., para. 82, referring to **RL-0012**, *MNSS v. Montenegro*, para. 196.

191.   The Tribunal does not subscribe to the position that the contribution must itself be towards an economic venture that is also an investment. It is sufficient in the Tribunal's view if it can be stablished that there was contribution by the investor of a not insignificant value. Indeed, the Tribunal finds that, however it is assessed, the Facility Agreement involves substantial contribution by the Claimant.

192.   The stated purpose of the Facility Agreement included repaying amounts initially advanced for the purchase of critical goods and supporting the country's balance of payments. In fulfilment of that stated purpose, financial resources were indeed made available by the Claimant under the Agreement. The Facility Agreement, indeed, involved the provision of access to financing on a scale intended to have national impact.

193.   The Tribunal recalls that the underlying debt that gave rise to the Facility Agreement involved the provision of an initial credit facility of USD 100 million in 2012, which was increased to USD 250 million in 2014, and eventually to USD 622 million under the Facility Agreement. Those facilities were used to finance the importation of strategic goods by businesses in South Sudan approved by the Government.

194.   The Tribunal finds not only that there was a contribution by the Claimant, but that relative to the state of the economy of the first Respondent, such contribution was substantial, and sufficiently so, such that the Respondents, by their own admission, have experienced difficulty meeting their contractual repayment obligations. According to the Respondents, since independence, "the first Respondent has been a struggling economy negatively impacted by peace instability and other natural calamities,"[159] and the delay in repayment has been caused "by the economic status of the South Sudan which has been adversely affected by war, floods and the covid-19 pandemic."[160]

195.   From the foregoing, the Tribunal finds that the element of contribution by the investor is met.

---

[159] Resp. C-Mem., para. 110.
[160] Resp. C-Mem., paras. 110, 117; Resp. Rej., para. 95.

(iii)    **Contribution to Economic Development of the Host State**

196.    The Tribunal notes that this criterion has assumed increasingly less importance over time, with tribunals and commentators concluding that it need not be established as part of an objective test in determining whether an investment exists under Article 25(1) of the ICSID Convention.[161]

197.    Regardless, the Tribunal finds that the Facility Agreement was intended to contribute, and would have contributed, to the economic development of South Sudan, thereby meeting that criterion in the objective test for an investment, if needed.

198.    The fact that the Facility Agreement was intended and understood by the Parties to contribute to the economic development of the State of South Sudan is clear from the stated purpose of the Agreement which includes provision of funds "to support the management of the balance of payments of South Sudan,"[162] as well as for prepaying or repaying amounts owed under the Existing Facility, which themselves were used for importation of "strategic goods."[163]

199.    In addition to the stated purpose of the Facility Agreement, and in fulfilment thereof, sums of money were made available through which an existing debt was refinanced and with which the Government's balance of payment was to be supported.

---

[161] Citing the *ad hoc* committee in **RL-0003**, *Mitchell v. DRC*, and the tribunal in *Malysian Historial Salvors v. Malaysia*, ICSID Case No. ARB/05/10, Award, 17 May 2007 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0496.pdf), Professor Schreuer notes that "only few tribunals [have] indicated that the criterion [of contribution to the economic development of the host State] was a necessary component to establish the existence of an investment in the sense of Art. 25(1):" *see* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), paras. 260 *et seq*. It is further noted that "an increasing number of tribunals reject [that criterion] as an independent critereon for determining the existence of an investment in the sense of Art. 25(1);" examples include *Bayindir Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0074.pdf); *Phoenix Action, Ltd. v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009 (available at: https://www.italaw.com/sites/default/files/case-documents/ita0668.pdf); **RL-0004**, *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010: C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), paras. 266 *et seq*.
[162] **C-0001**, Facility Agreement, Clause 3.1(b)(i).
[163] *See* **C-0074**, Email from Mr. Musadag El-Melik of QNB to Mr. Khalid Jaafar of QNB, 4 July 2012. *See also* Mok WS, para. 7, which states: "[U]nder the terms of the [2012] Guarantee, the Lender agreed to open Letters of Credit to traders nominated by government agencies namely, Ministry of Commerce and Trade, Ministry of Health, Nilepet on a list that is further communicated through [BSS] to QNB import [*sic*] strategic goods in South Sudan."

200.    The existing debt that was refinanced by virtue of the Facility Agreement had been used to finance expenses of national significance, being used for the importation of "strategic goods" as identified in the facility documents.[164] There is indication, from uncontroverted evidence before the Tribunal, that the Facility Agreement had an impact on the economic health of South Sudan.[165]

### (iv)    A Certain Duration of Performance

201.    This criterion was not argued by the Respondents in their written submissions and only perfunctorily addressed by them at the Hearing.[166] Nevertheless, and although accepting that all the elements of the *Salini* criteria need not be present or proven, the Tribunal has considered whether the Facility Agreement could be said to have met the criterion of a certain duration of performance.

202.    The Facility Agreement was for a fifteen-year term. This clearly meets the duration criterion under the *Salini* test. It is irrelevant that the term was truncated. It is the intended duration that is determinative for purposes of the present assessment. This is more so the case as the reduction in term is through no fault of the Claimant's but attributable to the Respondents.

203.    The Tribunal finds that with a stated term of 15 years, the criterion of *duration* is met by the Facility Agreement in an objective assessment of the existence of an investment for purposes of Article 25 of the ICSID Convention.

### (v)    Conclusion

204.    The Tribunal, applying the *Salini* criteria, which the Parties do not dispute as an appropriate objective standard for the purpose, finds that the Facility Agreement possesses the characteristics that qualify it as an investment for purposes of Article 25 of the ICSID Convention. It involved a significant contribution by the Claimant in deploying funds under the terms of the Agreement. The Facility Agreement was for a fifteen-year period even

---

[164] *See* **C-0028**, Guarantee Agreement between BSS and QNB, 29 June 2012, p. 3, Recital A.
[165] *See* **C-0080**, M. Ngor, "South Sudan pound rises after Qatari bank import deal," *Reuters*, 6 September 2012, reporting on the rise of South Sudan's currency "against the dollar on the key black market, its first gain since January after the government reached a deal with a Qatari bank to provide dollars needed for imports."
[166] Tr. Day 3, 73:8-14.

though, through no fault of the Claimant's, the term was truncated. The Facility Agreement involved risks which have been borne out by, for example, the current situation between the Parties that brings them before this Tribunal, as well as risks from an uncertain political situation. The Loan advanced under the Facility Agreement contributed to the development of South Sudan by making available funds that would, *inter alia*, be used towards clearance of existing debt of national importance, and supporting the management of the balance of payments of South Sudan.

205.   The Tribunal again stresses that the *Salini* criteria are not a strict set of conditions that must be met in each case for a finding that an investment exists for the purpose of Article 25(1) of the ICSID Convention. Going by an objective standard, what constitutes an investment in each case would also depend on the facts of the particular case, viewed through the lens of the objects and purpose of the ICSID Convention.

206.   Based on the foregoing the Tribunal has concluded that the Facility Agreement qualifies as an investment for purposes of Article 25(1) of the ICSID Convention and that the dispute in this case arose out of an investment.

207.   The Tribunal, having concluded that the Facility Agreement qualifies as an investment for purposes of the ICSID Convention, does not consider it necessary to embark on a further analysis as to whether the other investment-related activities identified by the Claimant would also individually qualify as such.

208.   The Tribunal notes, however, that should it have been necessary, there would have been no reason for which all the activities could not have been considered jointly in determining the existence or not of an investment. The Tribunal also sees no indication that such a review would not result in an affirmative conclusion that the activities together would constitute an investment under Article 25(1) of the ICSID Convention.

209.   The Facility Agreement builds on an existing business relationship between the Parties. Taken together, these agreements form a continuum which, in any event, qualifies as an investment in the context of the ICSID Convention. Together, they meet the criteria of contribution, risk, duration, and contribution to the development of the State of South

Sudan, on the same basis as already discussed when considering the Facility Agreement on its own.

210.    In the Tribunal's view, no matter how it is analysed, the transactions between the Parties cannot be termed a mere commercial transaction lacking the quality of an investment on an objective analysis. From the evidence before it, the Tribunal agrees that the Claimant, even by way of the Facility Agreement alone, did not only invest in South Sudan but was "invested" in South Sudan.  The Tribunal, accordingly, rejects the related objection to jurisdiction by the Respondents.

## B.    IS THE SECOND RESPONDENT SUBJECT TO ICSID JURISDICTION?

211.    Having found that there is a legal dispute that arose directly out of an investment that can be covered by the consent to ICSID arbitration provided in Clause 40.3(a) of the Facility Agreement, the Tribunal must now turn to the Respondents' second objection to jurisdiction, namely that the Second Respondent is not subject to ICSID jurisdiction. The Parties have presented detailed arguments which, although only set out in highlight below, have been fully considered by the Tribunal in reaching its conclusions.

### (1)    The Parties' Main Arguments

212.    The Respondents assert that the Second Respondent, not being a Member State of ICSID, is not subject to ICSID jurisdiction, because "South Sudan has neither designated the Second Respondent nor approved the Second Respondent's consent to ICSID arbitration."[167]

213.    The Respondents suggest that it is Clause 40.3(b) of the Facility Agreement, which provides for LCIA arbitration, that applies to the Second Respondent and not Clause 40.3(a), which provides for ICSID arbitration. According to the Respondents, Clause 40.3(a), by starting with "subject to clause (b)," is not a stand-alone clause but anticipates a scenario where ICSID does not have jurisdiction. Clause 40.3(a) also takes

---

[167] Resp. Request for Bifurcation, p. 3. *See also* Resp. C-Mem., para. 102.

cognizance of the fact that the Second Respondent is neither a Contracting State nor a designated entity and, for that reason, not subject to jurisdiction of ICSID.[168]

214.   The Respondents further argue that the Facility Agreement was signed by three parties. Two of the parties are subject to ICSID jurisdiction and one is not. Thus, a dispute between the two parties shall be determined by reference to the ICSID Arbitration Rules, whereas a dispute involving the party who is not subject to the ICSID Arbitration Rules is to be determined under the LCIA Rules.[169]

215.   The Respondents argue that the Second Respondent has not been designated to the Centre because there has been no communication from South Sudan to the Centre on any such designation.[170] Relying mainly on the decision on jurisdiction in *Cambodia Power v. Cambodia*, they argue that the requisite communication must be made by the State and cannot be made by way of the arbitration clause or the request for arbitration.[171] The Respondents argue that designation must be express and cannot be implied, and that there has been no communication by the First Respondent of any designation of the Second Respondent to the Centre.[172]

216.   Relying on the decision on jurisdiction in *Niko v. Bangladesh*, among others, the Claimant argues that South Sudan has designated BSS for ICSID arbitration and given its approval of BSS' consent to ICSID arbitration by entering into, and approving, the execution of the Facility Agreement and its dispute resolution clause.[173] This is reinforced by the undertaking provided in Clause 20.2 by South Sudan that it would do all that was needed

---

[168] Resp. Rej., paras. 89-90.
[169] Resp. Rej., para. 91.
[170] Resp. C-Mem., para. 103.
[171] Resp. C-Mem., para. 107, referring to **RL-0014**, *Cambodia Power Company v. Kingdom of Cambodia and Electricité du Cambodge*, ICSID Case No. ARB/09/18, Decision on Jurisdiction, 22 March 2011 ("***Cambodia Power v. Cambodia***"), paras. 248-251.
[172] Resp. C-Mem., para. 105.
[173] Cl. Mem., paras. 103-106, citing **CL-0006**, *Niko Resources (Bangladesh) Ltd. v. People's Republic of Bangladesh, Bangladesh Petroleum Exploration & Production Company Limited ("BAPEX") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case Nos. ARB/10/11 and ARB/10/18, Decision on Jurisdiction, 19 August 2013 ("***Niko v. Bangladesh***"), paras. 262, 288, 290, 299, 301, 341, 346.

to "authorise" (or in other words, approve) BSS to perform its obligations under Clause 40 of the Facility Agreement.[174]

217.    According to the Claimant, South Sudan's approval of BSS entering into the ICSID arbitration agreement is manifest by virtue of South Sudan having signed the Facility Agreement alongside BSS. The Facility Agreement was approved and ratified, *inter alia*, by South Sudan's legislature and executive as well as by the President of the Republic of South Sudan with the full knowledge that BSS was also a party to the Facility Agreement, including the ICSID arbitration agreement. The acts of approval contain no reservation relating to the position of BSS with regard to ICSID arbitration.[175]

218.    Thus, the Respondents assert that there has been no act of designation performed by the State with respect to the Second Respondent.[176] They challenge the notion that designation could be implicit or implied and describe as "flawed" the Claimant's argument that execution of the Facility Agreement impliedly nominated the Second Respondent as a designated agency.[177] According to the Respondents, there can be no designation without communication to the Centre and communication of designation cannot be made by way of the arbitration clause or request for arbitration.[178]

219.    The Claimant disagrees and asserts that the State, by executing the Facility Agreement as a party alongside the Second Respondent, designated the Second Respondent to the Centre for the purpose of ICSID arbitration of disputes arising from the Agreement. The Claimant agrees that communication to the Centre of designation is essential, but argues that communication need not be by the designating State party to be effective and that, in this case, the communication was by the Claimant in the Request for Arbitration.[179]

---

[174] Cl. Mem., paras. 101-102, citing **C-0001**, Facility Agreement, Clauses 18.5, 20.2.
[175] Cl. Mem., para. 106.
[176] Resp. C-Mem., para. 103.
[177] Resp. Rej., para. 92.
[178] Resp. C-Mem., para. 107.
[179] Cl. Request for Arbitration, paras. 36-38.

### (2)    *The Tribunal's Analysis*

220.    As an initial observation, the Tribunal notes that this objection to jurisdiction relates only to the eligibility of the Second Respondent to be a party in this proceeding. In effect, regardless of the Tribunal's determination on this objection, the First Respondent still has to answer the allegations put forward by the Claimant.

221.    Turning to the substance of the objection, which is that the Second Respondent is not subject to the jurisdiction of the Centre or of this Tribunal, the Tribunal first recalls that Article 25 of the ICSID Convention provides, in part, that:

> *(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*
>
> [...]
>
> *(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required. (underline added)*

222.    Thus, the Tribunal must determine the following questions with respect to this objection to jurisdiction.

    a.    Is the Second Respondent a constituent subdivision or agency of the State?

    b.    Is the Second Respondent designated to the Centre by the State?

    c.    Has the Second Respondent consented in writing to submit the dispute to ICSID?

    d.    If the Second Respondent has provided consent to ICSID arbitration, has the State approved the consent or, by notice to the Centre, waived the requirement for approval?

### a.    Is the Second Respondent a Constituent Subdivision or Agency of the State?

223.    It is not in dispute between the Parties that South Sudan is an ICSID Contracting State, nor is it disputed that the Bank of South Sudan, its Central Bank, is an agency of the State. There is a statement by the Respondents in their Rejoinder that the Second Respondent "is [not] an agent" of South Sudan.[180] However, this was neither expounded upon nor substantiated, either in writing or orally at the Hearing, or at all.

224.    The Respondents in any event assert that the Second Respondent has been acting as the Central Bank of South Sudan from the moment that autonomy was granted—well before independence.[181] At the same time, the Claimant has presented evidence in support of its contention that the Second Respondent performs functions that qualifies it as an agency of the State of South Sudan.[182]

225.    The position of the Parties, together with the uncontroverted evidence before the Tribunal, as well as its function, all point to the fact that the Second Respondent is an agency of the State of South Sudan. The Tribunal, therefore, accepts that the Second Respondent is, for purposes of Article 25(1) of the ICSID Convention, an agency of the State of South Sudan, a Contracting State of the ICISD Convention.

226.    Next, the Tribunal examines whether the Second Respondent has been designated to the Centre as required under Article 25(1) of the ICSID Convention.

### b.    Has the Second Respondent been Designated to the Centre?

227.    It is not in dispute that the State of South Sudan has neither produced nor communicated any document specifically designating the Second Respondent to ICSID for purposes of Article 25(1) of the Convention, whether generally or for the limited purpose of disputes arising from the Facility Agreement. What is primarily at issue is whether there can be said

---

[180] *See* Resp. Rej., para. 82 ("The [S]econd Respondent is neither an 'agent of a Contracting State designated to the Centre by that State'.").
[181] *See* Combined Chronology of Events, pp. 1-2; Tr. Day 1, 114:2-9.
[182] Professor Ruiz Fabri sought clarification of this in a question posed to the Parties at the end of the first day of the Hearing, with the option of immediate response or in the closing submissions. The only response was from the Claimant, immediately following the question, in which counsel reiterated its position already expressed in written pleadings: *see* Tr. Day 1, 178:4–179:2.

to have been designation in this case even in the absence of any formal designation document or express communication by the State.

228. To determine whether the Second Respondent has been designated by South Sudan to the Centre, the Tribunal must address questions such as what constitutes "designation," including its nature and form, as well as related questions about notification or communication of designation to the Centre.

229. These questions, on which the Parties have divergent views, have been addressed in some detail by previous ICSID tribunals albeit with differing conclusions. Indeed, for their respective positions on this issue of "designation," the Parties have relied mainly on decisions of ICSID tribunals that have adopted different positions on the issue—the Respondents rely on *Cambodia Power v. Cambodia*, and the Claimant relies on *Niko v. Bangladesh*.[183]

230. According to the *Cambodia Power* tribunal, designation entails "a structured and standardised system of notification."[184] The communication must be in writing—either through direct and formal communication by the State to the Centre, or by achieving such "public notoriety" that it comes to the attention of the Centre. However, such notoriety "cannot be achieved through the Claimant's communication to the Centre of a private investment contract annexed to the Request for Arbitration."[185]

231. The *Cambodia Power* tribunal reached the conclusion that the communication of a designation must be made by the State on the grounds that: (i) Article 25(1) refers to designation to the Centre "by that State;" (ii) "it is obviously essential that communication be the sole preserve of the State itself – and not a function which investors can discharge;"

---

[183] It should be noted that, unlike in the present case or in the case before the *Niko* tribunal, at the time that the contracts in the *Cambodia Power* case were concluded, the Kingdom of Cambodia was not a party to the ICSID Convention. That tribunal thus concluded that the commitments concerning designation made prior to Cambodia's adhesion to the ICSID Convention did not meet the requirements of Article 25(1).
[184] **RL-0014**, *Cambodia Power v. Cambodia*, paras. 227, 232.
[185] **RL-0014**, *Cambodia Power v. Cambodia*, para. 269.

and (iii) the designation serves a "gate-keeping" function that allows the Contracting State to control any given agency's dealings with foreign investors.[186]

232.    The *Niko* tribunal considered that the two concepts of designation and communication are separate elements of Article 25(1) of the ICSID Convention and should not be merged as had been done by the *Cambodia Power* tribunal.

233.    Both tribunals agree that designation is the sole preserve of the State. However, the *Niko* tribunal took "a more nuanced position with respect to the communication of designation to the Centre where in case of *ad hoc* designation other forms of communication are not necessarily excluded."[187]

234.    The Tribunal is persuaded by the detailed analysis by the *Niko* tribunal in its decision on jurisdiction.[188] In that analysis, the tribunal applies the rules of interpretation under the VCLT, which this Tribunal subscribes to. The *Niko* tribunal also provides explanations, which this Tribunal equally finds persuasive and convincing, for departing from and finding differently than the earlier decision in *Cambodia Power*.

235.    For context, and given its relevance to the arguments advanced by the Parties, the Tribunal recalls the "[c]onclusions concerning the requirement of 'designation' under Article 25(1)" of the *Niko* tribunal, which were expressed following its extensive analysis on the issue, including, distinguishing its position from that of the tribunal in *Cambodia Power*:

> *Designation, as required under Article 25(1), refers to an act by a Contracting State by which the State* <u>*confers upon the agency the capacity to conclude a valid ICSID arbitration agreement and become a party to an ICSID arbitration*</u>*. Designation may be expressed by the State in a general form or specifically for a particular project or dispute.*

---

[186] **RL-0014**, *Cambodia Power v. Cambodia*, paras. 249-250. It is also noteworthy, as observed by the *Niko* tribunal, that the "*Cambodia Power* tribunal itself, elsewhere in its decision, accepts that 'formal notification to the Centre' is not necessarily 'the only means by which a designation might be brought to the Centre's attention'; it also accepts 'the use of other channels of communication' and mentions specifically that designation may be 'given public notoriety by the Contracting State such as to come to the Centre's attention:'" **CL-0006**, *Niko v. Bangladesh*, para. 323.

[187] **CL-0006**, *Niko v. Bangladesh*, para. 323.

[188] **CL-0006**, *Niko v. Bangladesh*, paras. 264 *et seq*.

> *Article 25(1) does not prescribe a particular form for the designating act. In particular in the context of ad hoc designations, these may be expressed implicitly, for example by the State's approval of the conclusion by the agency of an ICSID arbitration agreement.*
>
> *The requirement in Article 25(1) of designation "by the State" does not necessarily apply to the manner in which designation is made known "to the Centre". Article 25(1) does not prescribe any form for this communication. Therefore, an arbitral tribunal may give effect to an existing ad hoc designation which may be made known to ICSID by an investor when filing a Request for Arbitration by a statement pertaining to a specific dispute, particular facts, and in accordance with Institution Rule 2.*
>
> *In particular, if an ad hoc designation is expressed implicitly in the form of the State's approval of the ICSID arbitration agreement concluded by the agency, communication may take place by bringing this approval to the attention of the Centre with the Request for Arbitration in the form in which it was expressed.*
>
> *This understanding of the designation requirement ensures that the principal objective, that of conferring limited international capacity on a particular agency, is met. It permits the State to use designation for purposes of public notification, if it so desires, but it does not require that this be done. The objective of protecting the State against poorly considered commitments by agencies is achieved above all by the requirement of approval according to Article 25(3).*[189] (emphasis added)

236.    The Tribunal also recalls the commentary by Professor Schreuer *et al.*, which notes, in relevant part, as follows:

> *Designation is an act of the Contracting State by which it manifests its intention that a constituent subdivision or agency can be,* in abstracto, *a party to an ICSID arbitration. As stated by the Tribunal in Niko Resources v Bangladesh, the designation has, as its main purpose, to confer on the constituent subdivision or agency in question limited international capacity before the Centre.*
>
> *Apart from this main purpose, designations also have a number of secondary purposes. One such purpose is to provide information to foreign investors and contribute to legal certainty by giving an investor an assurance that he or she is dealing with an entity that*

---

[189] **CL-0006**, *Niko v. Bangladesh*, paras. 325-329.

*can, in principle, and subject only to further approval pursuant to Art. 25(3), be a party to ICSID proceedings.*

*Another secondary purpose concerns the authentication connection to a designation made by the host State, as there may be a dispute whether an entity is in fact a constituent subdivision or agency.*[190] [footnotes omitted]

*In terms of content, a designation must demonstrate the host State's intention to confer procedural status on a constituent subdivision or agency before the Centre.* […] *[T]he instrument in question must evince a clear intention to confer the capacity on that entity to become a party to an ICSID proceeding. To this end, the instrument in question must identify the subdivision or agency in question and make clear that capacity is conferred on it to submit to ICSID's jurisdiction.* […] *Designations can be made either in general form, that is, for any future dispute with foreign nationals, or ad hoc, that is, for a specific project, agreement, or even dispute.*[191] [footnotes omitted]

237.   The Tribunal finds that the designation in this case occurred with the State executing alongside the Second Respondent, an agency of the State, the Facility Agreement, which provides for ICSID arbitration, and which went through different high-level Government approvals. There were no exceptions or limitations expressed in the Facility Agreement, nor in the process of approval, concerning the Second Respondent's capacity to be party to an ICSID arbitration under Clause 40.3(a) of the Facility Agreement. As is clear from the discussion in paragraphs 253 to 267 below, the Tribunal does not consider that such limitation can be inferred from reading sub-paragraphs (a) and (b) together.

238.   Put differently, the Facility Agreement—by creating benefits, obligations and responsibilities for the Second Respondent, including advance consent to ICSID arbitration for resolving any disputes that arise therefrom—clearly conveyed upon, and identified the Second Respondent as having, eligibility/capacity to be a party in a qualifying arbitration before ICSID.

---

[190] C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), paras. 549-550.
[191] C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 553, citing, *inter alia*, **CL-0075**, *Government of the Province of East Kalimantan v. PT Kaltim Prima Coal and others*, ICSID Case No. ARB/07/3, Award, 28 December 2009 ("***East Kalimantan v. PT Kaltim Prima Coal***"), para. 192; **CL-0006**, *Niko v. Bangladesh*, para. 299.

239. This Tribunal agrees with and adopts the conclusions of the *Niko* tribunal expressed in paragraph 235 above, and, as further explained in paragraphs 242 and 243 below, applying them to the facts of this case, has come to the conclusion that the State of South Sudan has in this case conferred upon the Second Respondent, being one of its agencies, the capacity to conclude a valid ICSID arbitration agreement and become a party to an ICSID arbitration. The Tribunal has, thus, found that the Second Respondent has been designated to the Centre by the State of South Sudan for purposes of Article 25(1) of the Convention with respect to disputes arising out of the Facility Agreement.

### (i)  Scope of Designation – General or *ad hoc*

240. Regarding the *ad hoc* nature of the designation identified in the preceding paragraphs, the Tribunal recalls that ICSID maintains a public register of entities that have been designated to the Centre by Member States for purposes of Article 25 of the Convention.[192] It is not disputed by the Parties that ICSID's public register does not list the Bank of South Sudan as an agency that has been designated generally to the Centre. At the same time, ICSID notes in the published list that "*ad hoc* designations and notifications made by Contracting States pursuant to Articles 25(1) and 25(3) are excluded from this listing."[193] This is not only recognition that designation could be *ad hoc*, but also an indication that lack of mention on the list is, alone, not decisive of the question whether an entity has been designated.

241. The Tribunal, thus, finds that the designation in this case is no less valid because of its *ad hoc* nature.

### (ii)  Designation in the Facility Agreement

242. As stated in paragraph 239 above, the Tribunal finds that the designation of BSS to the Centre is clear from the Facility Agreement, which is also the instrument of consent in this case, and which is entered into jointly by the State and one of its agencies. From the arbitration clause, to which no limitations or reservations were expressed by the State, it is

---

[192] ICSID, Designations by Contracting States Regarding Constituent Subdivisions or Agencies, Doc. No. ICSID/8-C, 28 October 2022 (available at:
https://icsid.worldbank.org/sites/default/files/documents/2022_Oct%2028_ICSID.ENG.pdf#page=9).
[193] Note to ICSID/8-C.

clear that the State intended that the Second Respondent can be a party to an ICSID arbitration of disputes arising from the Agreement. The existence of such capacity is also meant to be conveyed by that provision. In reaching this conclusion, the Tribunal notes the following points.

a.    The Facility Agreement was executed by both Respondents, with no limitations, reservation or carveout regarding the consent to arbitration.

b.    The Facility Agreement is replete with provisions stipulating different roles for the different parties thereto. Some of the provisions apply jointly to the two sides, some to each one of the three parties. There is no indication that the ICSID arbitration clause is in any way limited or exclusionary of one of the three contracting parties as argued by the Respondents. Thus, without more, the clause can only be read as applying equally to all parties to the Facility Agreement.

c.    Having been signed by the State alongside the Second Respondent, the Facility Agreement went through different levels of approval within the executive and legislative arms of the Government.[194] It would not, in such circumstances, be wrong to infer that the Government, in the Facility Agreement and the related approvals, intended to, and did, confer on the Second Respondent capacity to be a party to arbitration before ICSID. Indeed, it would be wrong to conclude that the Government signed the Facility Agreement alongside the Second Respondent, and had it approved (by the Technical Loan Committee in the Office of the President, the Council of Ministers, the Legislature, and the President), and all the while intending that certain unidentified provisions, such as the ICSID arbitration clause, do not apply to a certain party.  This is in spite of there being no indication in support thereof on the face of the provisions in question. If this were to be accepted as fact, then it would be difficult to ever know how many other such provisions

---

[194] See C-0052, Republic of South Sudan, Office of the President, Technical Loan Committee, "Approval of the Facility Agreement," 6 April 2018; C-0053, Republic of South Sudan, Ministry of Cabinet Affairs, Transitional Government of National Unity Resolutions of the Council of Ministers, Resolution No. 23/2018, 6 April 2018; C-0054, Republic of South Sudan, National Legislative Assembly, Resolution No. 20/2018, 10 April 2018; C-0055, Republic of South Sudan, The President, "Instrument of Ratification of the Republic of South Sudan of the Master Facility Agreement between the Government of the Republic of South Sudan and Qatar National Bank (Q.P.S.C.)," 27 April 2018; and C-0056, Republic of South Sudan, The President, Republican Order No. 3/2018, 27 April 2018.

exist in the document. The effect would be to undermine the integrity of the document, which could not have been the intention of the parties thereto.

d.    Relatedly, it is assumed that the Parties entered into the Facility Agreement in good faith. It can therefore not be the case that the Second Respondent consented to ICSID arbitration in the Facility Agreement, knowing that it did not have the capacity to do so. Neither can it be assumed that the Government not only entered into the Facility Agreement alongside the Second Respondent but approved it without reservation, in the knowledge that the clause providing for ICSID arbitration is of no effect with respect to the Second Respondent, even though on the face of it there is no reason to doubt that it has effect.

243.    The Tribunal can therefore only conclude, based on the above, that the State intended to, and did, confer on the Bank of South Sudan, capacity to be party to ICSID arbitration relating to the Facility Agreement. The Tribunal, thus, finds that the Government's unreserved entry into the Facility Agreement constitutes an *ad hoc* designation of the Bank of South Sudan for purposes of Article 25(3) of the ICSID Convention. This is a finding strengthened, first, by the fact that the Bank of South Sudan was a party to the Facility Agreement, alongside the Government, and, secondly, by the fact of the Government's equally unreserved approval of the Facility Agreement post-signature.

### (iii)    <u>Communication of Designation</u>

244.    The Tribunal notes that it is common ground among the Parties that designation, whether general or *ad hoc*, and in whatever form, must be communicated to the Centre. The controversy is, however, over who can communicate designation to the Centre for it to be effective.

245.    The tribunal in *Cambodia Power v. Cambodia* considered that communication of the designation is the sole preserve of the State which is the only one that can make the designation. Conversely, in *East Kalimantan v. PT Kaltim Prima Coal*, the tribunal stated that "the designation requirement may in particular be deemed fulfilled when a document that emanates from the State is filed with the request for arbitration and shows the State's

intent to name a specific entity as a constituent subdivision or agency."[195] Also, commentators have argued that how and by whom communication occurs is irrelevant where there is a clear intention of the State to designate.[196]

246.    Again, the Tribunal after its analysis of the issue is persuaded by the analysis, reasoning and conclusions of the *Niko v. Bangladesh* tribunal. According to that tribunal, since Article 25(1) of the ICSID Convention does not specify the manner in which designation is to be made known to the Centre, nor the form of any such communication, "an arbitral tribunal may give effect to an existing *ad hoc* designation which may be made known to ICSID by an investor when filing a Request for Arbitration."[197]

247.    Further, the Tribunal recalls that Rule 2(1)(b) of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**ICSID Institution Rules**") provides that the Request for Arbitration shall "state, if one of the parties is a constituent subdivision or agency of a Contracting State, that it has been designated to the Centre by that State pursuant to Article 25(1) of the Convention." The Tribunal also notes that in the case before it, the Claimant states as follows in the Request for Arbitration:

> *By way of the Facility Agreement, South Sudan has designated BSS for ICSID arbitration and given its approval of the Respondents' consent to ICSID arbitration per the requirements of Article 25 of the ICSID Convention.* […]
>
> *In the present case, South Sudan has clearly designated BSS for ICSID arbitration by expressly and formally approving in the Facility Agreement a clause submitting disputes between BSS and the Claimant to arbitration under the ICSID Arbitration Rules.*
>
> *By way of this Request for Arbitration, the Claimant has communicated the designation of BSS to ICSID.*[198]

---

[195] **CL-0075**, *East Kalimantan v. PT Kaltim Prima Coal*, para. 193.
[196] *See* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 561 and the authorities cited therein.
[197] **CL-0006**, *Niko v. Bangladesh*, para. 327.
[198] Cl. Request for Arbitration, paras. 36-38.

248.    The Tribunal thus accepts that the designation of the Second Respondent to the Centre was properly communicated to the Centre by the Claimant in the Request for Arbitration, as anticipated by ICSID Institution Rule 2(1)(b).

#### (iv)    The Second Respondent has been Designated to the Centre

249.    The Tribunal, having carefully considered the arguments and evidence presented by the Parties as well as relevant jurisprudence on the subject, finds that the Second Respondent has been designated to ICSID by the State of South Sudan, for purposes of the present arbitration. The Tribunal, accordingly, rejects the Respondents' objection to jurisdiction in that regard.

250.    It is the Tribunal's conclusion that the designation by South Sudan is clear from the signing of the Facility Agreement, to which both the State and the Second Respondent are parties along with the Claimant.

251.    The Facility Agreement contains a provision in which the parties agree to submit disputes to ICSID. Evidence has been submitted to the Tribunal showing that the Agreement went through different high-level Government approvals. There is nothing on the face of the Facility Agreement, nor from the different instruments of Government approvals to suggest that the Second Respondent would not have capacity to be a party to ICSID arbitration of disputes for which consent appears to be provided in Clause 40.3(a).

252.    The Tribunal, while noting the significance of notification to the Centre of designation, also finds that such notification of an *ad hoc* designation was in this case done by the Claimant when submitting the request for arbitration as anticipated in ICSID Institution Rule 2(1)(b).

#### c.    Has the Second Respondent Provided Written Consent to ICSID Arbitration?

253.    Having determined that there exists, for the purposes of the ICSID Convention, an investment in this case, and that the Second Respondent was properly designated to the Centre for purposes of Article 25(1) of the ICSID Convention concerning disputes arising out of the Facility Agreement, the Tribunal must now turn to the question of consent to

arbitration. In particular, the Tribunal has to determine whether the Second Respondent has provided written consent which has been approved by the State as required by Article 25(2) of the Convention in the event that the State has not notified ICSID that no such approval is required.

254.    This is thus a two-part inquiry. First, is the question whether the Second Respondent has provided consent to ICSID arbitration, as required of all parties in an arbitration under the Convention. The second question is, if consent has been given, whether such consent has been approved by the relevant ICSID contracting State Party.

### (i)    Consent to Arbitration

255.    The Facility Agreement provides in Clause 40.3, in relevant part, as follows:

> (a)    *Subject to paragraph (b) below, any dispute, claim, difference or controversy arising out of, relating to or having any connection with this Agreement, including any dispute as to its existence, validity, interpretation, performance, breach or termination or the consequences of its nullity and any dispute relating to any non-contractual obligations arising out of or in connection with it (for the purpose of this Clause 40, a **Dispute**), shall be referred to and finally resolved by arbitration under the Arbitration Rules of the International Centre for Settlement of Investment Disputes (**ICSID**) by three arbitrators appointed in accordance with such Arbitration Rules.*

> (b)    *The Parties hereby agree that if for any reason whatsoever ICSID or any Tribunal appointed pursuant to paragraph (a) above should decline to accept jurisdiction to hear any Dispute referred to them, then such Dispute shall be finally settled by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this Clause 40 if this paragraph (b) applies.[199]*

256.    The fact is that Clause 40.3(a) constitutes consent to ICSID arbitration. The issue is whether such consent is attributable to and applicable to the Second Respondent.

---

[199] **C-0001**, Facility Agreement, Clauses 40.3(a)-(b).

257.    In particular, the Parties differ in their interpretation of the effect of the opening words of Clause 40.3(a): "Subject to paragraph (b) below." The issue is whether, as the Respondents assert, those words have the effect of excusing the Second Respondent from the consent to ICSID arbitration provided therein.

258.    According to the Respondents, Clause 40.3(a) "takes cognizant [*sic*] of the fact that the [S]econd Respondent is not a contracting state and neither is it a designated entity and for that reason is not subject to the jurisdiction of ICSID."[200] They maintain that "the Parties were well aware that there was a possibility that the [Facility] Agreement and the transactions thereunder did not squarely fall within the scope of the Centre's jurisdiction."[201]

259.    The Respondents also seem to contend that the consent to ICSID arbitration provided in Clause 40.3(a) was, by application of Clause 40.3(b), limited only to first determining jurisdiction, as a result of the introductory phrase to Clause 40.3(a).[202] Such an interpretation of the clause is not apparent from the plain reading of the words. It would therefore involve implying a meaning into the words. However, that step is only necessary when the intention of the parties is not clear from the plain meaning of the words used.

260.    Under English law, which is the applicable law under the Facility Agreement, the primary source for understanding what contracting parties mean in their agreement is "their language interpreted in accordance with conventional usage."[203] Thus, the Tribunal would first determine whether the intention of the contracting parties in Clause 40.3 is clear and, if not, seek to determine what those intentions could be.

261.    The Tribunal considers that the intention of the parties as expressed in Clause 40.3 is clear. The Tribunal agrees with the Respondents that by virtue of its opening phrase ("subject to

---

[200] Resp. Rej., para. 90.
[201] Resp. C-Mem., para. 54.
[202] Tr. Day 1, 123:16–124:21; Tr. Day 3, 66:9–68:5.
[203] *See* **CL-0107**, *Bank of Credit and Commerce International SA (in compulsory liquidation) v. Munwar Ali, Sultana Runi Khan and others*, United Kingdom House of Lords, Judgment, 1 March 2001 ("***BCCI v. Ali***"), para. 39; **CL-0108**, *Rainy Sky SA and others v. Kookmin Bank*, United Kingdom Supreme Court, Judgment, 2 November 2011 ("***Rainy Sky v. Kookmin Bank***"), para. 14 (which was recently cited in **CL-0109**, *Soteria Insurance v. IBM United Kingdom Limited*, England and Wales Court of Appeal, Judgment, 4 April 2022 ("***Soteria v. IBM***"), para. 31).

paragraph (b) below"), "Clause 40.3 (a) is not a stand alone clause."[204] However, the Tribunal disagrees with the Respondents as to the implication of that link between the two sub-paragraphs of Clause 40.3.

262.    The two sub-clauses deal with the forum for "final" resolution or settlement of disputes arising under the Agreement. Disputes are to be finally settled by arbitration before ICSID. Those disputes that cannot be so resolved because ICSID or any of its tribunals declines jurisdiction, shall be finally resolved by arbitration before the LCIA.

263.    Thus, "[s]ubject to paragraph (b) below" simply refers to the alternative forum that the parties have agreed for final resolution of disputes that will (for reasons identified in subparagraph (b)) not be finally resolved under paragraph (a).

264.    Further, subparagraph (b) begins with "if for any reason whatsoever ICSID or any Tribunal appointed pursuant to paragraph (a) above should decline to accept jurisdiction to hear any Dispute referred to them […]." This means that the application of that sub-paragraph is dependent on the outcome of a jurisdictional determination by ICSID or an ICSID tribunal. The authority for such determination is the consent provided by the contracting parties in subparagraph (a). Indeed, the clear implication of the opening words of subparagraph (b) is that the disputes referred to therein would already have been taken before ICSID—based on the consent provided in paragraph (a). Thus, those opening words of subparagraph (b) reflect acceptance by the parties that they have provided consent on the basis of which such determinations could be made by ICSID or by an arbitral tribunal constituted under the ICSID Convention for a dispute under the Facility Agreement.

265.    The Tribunal, therefore, concludes that the phrase in Clause 40.3(b) of the Facility Agreement conditioning the LCIA arbitration option on the decision of ICSID or an ICSID tribunal declining to accept jurisdiction is simply a recognition of the ever-present possibility in every arbitration of a finding of absence of jurisdiction. The Tribunal considers that, in separating that possibility into two—first, the declining of jurisdiction by "ICSID;" and second, the declining of jurisdiction by an ICSID tribunal—the Facility

---

[204] Resp. Rej., para. 88.

Agreement is merely recognizing the facts that (i) the Centre may refuse registration of a request for arbitration under Article 36(3) of the Convention and ICSID Institution Rule 6(1)(b); and (ii) an ICSID tribunal can make a finding of absence of jurisdiction under Article 40(1) of the ICSID Convention and ICSID Arbitration Rule 41.

266.    In conclusion, the Tribunal reiterates its findings that Clause 40.3(a) of the Facility Agreement is a valid arbitration clause by which the parties to the Facility Agreement provide advance consent to ICSID arbitration of qualifying disputes. The consent in that Clause is not, as argued by the Respondents, conditional "upon the Centre determining its competence as to jurisdiction" or "upon determination of the issue of jurisdiction by the Tribunal."[205] Thus, BSS consented to ICSID arbitration when it executed the Facility Agreement.

267.    The Tribunal rejects any notion that the ICSID and LCIA options are alternative options. The Tribunal equally rejects any contention that the consent to ICSID arbitration under Clause 40.3(a) of the Facility Agreement is limited in scope to a determination on jurisdiction as the Respondents would appear to suggest.

### (ii)    Approval of Consent to Arbitration

268.    Having thus found that the Second Respondent consented in writing to submit the present dispute to ICSID arbitration, the Tribunal must now determine whether such consent of the Second Respondent was approved by the Government in the event that the State not notified ICSID that no such approval is required, as required under Article 25(3) of the ICSID Convention which provides:

> *Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.*

269.    For purposes of Article 25(3) of the ICSID Convention, therefore, there must be a showing of approval by the State of the consent which BSS has been found to have provided in Clause 40.3(a) of the Facility Agreement. It is not in dispute that there has been no

---

[205] Resp. C-Mem., paras. 54-55.

notification to the Centre of approval by the State of the consent to ICSID arbitration provided by BSS in Clause 40.3(a) of the Facility Agreement. It is also not in dispute that South Sudan has not notified the Centre that approval of consent provided by BSS is not required. The Tribunal must therefore determine whether there has been such approval of consent in this case in the absence of any direct notification of approval or communication of waiver of its requirement.

270. The Tribunal accepts that the requirement of the approval of consent serves a gate keeping function by ensuring that the State maintains control over which of its constituent subdivisions or agencies are permitted to have access to ICSID arbitration.[206]

271. The Tribunal also recognizes that approval is a unilateral act of the State which, although advisable, need not be communicated to be valid.[207] The Convention does not specify any particular form for the approval of consent, thus, approval could exist even when not specifically expressed—and can be inferred from actions of the State. For example, in *Noble Energy v. Ecuador*, the tribunal found that consent to ICSID arbitration was "satisfactorily approved by the State" when the concession contract in issue was signed by the then President of Ecuador as witness of honour ("*Testigo de honor*").[208]

272. In the present case, the Tribunal finds that both the Government and BSS provided consent to ICSID arbitration when they executed the Facility Agreement. By providing consent to ICSID arbitration in Clause 40.3 alongside BSS, the Government also approved the consent that BSS provided in that clause. The Tribunal finds it difficult to contemplate that in a situation such as the present, the Government could be taken as not having approved the consent provided by BSS.

---

[206] *See* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 1451; *see also* **CL-0006**, *Niko v. Bangladesh*, para. 324.
[207] *See* C. Schreuer, S. Schill and A. Sinclair, "Article 25," in *The ICSID Convention: A Commentary* (Cambridge University Press, 2022), para. 1457.
[208] **CL-0007**, *Noble Energy v. Ecuador*, paras. 179-182.

273.    The Tribunal notes that, after its execution by the contracting parties, the Facility Agreement was approved without reservation at the highest levels of the Government of South Sudan,[209] including:

a.    the Office of the President's "Technical Loan Committee" and its Supervisor;[210]

b.    the Council of Ministers;[211]

c.    the National Legislative Assembly;[212] and

d.    the President of the Republic of South Sudan.[213]

274.    In these acts of approval of the Facility Agreement, there was no reservation relating to the consent to ICSID arbitration provided by the Bank of South Sudan in Clause 40.3(a). There is, thus, no basis on which to conclude that the Government was in any way opposed to the provision of that consent. Beyond that, it can only be concluded that the Government by approving the Facility Agreement, which was signed by its Ministry of Finance and Economic Planning, naturally approved every provision in it, including the clause in which the Second Respondent consented to ICSID arbitration.

275.    Indeed, it would be illogical to conclude, in the circumstances, that a government that provided consent jointly with its agency did not approve of that consent provided by the agency. Not only is there no text in the instrument itself to support such a conclusion, but there is also no indication in any of the instruments by which the Facility Agreement was approved by the Technical Loan Committee, the Council of Ministers and the legislative

---

[209] Included among the nine "Authorising documentation" listed in Schedule 2 to the Facility Agreement as "Conditions Precedent" are approving Resolutions of the National Assembly and of the Council of Ministers.
[210] *See* Cl. Reply, fn. 350, referring to **C-0052**, Republic of South Sudan, Office of the President, Technical Loan Committee, "Approval of the Facility Agreement," 6 April 2018.
[211] *See* Cl. Reply, fn. 348, referring to **C-0053**, Republic of South Sudan, Ministry of Cabinet Affairs, Transitional Government of National Unity Resolutions of the Council of Ministers, Resolution No. 23/2018, 6 April 2018.
[212] *See* Cl. Reply, fn. 349, referring to **C-0054**, Republic of South Sudan, National Legislative Assembly, Resolution No. 20/2018, 10 April 2018. On the publicity of the National Legislative Assembly's sessions, *see* **C-0051**, Transitional Constitution of the Republic of South Sudan, 2011, Art. 75.
[213] *See* Cl. Reply, fn. 347, referring to **C-0055**, Republic of South Sudan, The President, "Instrument of Ratification of the Republic of South Sudan of the Master Facility Agreement between the Government of the Republic of South Sudan and Qatar National Bank (Q.P.S.C.)," 27 April 2018; **C-0056**, Republic of South Sudan, The President, Republican Order No. 3/2018, 27 April 2018.

arm of the Government and the Presidency, to suggest that there was any intention for the approval of the Facility Agreement to exclude the consent to arbitration in Clause 40.3. To conclude differently would make the relevant provisions in the Facility Agreement meaningless, while calling into question the good faith of the Government in concluding the Facility Agreement.

276.    The need for agreements such as the Facility Agreement to be approved by different arms of Government at very senior levels, highlight the importance that the Government ascribes to such an agreement, and safeguards against the Government assuming obligations that were not intended. The Tribunal must therefore ascribe to the fact of those approvals the seriousness that they imply. Indeed, if any of those approvals had contained a reservation or carveout on any of the provisions in the Facility Agreement, the Tribunal would have no option but to take that into consideration in interpreting the Facility Agreement.

### d.    Conclusion

277.    From the foregoing, the Tribunal makes the following conclusions with respect to the second objection to jurisdiction.

a.    South Sudan, through the act of entering into the Facility Agreement which contains consent to ICSID arbitration, alongside the Bank of South Sudan, identified the Bank of South Sudan as eligible to be a party to arbitration under the ICSID Convention. Such act, for this Tribunal, constitutes designation for purposes of Article 25(1) of the ICSID Convention.

b.    As recognized by other tribunals, the designation is no less valid for not having been expressly communicated by the Government to the Centre. ICSID in its published list of designated entities recognizes that there may be designations that may not have been communicated to the Centre by the State. The designation in this case was properly communicated to the Centre by the Claimant, pursuant to ICSID Institutional Rule 2.

c.    The Bank of South Sudan provided consent in writing to ICSID arbitration under Clause 40.3(a) of the Facility Agreement. The consent to LCIA arbitration in

Clause 40.3(b) does not in any way invalidate the consent provided in Clause 40.3(a). Rather, it confirms that the contracting parties have agreed to first take disputes under the Facility Agreement to ICSID.

d.  South Sudan, through the actions of executing the Facility Agreement without reservation, approved the consent to ICSID arbitration provided by the Bank of South Sudan in Clause 40.3(a). This is buttressed by the fact that Facility Agreement also went through several governmental approvals, without reservations on the ICSID arbitration clause.

278.  These conclusions are drawn from the Tribunal's interpretation of Clauses 40.3(a) and (b) of the Facility Agreement in the light of the object and purpose of the Agreement.

279.  The Tribunal, therefore, finds that the Second Respondent is subject to the jurisdiction of ICSID and of this Tribunal and rejects the second objection to jurisdiction.

## VIII.  LIABILITY

### A.  THE CLAIMANT'S POSITION ON LIABILITY

280.  The Claimant alleges that the Respondents have breached the Facility Agreement, primarily, by failing to make payment on the agreed schedule. In particular, the Claimant asserts that the First Respondent has breached Clause 6(a) of the Facility Agreement which provides that "[t]he Borrower must repay the Loans by the instalments and on the repayment dates specified in [the Repayment Schedule]."[214] QNB notes that under Clause 21 of the Facility Agreement, non-payment is an event of default based on which Clause 21.16 of the Agreement (*i.e.* the "**Acceleration Clause**") could be invoked, and having breached Clause 6(a), South Sudan is liable to immediately repay the entire loan amount plus accrued interest.[215]

---

[214] **C-0001**, Facility Agreement, Clause 6(a).
[215] Cl. Reply, paras. 196-200.

281.    The Claimant admits receiving, after commencing the present proceedings, "partial repayments through the Off-take Agreement mechanism. However, South Sudan remains in default and BSS has failed to honour its obligations as guarantor."[216]

282.    The Claimant further asserts that

> in addition to material breaches of its repayment obligations, South Sudan has also breached multiple other provisions of the Facility Agreement, including, but not limited to:
>
> a)  Breach of clause 11.1 by failing to pay the Management Fee; and
>
> b)  Breach of clause 20.7(c) by failing to maintain "[...] a balance standing to the credit of the Proceeds Account [of] an amount not less than the aggregate [of] the [USD] equivalent of the amount received by the Borrower under the Off-take Agreement in respect of the sale of not less than 600,000 barrels of oil per quarter".[217]

283.    The Claimant asserts that BSS breached its obligations as guarantor under the Facility Agreement with respect to the Agreement's "see to it" provision (*i.e.* Clause 17.(a)), which provides that BSS guarantees that South Sudan punctually performs its obligations; BSS thereby becomes automatically liable for any instalments due, as well as for the entire amount owed when the Acceleration Clause was invoked.[218] The Claimant argues that

> BSS has also breached other provisions of the Facility Agreement by failing to:
>
> a)  Honour its guarantee of the payment of the Management Fee as per clause 11.1.
>
> b)  Honour its guarantee of the maintenance of "[...] a balance standing to the credit of the Proceeds Account of an amount not less than the aggregate of the USD equivalent of the amount received by the Borrower under the Off-take Agreement in respect of the sale of not less than 600,000 barrels of oil per quarter" as per clause 20.7(c); and

---

[216] Cl. Reply, para. 202.
[217] Cl. Mem., para. 118; Cl. Reply, para. 205.
[218] Cl. Reply, paras. 206-209.

    c)  *"[E]nsure that it deposits an amount into the Consolidated Fund Account such that the balance standing to the credit of the Consolidated fund Account is not less than the Required Balance" as per clause 20.7(f).*[219] [footnotes omitted]

284.  The Claimant dismisses as general, irrelevant and not constituting a defence to liability the arguments advanced by the Respondents in support of their position that they had not breached the Agreement.[220]

285.  Responding to the arguments by the Respondents in their post-Hearing submission on the Acceleration Clause, the Claimant argues that under English law, there is no requirement for a lender to terminate a loan agreement, or treat a loan agreement as terminated, upon invocation of an acceleration clause; rather, "the lender's entitlement to rely on an invocation of an acceleration clause is determined by the agreed contractual provisions."[221]

286.  Noting that in the present case the Acceleration Clause does not require that the lender terminate the Facility Agreement or treat it as terminated, the Claimant cites the English High Court case of *International Finance Corporation v. Punj Lloyd Limited* in support of the contention that "the lender may decide to invoke the acceleration clause in a loan agreement without terminating the contract."[222]

287.  The Claimant rejects the Respondents' contention that it can be deduced from a reading of Clause 21 of the Facility Agreement as a whole that the spirit of the clause is that triggering the acceleration implies cancellation of the Facility Agreement. It argues that under English law, the primary source for understanding what the parties meant is their language interpreted in accordance with conventional usage. In this case, the language is clear and there is no basis for reading any further meaning into it. The *Lombard v. European Skyjets* case cited by the Respondents is distinguishable from the present case because the contract

---

[219] Cl. Reply, para. 214.
[220] Cl. Reply, paras. 215 *et seq*.
[221] Cl. Reply WR, para. 13.
[222] Cl. Reply WR, paras. 13-14, referring to, *inter alia*, **CL-0106**, *International Finance Corporation v. Punj Lloyd Limited and Punj Lloyd Upstream Limited*, England and Wales High Court (Queen's Bench Division, Commercial Court), Judgment, 6 May 2016 ("***International Finance Corporation v. Punj Lloyd Limited***"), paras. 3, 12.

in that case specifically provided for cancellation of the agreement upon triggering of the Acceleration Clause.[223]

288.    Regarding the effect of receiving partial payments and not objecting to the coming into effect of the Off-take arrangement, after having triggered the Acceleration Clause, the Claimant argues that it has not by so doing waived its right to rely on the Acceleration Clause.[224] Clause 34 of the Facility Agreement deals with waivers and Clause 35.1(a) addresses required consents for amendments and waivers. Together, they provide that written consent is required for waivers, which the Claimant has not provided.[225] Similarly, a waiver can only occur under English law if the Claimant has unequivocally represented by words or conduct that it does not intend to enforce those legal rights—which has not happened in this case.[226]

## B.    THE RESPONDENTS' POSITION ON LIABILITY

289.    The Respondents respond to the Claimant's "allegations of breach of the Facility Agreement" with arguments that include the following points.[227]

    a.    "[T]he Loan was utilized for the specific purpose as had been intended by [the] parties and stated in the Facility Agreement. There is no evidence pointing to any form of misappropriation of the Loan. This confirms that indeed the [F]irst Respondent honored the terms of the Agreement with respect to the purpose of the Loan as provided under Clause 3.1 of the Facility Agreement."[228]

    b.    Since gaining independence "on or about 9th July, 2011 […] the [F]irst Respondent has been a struggling economy negatively impacted by peace instability and other

---

[223] Cl. Reply WR, paras. 16-18.
[224] Cl. Reply WR, para. 19.
[225] Cl. Reply WR, paras. 20-22.
[226] Cl. Reply WR, para. 24, citing **CL-0114**, *Motor Oil Hellas (Corinth) Refineries SA v. Shipping Corporation of India (The Kanchenjunga)*, United Kingdom House of Lords, Judgment, 15 February 1990; **CL-0115**, *F&T Terrix Limited v. CBT Global Limited*, England and Wales High Court (Queen's Bench Division, Commercial Court), Judgment, para. 51; **CL-0116**, *Pharmapac (U.K.) Ltd v. HBS Healthcare Ltd*, England and Wales High Court (Queen's Bench Division, Commercial Court), Judgment, 7 January 2022, para. 25 (where the question was whether there was any "unequivocal indication that the Claimant had elected to treat the contract as continuing.").
[227] Resp. C-Mem., paras. 109 *et seq*.
[228] Resp. C-Mem., para. 109.

natural calamities such as floods and in the recent past Covid-19 pandemic." They cite to publicly available sources to back up this point.[229]

c.    The First Respondent has made efforts to repay the instalments and has, since this arbitration was initiated, made payments which the Claimant acknowledges.[230]

d.    Under an Off-take arrangement provided for in the Facility Agreement, the First Respondent could repay the Loan by way of quarterly shipments of 600,000 barrels of crude oil over 15 years starting from 15 June 2021. The first cargos were to be delivered by the First Respondent in September and December 2020, respectively, under the Off-take Agreement that the First Respondent signed with Euro American on 3 July 2020.[231]

e.    In compliance with the Off-take Agreement, Euro American, on 25 November 2020 and 22 April 2021, respectively, paid the sums of EUR 14,261,744.97 and EUR 19,065,460.85 into the dedicated bank account that the Second Respondent and the First Respondent's Ministry of Petroleum maintain with the Claimant for that purpose.[232]

290.    During the Hearing, however, the Respondents introduced arguments asserting that the Acceleration Clause in the Facility Agreement may not have been properly invoked or that the effect of that clause having been invoked may not have been sustained in the face of

---

[229] Resp. C-Mem., paras. 110-115, citing The World Bank, "The World Bank in South Sudan" (available at: https://www.worldbank.org/en/country/southsudan/overview#); United Nations, "South Sudan: Political violence on the rise, UN rights experts warn," 11 February 2022 (available at: https://news.un.org/en/story/2022/02/1111752); "440 civilians killed in South Sudan clashes: UN," *The East African*, 2 March 2022, (available at: https://www.theeastafrican.co.ke/tea/news/east-africa/south-sudan-clashes-3734056); International Committee of the Red Cross, "Ten Years after Independence, South Sudanese struggle with scars of violence," 5 July 2021 (available at: https://www.icrc.org/en/document/ten-years-after-independence-south-sudanese-struggle-scars-violence); The World Bank, "South Sudan Economic Update: Support to Agricultural Investment and Economic Reforms Critical for Sustainable Food Scarcity," 2 July 2021 (available at: https://www.worldbank.org/en/country/southsudan/publication/south-sudan-economic-update-support-to-agricultural-investment-and-economic-reforms-critical-for-sustainable-food-securi). In their Rejoinder, the Respondents also cite a 2012 paper by the Carnegie Endowment for International Peace addressing "the different types of conflict that faced South Sudan:" Resp. Rej., para. 96, citing M. Ottaway and M. El-Sadany, "Sudan: From Conflict to Conflict" in *The Carnegie Papers* (May 2012) (available at: https://carnegieendowment.org/files/sudan_conflict.pdf).
[230] Resp. C-Mem., para. 118.
[231] Resp. C-Mem., paras. 120-122.
[232] Resp. C-Mem., para. 123.

subsequent acceptance of payment by the Claimant along the terms of the Facility Agreement.[233] This prompted the Tribunal to seek, from the Respondents, post-Hearing written responses to the following questions:

> *In the event the Tribunal finds that it does have jurisdiction, and understanding that there are differences with regard to the calculation of quantum:*
>
> *(i)    Does failure to make the payments under the Facility constitute a default sufficient to accelerate the loan, and if not, why not?*
>
> *(ii)    Was the Acceleration Clause (21.16) of the Facility Agreement validly invoked, and if not, why not?*[234]

291.    The Respondents contend that it is not in dispute that, as at the time of the letter notifying the Respondents of the Acceleration Clause, there was an ongoing event of default in accordance with Clause 21 of the Facility Agreement.[235] Rather, they dispute that the conduct of the Claimant was consistent with cancellation of the Facility Agreement and an acceleration of the repayment obligations.[236]

292.    They suggest that from reading of Clause 21 as a whole, it can be inferred that "the spirit of the clause is such [that] it's triggering implies cancellation of the [Facility Agreement] and subsequent repayment arrangements made thereunder." Yet, the Claimant continued to receive repayment of the loan under terms agreed in the Facility Agreement "even after giving the notice of cancellation."[237]

293.    The Respondents assert that "taking money in partial repayment on terms agreed in the impugned agreement denotes a subsisting agreement for which one would be precluded from claiming damages for breach except such damages (special damages) that are associated with or flowing from the borrower[']s default in repayment."[238]

---

[233] *See* Tr. Day 2, 41:2-16 (Testimony of Mr. Johannes); Tr. Day 3, 78:6–79:9 (Respondents' Closing Statement).
[234] Letter from the Tribunal to the Parties, 20 January 2023.
[235] Resp. WR, paras. 1.1.-1.2. By this statement, the Respondents will appear to accept that there was indeed a breach of the Facility Agreement, which in earlier submissions they had denied.
[236] Resp. WR, para. 1.2.
[237] Resp. WR, para. 1.3.
[238] Resp. WR, para. 1.7.

294.   The Respondents cite the English High Court decision in *Lombard v. European Skyjets,* noting that although the facts of that case are different from the present, the principle in both cases is the same. The principle is that "upon activation of the acceleration clause, the lender must conduct himself in a manner as to indicate that the contract has been cancelled and he is at that point entitled only to a repayment in full of the amounts due. Any conduct inconsistent with this fact, would in his regard, constitute a waiver of his strict reliance on the acceleration clause."[239]

295.   In the present case, the Respondents argue, the Off-take Agreement was executed on 3 July 2020 and notified to the Claimant on 24 July 2020. Yet, the Claimant did not protest its coming into effect despite having activated the Acceleration Clause by letter of 16 July 2019, and in fact went on to receive payments from the Off-taker to offset the loan. The Facility Agreement is therefore not cancelled, and the Claimant should be stopped from claiming "any other damages, except such damages (special damages) flowing from or associated with the default."[240]

## C.   THE TRIBUNAL'S ANALYSIS

296.   South Sudan's repayment obligations under the Facility Agreement are stated in the Amended Repayment Schedule as follows: "The quarterly repayment shall be USD 20,000,000 (ONLY Twenty Million United States Dollars) starting 31st March 2019 until outstanding under the Facility Agreement repaid in full."[241] In Clause 17.1 of the Facility Agreement, the Second Respondent "irrevocably and unconditionally" guarantees punctual performance by South Sudan of its obligations under the Agreement; and undertakes immediately on demand to pay any amount that is due under the Agreement and not paid by the Government.

297.   The Claimant alleges a breach of the Facility Agreement through, particularly, the non-repayment of the Loan by the Respondents on the agreed schedule. The Respondents

---

[239] Resp. WR, paras. 1.4-1.6; **CL-0102**, *Lombard North Central plc v. European Skyjets Ltd (in liquidation) and others*, England and Wales High Court (Queen's Bench Division), Judgment, 30 March 2022 ("***Lombard v. European Skyjets***").
[240] Resp. WR, paras. 1.8-1.13.
[241] **C-0004-R**, Addendum No. 1 to the Facility Agreement, 30 November 2018.

do not deny that the Loan had not been repaid.[242] However, they offer reasons for the non-repayment and, for most of the proceeding, maintained that the Facility Agreement had not been breached. The Claimant also alleges breaches of Clause 11.1 for non-payment of the Management Fee, and of Clause 20.7 for not maintaining a certain balance in the Proceeds Account.[243] This is not disputed nor specifically argued by the Respondents.

298.   Another point of contention, albeit belatedly raised,[244] is whether by having received, and or continuing to receive, partial payment after invoking the Acceleration Clause, the Claimant retained its right to full immediate payment under that Clause. In other words, whether the Claimant waived its right to immediate full repayment of the outstanding loan amount when, after its demand for such, it did not oppose the coming into effect of the Off-take Arrangement, and in fact proceeded to accept repayments by instalments from the proceeds of the Off-take Agreement, which was provided for in the Facility Agreement.

299.   In their post-Hearing submissions elaborating on the Claimant's alleged loss of its rights under the Acceleration Clause, the Respondents state that "[t]he question […] is whether at the time the letter notifying the Respondents of the activation of the acceleration clause, there was an ongoing event of default in accordance with Clause 21 of the Facility Agreement. It is the Respondents' contention that this is not in dispute. What we dispute is whether the conduct of the [Claimant] was consistent with a cancellation of the [A]greement and an acceleration of repayment obligations."[245]

300.   Having not been presented in the alternative, this argument could be considered to constitute a late-in-the-day withdrawal of the Respondents' initial position that the Facility Agreement had not been breached. Nevertheless, given that the Respondents had not clearly withdrawn or retracted that initial defence and its supporting arguments, the

---

[242] *See* Tr. Day 1, 161:3–163:5 (Testimony of Mr. Mok) ("And [BSS] did not pay the total due amount, did it? It didn't.").

[243] As explained by the Claimant, "[t]o facilitate the repayment of the amounts owing under the Facility Agreement, clause 20.7 contains provisions on the accounts to be maintained with QNB by BSS on behalf of South Sudan. These are a 'Consolidated Fund Account' […] and a 'Proceeds Account:'" *see* Cl. Mem., para. 63.

[244] *See* Resp. WR, para. 6; Cl. Reply WR, para. 10.

[245] Resp. WR, paras. 1.1.-1.2.

Tribunal considers it necessary to still determine whether the Facility Agreement has been breached.

301.    Generally, therefore, the issues to be determined by the Tribunal are, first, whether there has been a breach of the Facility Agreement. If a breach is found to have occurred, the Tribunal must determine whether the entire outstanding amount of the loan is immediately payable in full, by virtue of the application of the Acceleration Clause and the subsequent entering into force of the Off-take Agreement.

### *(1)    Breach of Contract*

302.    Among the different events or circumstances set out in Clause 21 of the Facility Agreement to be an "Event of Default" is "Non-payment'" which is described as follows:

> *An Obligor does not pay on the due date any amount payable pursuant to a Finance Document in the manner and place and in the currency in which it is expressed to be payable, unless:*
>
> (a)    *its failure to pay is caused by:*
>
>    (i)    *administrative or technical error; or*
>
>    (ii)    *a Disruption Event; and*
>
> (b)    *payment is made within three Business Days of its due date.*[246]

303.    The effect of that Clause is that a breach of the Facility Agreement occurs if due payment is not made when and how provided for in the Agreement, unless such failure is caused either by administrative or technical error or by a Disruption Event. Those reasons can only delay payment for three business days, in any event.

304.    The phrase "administrative or technical error" is self-explanatory and "Disruption Event" is defined in Clause 1.1 as:

> (a)    *a material disruption to the payment or communications systems or to the financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for*

---

[246] **C-0001**, Facility Agreement, Clause 21.2.

> *transactions contemplated by the Finance Documents to be carried out), provided that the disruption is not caused by, and is beyond the control of, any of the Parties; or*
>
> (b)    *the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:*
>
> > (i)    *from performing its payment obligations under the Finance Documents; or*
> >
> > (ii)    *from communicating with other Parties in accordance with the terms of the Finance Documents,*
>
> *and which (in either case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.*[247]

305.    The Respondents failed to pay the first and subsequent instalments due from 31 March 2019, pursuant to the Amended Repayment Schedule. The Claimant, by a series of letters initially to the Government and later to BSS, starting from 26 July 2019, declared a default under Clause 21.16 of the Facility Agreement and requested immediate repayment of the entire outstanding amount due under the Agreement.[248]

306.    The Respondents, while not denying that they had defaulted in payment,[249] did not initially accept that they breached the Facility Agreement, citing as reasons for non-repayment, the fact that the funds had been utilized for their intended purpose, and not misappropriated;[250] economic hardship resulting from natural disasters and political instability;[251] and that

---

[247] **C-0001**, Facility Agreement, Clause 1.1.

[248] **C-0007**, Letter from QNB to the Ministry of Finance and Planning (with BSS in copy), 16 July 2019; **C-0008**, Letter from QNB to the Ministry of Finance and Planning, 10 September 2019; **C-0009**, Letter from QNB to the Ministry of Finance and Planning (with BSS in copy), 9 October 2019; **C-0010**, Letter from QNB to BSS (with the Ministry of Finance and the Ministry of Justice in copy), 26 January 2020; **C-0011**, Letter from QNB to the Ministry of Finance and Planning and BSS (with the Ministry of Justice in copy), 13 May 2020.

[249] See Resp. C-Mem., para. 117, noting the First Respondent's "delay in payment of the installment" and the "lack of prompt payment."

[250] Resp. C-Mem., para. 109.

[251] According to the Respondents, the reports and news releases cited are among "numerous reports" that depict the economic affairs of the First Respondent: *see* Resp. C-Mem., paras. 111-116 and the citations therein.

repayment has started, by operation of the Off-take arrangement, even if not on the agreed schedule.[252]

307.    The Tribunal notes that the reasons advanced by the Respondents for non-payment as scheduled relate only to the First Respondent. No arguments were advanced to explain why the Second Respondent did not make the payment. The Tribunal further notes that the reasons provided are not said to constitute an "administrative or technical error" or a "Disruption Event" as defined in Clause 21, or that they in any way fall under the exclusion clause of the Agreement. The Respondents have equally not argued that the reasons excuse non-performance under English law, nor do they claim that those reasons caused "a material disruption to the payment or communications systems or to the financial markets" which need to be in operation for payments under the Agreement to be made. Neither do they claim that there was a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party that resulted in the non-payment.

308.    Under English law, a breach of contract occurs where, without lawful excuse, a party either: (i) fails or refuses to perform a performance obligation imposed upon it under the terms of the contract; or (ii) performs that obligation defectively, in the sense of failing to meet the required standard of performance.[253] Thus, a breach of an agreement occurs when a party fails to comply with material obligations therein and the failure is not excused either by provisions of the agreement or operation of the law. Further, the Tribunal notes that under English law, generally, "the performance obligation is strict, so that the contractual obligation must be completely and precisely performed. There is no defence for failure to meet this strict obligation, other than an enforceable exemption clause, […], or if the deviation is 'microscopic' (the *de minimis* rule)."[254]

---

[252] Resp. C-Mem., para. 126(c). In their post-Hearing submission, the Respondents argue that the fact that the Facility Agreement had been breached is not disputed. Rather, the issue is "whether the conduct of the [Claimant] was consistent with a cancellation of the [A]greement and acceleration of repayment obligations:" see Resp. WR, paras. 1.1-1.2.

[253] *See*, *generally*, *Albert Hochster v. Edgar Frederick De La Tour*, England and Wales High Court (Queen's Bench), Judgment, 25 June 1853 (available at: https://law.justia.com/cases/foreign/united-kingdom/2-ellis-bi-678-1853.html); *Photo Production Ltd v. Securicor Transport Ltd*, United Kingdom House of Lords, Judgment, 14 February 1980 (available at: https://www.casemine.com/judgement/uk/5a8ff8da60d03e7f57ece80a).

[254] **CL-0077**, R. Merkin and S. Saintier, "13.2: Discharge by performance or agreement," in *Poole's Textbook on Contract Law* (Oxford University Press, 2021) (excerpt), p. 495.

309.    In the present case, it is not disputed that there was failure to make payment as provided under the Facility Agreement. The Respondents have not argued that their non-payment is excused under the Agreement or under the law.

310.    Against this backdrop, the Tribunal finds that failure to repay the loan, initially by the First Respondent, and later by the Second Respondent, on the due date and in the manner in which payment is expressed to be payable constitutes an Event of Default as described under Clause 21.2 of the Facility Agreement.

311.    A breach of the Facility Agreement as stipulated in Clause 21.2, thus, occurred when the Respondents failed to pay "on the due date [the] amount payable pursuant to a Finance Document in the manner and place and in the currency in which it is expressed to be payable." The Respondents have not argued nor proven that the reasons they provide for non-payment are covered under an exclusion clause in the Facility Agreement or otherwise under English law.

312.    Based on the foregoing, the Tribunal finds that, as alleged by the Claimant, the Respondents did not comply with the terms of the Facility Agreement. The Respondents have not shown, and the Tribunal has not seen reason to be convinced, that liability for such non-compliance is excused either under provisions of the Facility Agreement or otherwise exculpated under English law.

313.    The Tribunal, thus, finds that the Respondents are in breach of the Facility Agreement. By operation of the provisions of the Facility Agreement by which they have individually breached the payment obligations under the Agreement, the Respondents are jointly and severally liable for the breach.

### (2)    Acceleration Clause

314.    Next, the Tribunal considers whether, the Facility Agreement having been breached and the Acceleration Clause of the Agreement invoked, the Claimant later lost its right to full and immediate payment by continuing to receive payments by instalments. Put differently, it remains to be determined whether the Acceleration Clause, having been activated, remained tenable and valid in the face of ensuing payments by the Respondents.

315.    The Facility Agreement in Clause 21.16 provides different options for the Claimant if an Event of Default is continuing. These include the option to accelerate repayment of the entire outstanding amount under the Agreement. The provision, which is what is referred to here as the "Acceleration Clause," allows QNB by written notice to the Borrower, to

> *declare that all or part of the Loans, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable*[.][255]

316.    After the First Respondent failed to make payments due on 31 March 2019 and 30 June 2019, as provided for in the amended repayment schedule, the Claimant, by letter of 16 July 2019, to the First Respondent, with the Second Respondent in copy, activated the Acceleration Clause. The Claimant by that letter demanded immediate repayment of the entire loan amount plus accrued interest.[256]

317.    The Respondents assert that there is no dispute whether the Acceleration Clause was properly invoked as there was an ongoing default at the time of the invocation.[257] The Tribunal thus accepts that the Acceleration Clause was properly activated by the Claimant's said letter of 16 July 2019.

318.    The Respondents however argue that the dispute is "whether the conduct of the [Claimant] was consistent with a cancellation of the [A]greement and acceleration of the repayment obligations."[258] The conduct in question is the Claimant continuing to accept payment by instalment and not objecting to the execution of the Off-take Agreement.

319.    The Tribunal will thus consider whether the right to full and immediate payment of the amount outstanding under the Agreement which arose when the Acceleration Clause was properly activated, was later lost, either by virtue of provisions of the Facility Agreement or otherwise by application of English law, owing to the subsequent actions of the Parties.

---

[255] **C-0001**, Facility Agreement, Clause 21.16(b)
[256] **C-0007**, Letter from QNB to the Ministry of Finance and Planning (with BSS in copy), 16 July 2019.
[257] Resp. WR, paras. 1.1-1.2.
[258] Resp. WR, para. 1.2.

320.    The Tribunal notes that in the letter of 10 September 2019 to the Ministry of Finance and Economic Planning, after the Acceleration Clause was invoked in the letter of 16 July 2019, the Claimant, although noting, *inter alia*, that "the current outstanding as at September 09, 2019 [was] USD693,387,083.06 (the 'Total Due Amount')," sought "repayment of USD60 million on/before September 30, 2019."[259] The Tribunal does not consider this to affect the validity of the invoking of the Acceleration Clause. The Acceleration Clause, in the Tribunal's view, provides the Claimant an additional option for repayment, which does not extinguish its existing right to receive repayment in part if it so wishes.

321.    Turning first to the provisions of the Facility Agreement, the Tribunal accepts that under English law it is settled that the primary source for understanding what contracting parties mean in their agreement is "their language interpreted in accordance with conventional usage."[260] Further, the clearer the ordinary meaning of the language of a contract, "the more difficult it is to justify departing from it,"[261] and flowing from that, "no term can be implied into a contract if it contradicts an express term."[262]

322.    By definition, an acceleration clause is a loan-agreement provision that requires the debtor to pay off the balance sooner than the due date if some specified event occurs, such as failure to pay an instalment.[263] Clause 21.16 of the Facility Agreement states in relevant part that if an Event of Default is continuing, the Claimant may by notice to the First Respondent declare that all outstanding amounts be immediately due and payable, and the notice will take effect in accordance with its terms. The Tribunal finds this provision to be unambiguous and clear enough to not require an intent to be implied into it beyond the

---

[259] **C-0008**, Letter from QNB to the Ministry of Finance and Planning, 10 September 2019. In the ensuing letters of 9 October 2019, 26 January 2020, and 13 May 2020, QNB, again demands—as it did in the 16 July 2019 letter—"the immediate repayment of the Total Due Amount" while reserving its "rights, without further notice, to exercise any and all rights, remedies and powers (including taking [legal proceedings]) pursuant to the terms of [the Facility Agreement]:" *see* **C-0009**, Letter from QNB to the Ministry of Finance and Planning, 9 October 2019; **C-0010**, Letter from QNB to BSS (with the Ministry of Finance and Planning and the Ministry of Justice in copy), 26 January 2020; **C-0011**, Letter from QNB to the Ministry of Finance and Planning and BSS (with the Ministry of Justice in copy), 13 May 2020.
[260] **CL-0107**, *BCCI v. Ali*, para. 39.
[261] *Arnold v. Britton and others*, United Kingdom Supreme Court, Judgment, 10 June 2015, para. 18 (available at: https://www.supremecourt.uk/cases/docs/uksc-2013-0193-judgment.pdf).
[262] **CL-0111**, *Marks and Spencer plc v. BNP Paribas Securities Services Trust Company (Jersey) Limited and others*, United Kingdom Supreme Court, Judgment, 2 December 2015, para. 28.
[263] "Acceleration Clause," in B. Garner (ed.), *Black's Law Dictionary* (West Group, 1999).

express provisions thereof. Nor does the Tribunal see anything in Clause 21.16 or other provisions of the Facility Agreement to support an interpretation that the invoking of the Acceleration Clause entails a cancellation of the Agreement and, as a result, loss of the right to continue receiving payment by instalments.

323.    The Tribunal considers that Clause 21.16, while not requiring or implying that the Facility Agreement be cancelled, grants the lender a further option for receiving repayment under the Facility Agreement. In other words, the provision entitles the lender to demand and receive repayment in lump sum if it so wishes, in addition to the existing right to receive repayment as provided for in the Facility Agreement under the amended repayment schedule.

324.    Further, the Tribunal finds nothing in Clause 21, nor in any other provision invoked by either Party, that mandates that repayment, if demanded in whole, must be accepted in whole. The Facility Agreement's Acceleration Clause, in the Tribunal's view, has the effect of granting to the lender the additional right or prerogative to demand and/or receive payment in full—if it so chooses. That right would qualify as cumulative, with the existing ones, as referred to in Clause 34 of the Facility Agreement, which provides in relevant part that "the rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law."[264]

325.    Having already found that it considers the relevant provisions of the Facility Agreement to be unambiguous in their meaning and intent, the Tribunal also notes that English law does not require a loan agreement to be terminated, or treated as terminated, as a condition for the activation of the Acceleration Clause in the Facility Agreement.[265] The Tribunal further notes that in *Lombard v. European Skyjets*, which the Respondents rely on, the contract under consideration required the claimant to terminate the contract in order to accelerate payment of the outstanding amount.[266] That is different from the case before the present

---

[264] **C-0001**, Facility Agreement, Clause 34.
[265] *See*, *for example*, **CL-0106**, *International Finance Corporation v. Punj Lloyd Limited*.
[266] **CL-0102**, *Lombard v. European Skyjets*, para. 104. In that case, the Court understandably—given the facts of that case including the contractual provisions—held that "upon activation of the acceleration clause, the lender must conduct himself in a manner as to indicate that the contract has been cancelled and he is at that point entitled only to a repayment in full of the amounts due:" Resp. WR, para. 1.6.

Tribunal as the Facility Agreement contains no such provision, nor can it be implied as there is no ambiguity in the terms of the Facility Agreement.

326.   Ultimately, it is the borrower's obligation to repay the loan it has taken out and the lender has an interest in getting paid. Unless otherwise agreed by the parties, the borrower discharging its obligation in a manner that the lender has accepted cannot deprive the lender of rights that it has acquired under the contract. To ascribe a different interpretation to the situation would amount to the borrower benefiting from its own infraction—in this case, breach of contract.

327.   In the Tribunal's view, the Off-take arrangement exists as further assurance that the Claimant would receive repayment of the amounts due. The Tribunal therefore does not consider it necessary, as suggested by the Respondents, for QNB to object to the coming into effect of the Off-take arrangement, in order to preserve its right to receive payment immediately and in full by operation of the Acceleration Clause.

328.   The Tribunal thus finds that, in the circumstance, the Claimant was entitled to exercise its right to invoke the Acceleration Clause of the Facility Agreement, as it did, and seek immediate payment of all the amounts due.

329.   The Tribunal finds that invoking the Acceleration Clause did not imply cancellation of the Facility Agreement; nor signify that from that point the Claimant was only entitled to repayment in full of the amounts due.

330.   The Tribunal further finds that the Claimant did not waive its right to full and immediate payment under the Acceleration Clause, by not objecting to the execution of the Off-take Agreement or by continuing to accept repayment in instalments, whether through the operation of the Off-take Agreement or otherwise.

331.   Indeed, concerning the alleged waiver, the Tribunal notes that Clause 34 of the Facility Agreement provides that:

> *No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under a Finance Document will operate as a waiver, nor will any single or partial exercise of*

> *any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law and may be waived only in writing and specifically.*[267]

332.    Thus, the Tribunal considers this to mean that the Claimant does not waive its right to full and immediate payment of the total outstanding amount by not exercising it, or by exercising it partially by continuing to receive partial payment. In this regard, the Tribunal also notes the conclusion of the English High Court in *JBR Capital v. JM Investments*, that "the fact of earlier late payments accepted without protest could not amount to a relevant unequivocal representation (or agreement) precluding the [claimant's] right to rely on arrears" to terminate the contract.[268]

333.    There have also been defaults of other (non-payment) obligations defined in Clause 21.3 to be when "[a]n Obligor does not comply with any provision of the Finance Documents (other than those referred to in Clause 21.2 (Non-payment)." These alleged breaches have not been challenged and are accepted by the Tribunal as proven.

334.    Based on the foregoing, the Tribunal concludes that the Respondents are, and continue to be, liable to the Claimant for any outstanding amounts owed under the Facility Agreement. The Claimant, having properly invoked the Acceleration Clause, is entitled to immediate repayment in full of the outstanding sums under the Facility Agreement.

## IX.    DAMAGES

### A.    THE PARTIES' RESPECTIVE POSITIONS ON CALCULATION OF DAMAGES

335.    The Claimant seeks damages against both Respondents on a joint and several basis, in line with the common law compensatory principle governing damages, "which requires that the injured party is 'so far as money can do it to be placed in the same situation with respect to

---

[267] **C-0001**, Facility Agreement, Clause 34.
[268] **CL-0113**, *JBR Capital Limited v. JM Investments/Trading Ltd and Mr. Karan Abbott*, England and Wales High Court (King's Bench Division: Commercial Court), Judgment, 3 February 2023, para. 32.

damages as if the contract had been performed'."[269] The Claimant asserts that, in accordance with the Facility Agreement, it is entitled to receive in compensation:

a.    the Loan amount;

b.    interest on the Loan amount calculated as per Clause 8.1 of the Facility Agreement;

c.    the Management Fee;

d.    pre-award interest until the date of the award, calculated as per Clause 8.3 of the Facility Agreement; and

e.    post-award interest from the date of the award until date of payment, calculated as per Clause 8.3 of the Facility Agreement.[270]

336.   The Respondents have not disputed the Facility Agreement as basis for calculation of any compensation due.

337.   The Claimant supports its claim with two expert reports by FTI. The Respondents also submitted an Expert Report by Kepler Associates. The Claimant's experts calculated damages, first, as at 29 November 2021, the date of the Memorial, and second, as at 18 August 2022, the date of the Reply. FTI's Second Expert Report was simply an update of the first, reflecting any changes that occurred in the intervening period.[271]

338.   Although basing their respective reports on the Facility Agreement, the experts arrive at different results in their calculations. The differences between them were addressed in oral testimony by the experts—Mr. Noel Matthews, for the Claimant, and Mr. Emmanuel Johannes for the Respondents—which the Tribunal will now consider.

---

[269] Cl. Mem., para. 129, citing **CL-0056**, *Bunge SA v. Nidera BV*, United Kingdom Supreme Court, Judgment, 1 July 2015 ("***Bunge v. Nidera***"), para. 14 (citing, in turn, *Robinson v. Harman*, English Court of Exchequer, Judgment, 18 January 1848).

[270] Cl. Reply, paras. 224-225.

[271] The Claimant's expert, Mr. Noel Matthews, provided updated figures during the hearing: *see* Expert Presentation of Mr. Matthews, slide 7, which states: "Interest has continued to accrue since 18 August 2022, and we understand no further payments have been made by the Respondents. If the Tribunal requires, we can extend our calculation to a more recent date (by way of example, as at 31 December 2022 the total outstanding amount was approximately $860 million)."

B.    THE TRIBUNAL'S ANALYSIS

339.    The Tribunal has found the Respondents to be in breach of the Facility Agreement and that the Acceleration Clause of the Agreement having been properly invoked has remained effective.

340.    The consequence is that the Respondents are jointly and severally liable to compensate the Claimant for the damages due. Under English law, such damages shall be calculated such as to make the Claimant whole in accordance with the contract that has been breached.[272] In this case, to make the Claimant whole, damages must be calculated in accordance with provisions of the Facility Agreement.[273]

341.    The Tribunal notes that the differences between the Parties arise from the different ways in which they interpret and apply the relevant provisions of the Facility Agreement. Specifically, the experts have adopted different approaches with regard to their treatment of: (i) default interest penalty; (ii) number of days of accrued interest; and (iii) treatment of partial repayments.[274]

342.    Under the Facility Agreement, repayment of the loan was to be at the rate of USD 20 million every quarter. Interest accrued on the opening balance at the rate of LIBOR plus a margin of 6%. Where applicable, default interest applied at the rate of 2%. The closing balance for each period would be: opening balance + interest + default penalty (if any) LESS repayments. Pursuant to Clause 8.3, default interest, at 2%, is calculated on the overdue amount only.

*(1)    Number of Days of Accrued Interest*

343.    On the number of days for which accrued interest would be calculated, the Tribunal accepts the explanation of the Respondents' expert, Mr. Johannes, in oral testimony that the calculation of interest period did not include the last day of the month since that is the day

---

[272] Cl. Mem., para. 129, citing **CL-0056**, *Bunge v. Nidera*, para. 14 (citing, in turn, *Robinson v. Harman*, English Court of Exchequer, Judgment, 18 January 1848).
[273] The Tribunal notes, in any event, that there is no dispute between the Parties as to the basis for calculation of damages, which is the Facility Agreement. Indeed, each side has done its calculation based on its interpretation of the Agreement.
[274] *See, for example*, Expert Presentation of Mr. Matthews, slide 9.

on which it is assumed that payment would be made. The expert also accepted that the assumption would be wrong if indeed payment was not made on that day.[275] Given that payments were indeed continuing to be made, albeit not on the agreed schedule nor in the anticipated sum of USD 20 million per quarter, the Tribunal considers it reasonable to adopt the Respondents' approach. This would ensure that the Respondents are not charged interest for more days than they are liable for, while at the same time not unduly prejudicing the Claimant's entitlement to be made whole.

### (2)    Treatment of Partial Repayments

344.    On the treatment of the four payments which had been received as at Hearing, with regard to calculation of interest, the Tribunal notes that the payments in question were typically made in the course of an interest period, and not at the end of such periods. The Claimant's approach is to split the period into two—before and after payment. Interest for the second part is calculated on a lower amount that reflects the payment received rather than continuing to be assessed on the opening balance as the Respondents have done.

345.    Since the Respondents are not liable for interest on sums already paid, the calculation ought to take into account the sums paid by the Respondents, even if in the middle of an interest period. The Tribunal therefore finds that the calculation method adopted by the Claimant in this regard is more in keeping with the Facility Agreement and should be used in calculating the liability of the Respondents under the Agreement.

### (3)    Default Interest

346.    The most significant difference between the calculations of the two sides is simply from their respective interpretations of the Acceleration Clause and, thus, the application of default interest. From 16 July 2019, when the Acceleration Clause was triggered onward, the Claimant's experts calculate default interest on the entire outstanding amount while the Respondents' experts do their calculation on the basis that repayment had not been accelerated.[276] The Tribunal notes that the letters of demand sent by QNB calculated

---

[275] Tr. Day 2, 41:17–42:3, 83:11–84:6.
[276] In oral testimony, Mr. Johannes stated that since payments were being made under the Facility Agreement, they did not consider that "there was a complete default that has triggered the acceleration clause:" *see* Tr. Day 2, 41:8-16.

default interest only on the unpaid instalments and not on the entire sum. This was the reason for the difference between the figures in the Claimant's letters and in the report of its experts.[277]

347. The Parties are in agreement that the Acceleration Clause was properly invoked on 16 July 2019 and the Tribunal has found that the Claimant's rights arising therefrom were not affected, forfeited, nor waived by the Claimant's subsequent acceptance of payment in instalments. Consequently, the Tribunal accepts the approach of the Claimant's experts by which interest is calculated on the entire amount owed from the moment payment was accelerated by operation of the Acceleration Clause. The Tribunal finds this to be consistent with Clause 8.3 of the Facility Agreement, which provides that the default interest accrues on "any amount payable."

348. The experts on both sides concede that it is not possible to predict, *ad infinitum*, the exact sum that the Respondents would be liable to pay at any given time in the future.[278] Nevertheless, the Tribunal considers that, as with the calculations already done by the Parties in the course of the proceeding, such prediction would be more feasible in reference to specific dates. Also, the differences that existed between the Parties in their previous computations can be easily resolved by referring to the Tribunal's findings above.

349. Presently, therefore, the Tribunal can go no further than finding that the Claimant shall be compensated in an amount calculated in accordance with the provisions of the Facility Agreement and providing target dates for updated calculations by the Parties. The resulting calculations will inform the Tribunal's deliberations on the quantum of compensation to be reflected in any Award that will follow this Decision.

---

[277] Tr. Day 1, 10:23–11:17.
[278] *See, for example*, Kepler ER, p. 8. This is mostly due to the changing rate of interest, and the fact that figures will have to be recalculated any time part payment is made. Repayment was ongoing at the time of the Hearing and set to continue, although the schedule was not certain nor advised.

## X.    DECISION OF THE TRIBUNAL AND DIRECTIONS TO THE PARTIES

350.    For the reasons set forth above, the Tribunal decides as follows:

(1)    The Tribunal rejects the objections of the Respondents to the jurisdiction of the Centre and of this Tribunal.

(2)    The Tribunal finds that the Respondents have breached the Facility Agreement and are liable to the Claimant for damages.

(3)    The Tribunal finds that the Claimant has not waived its right to full and immediate repayment of the outstanding balance under the Facility Agreement.

(4)    The Tribunal finds that the Claimant is entitled to compensation for the Respondents' breach to be calculated in accordance with the provisions of the Facility Agreement for:

a.    the outstanding Loan amount;

b.    interest on the Loan amount calculated in accordance with Clauses 8.1 and 8.3 of the Facility Agreement; and

c.    the Management Fee.

(5)    In order to facilitate the Tribunal's deliberations on the quantification of damages by the date of any Award that will follow this Decision, the Tribunal:

a.    directs the Parties jointly to calculate the sums due under the Facility Agreement, as at two months from the date of this Decision, and monthly thereafter for six months. Such calculation should be submitted to the Tribunal within six weeks from the date of this Decision; and

b.    in the event of disagreement between the Parties with regard to 5(a) above, the Tribunal directs the Parties jointly to submit, by the same six-week deadline, a  document that sets out their respective calculations and briefly explains, in table format, the points and reasons for the differences. The

Tribunal will thereafter determine if any additional submissions will be required.

(6)    The Tribunal directs the Parties to submit their respective updated Statements of Costs within two weeks of the final submissions under the preceding paragraphs.

(7)    The Tribunal reserves its decision on Costs.

_____
Mr. Peter Rees KC
Arbitrator

Date: 5 January 2024

_____
Professor Hélène Ruiz Fabri
Arbitrator

Date: 5 January 2024

_____
Dr. Ucheora Onwuamaegbu
President of the Tribunal

Date: 5 January 2024

107

**APPENDIX 2**

**Joint Calculation of the Parties of Amounts due Under the Facility Agreement**

**QNB v South Sudan in ICSID Case No. ARB/20/40**
**Updated calculations to 5 September 2024**
Summary tables
Confidential

## Summary of sums due under the Facility Agreement

| Component | 5 March 2024 | 5 April 2024 | 5 May 2024 | 5 June 2024 | 5 July 2024 | 5 August 2024 | 5 September 2024 |
|---|---|---|---|---|---|---|---|
| Principal | 659,814,830 | 659,814,830 | 659,814,830 | 659,814,830 | 659,814,830 | 659,814,830 | 659,814,830 |
| Accrued interest | 409,727,522 | 420,870,461 | 432,285,896 | 444,081,845 | 455,208,400 | 467,410,158 | 479,611,917 |
| Management fee | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| Less: repayments made | (71,118,516) | (71,118,516) | (71,118,516) | (71,118,516) | (71,118,516) | (71,118,516) | (71,118,516) |
| **Total amount outstanding** | **998,723,836** | **1,009,866,775** | **1,021,282,210** | **1,033,078,160** | **1,044,204,714** | **1,056,406,473** | **1,068,608,231** |

## Summary of loan, excluding management fee

| Period start | Period end | Number of days | Start of period balance | Interest | Repayment | End of period balance | Check |
|---|---|---|---|---|---|---|---|
| 11-Feb-19 | 29-Mar-19 | 45 | 659,814,830 | 7,062,909 | 0 | 666,877,740 | Ok |
| 29-Mar-19 | 28-Jun-19 | 90 | 666,877,740 | 14,439,539 | 0 | 681,317,278 | Ok |
| 28-Jun-19 | 30-Sep-19 | 75 | 681,317,278 | 17,380,122 | 0 | 698,697,400 | Ok |
| 30-Sep-19 | 31-Dec-19 | 91 | 698,697,400 | 17,835,713 | 0 | 716,533,113 | Ok |
| 31-Dec-19 | 31-Mar-20 | 90 | 716,533,113 | 17,814,142 | 0 | 734,347,255 | Ok |
| 31-Mar-20 | 30-Jun-20 | 90 | 734,347,255 | 17,349,193 | 0 | 751,696,447 | Ok |
| 30-Jun-20 | 30-Sep-20 | 91 | 751,696,447 | 15,785,982 | 0 | 767,482,429 | Ok |
| 30-Sep-20 | 31-Dec-20 | 27 | 767,482,429 | 15,666,848 | 17,135,487 | 766,013,791 | Ok |
| 31-Dec-20 | 31-Mar-21 | 89 | 766,013,791 | 15,630,837 | 0 | 781,644,628 | Ok |
| 31-Mar-21 | 30-Jun-21 | 63 | 781,644,628 | 15,522,097 | 22,878,552 | 774,288,173 | Ok |
| 30-Jun-21 | 30-Sep-21 | 91 | 774,288,173 | 15,946,029 | 0 | 790,234,203 | Ok |
| 30-Sep-21 | 31-Dec-21 | 91 | 790,234,203 | 16,242,968 | 0 | 806,477,170 | Ok |
| 31-Dec-21 | 31-Mar-22 | 89 | 806,477,170 | 16,396,437 | 0 | 822,873,607 | Ok |
| 31-Mar-22 | 30-Jun-22 | 52 | 822,873,607 | 17,615,627 | 31,104,477 | 809,384,757 | Ok |
| 30-Jun-22 | 30-Sep-22 | 91 | 809,384,757 | 20,971,814 | 0 | 830,356,571 | Ok |
| 30-Sep-22 | 30-Dec-22 | 90 | 830,356,571 | 24,234,247 | 0 | 854,590,818 | Ok |
| 30-Dec-22 | 31-Mar-23 | 90 | 854,590,818 | 27,197,054 | 0 | 881,787,872 | Ok |
| 31-Mar-23 | 30-Jun-23 | 90 | 881,787,872 | 29,008,925 | 0 | 910,796,797 | Ok |
| 30-Jun-23 | 29-Sep-23 | 90 | 910,796,797 | 30,825,599 | 0 | 941,622,396 | Ok |
| 29-Sep-23 | 29-Dec-23 | 90 | 941,622,396 | 32,136,843 | 0 | 973,759,238 | Ok |
| 29-Dec-23 | 28-Mar-24 | 89 | 973,759,238 | 32,763,421 | 0 | 1,006,522,660 | Ok |
| 28-Mar-24 | 28-Jun-24 | 91 | 1,006,522,660 | 34,626,819 | 0 | 1,041,149,478 | Ok |
| 28-Jun-24 | 30-Sep-24 | 93 | 1,041,149,478 | 36,605,276 | 0 | 1,077,754,754 | Ok |

**QNB v South Sudan in ICSID Case No. ARB/20/40**
**Updated calculations to 5 September 2024**
Calculation
Confidential

## Preparation note

We have used the second report of Noel Matthews and Henry Pannell (the Claimant's experts) dated 18 August 2022 as the starting point to prepare our updated calculations to 5 September 2024.
The updates we have made are explained in an accompanying memorandum.

## Inputs

| | | |
|---|---|---|
| Utilisation Date | 11/02/2019 | *Exhibit FTI-1: QNB notification of Loan utilisation, dated 19 February 2019* |
| Loan amount, USD | 659,814,830 | *Exhibit FTI-1: QNB notification of Loan utilisation, dated 19 February 2019* |

## Loan calculation

| Start of period | Interest Period | | | Interest | | | | | | | | Repayments and default interest | | | | | End of period | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capitalised balance at start of period, USD | Start of period | End of period | Number of days | Quotation Day | LIBOR 1 Month | LIBOR 2 Month | LIBOR 3 Month | LIBOR | Margin | Interest rate (LIBOR + Margin) | Interest on start of period balance, USD | Quarterly scheduled repayments (not paid), USD | Partial repayments (actually paid), USD | Accrued repayments (overdue), USD | Default interest rate | Default interest, USD | Capitalised balance after repayment, USD | Total period interest, USD | End of quarter interest capitalised, USD | Capitalised balance at end of period, USD | Total outstanding balance at end of period, USD |
| [A] | [B] | [C] Note (1) | [D] = [C] - [B] - 1 | [E] Note (2) | [F] Note (3) | [G] Note (3) | [H] Note (3) | [I] Note (4) | [J] Note (5) | [K] = [I] + [J] | [L] = [A] x [K] x [D] / 360 Note (6) | [M] Note (7) | [N] Note (8) | [O] Notes (9), (10) | [P] Note (11) | [Q] = [O] x [P] x [D] / 360 Note (12) | [R] = [A] - [N] | [S] = [L] + [Q] | [T] Note (13) | [U] = [R] + [T] Note (14) | [V] = [R] + [S] Note (15) |
| 659,814,830 | 11/02/2019 | 29/03/2019 | 45 | 07/02/2019 | 2.52% | 2.61% | - | 2.56% | 6.00% | 8.56% | 7,062,909 | 20,000,000 | 0 | 0 | 2.00% | 0 | 659,814,830 | 7,062,909 | 7,062,909 | 666,877,740 | 666,877,740 |
| 666,877,740 | 29/03/2019 | 28/06/2019 | 90 | 27/03/2019 | - | - | 2.60% | 2.60% | 6.00% | 8.60% | 14,339,539 | 20,000,000 | 0 | 20,000,000 | 2.00% | 100,000 | 666,877,740 | 14,439,539 | 14,439,539 | 681,317,278 | 681,317,278 |
| 681,317,278 | 28/06/2019 | 16/07/2019 | 17 | 26/06/2019 | - | - | 2.33% | 2.33% | 6.00% | 8.33% | 2,679,999 | 0 | 0 | 40,000,000 | 2.00% | 37,778 | 681,317,278 | 2,717,776 | 0 | 681,317,278 | 684,035,055 |
| 681,317,278 | 16/07/2019 | 30/09/2019 | 75 | 26/06/2019 | - | - | 2.33% | 2.33% | 6.00% | 8.33% | 11,823,523 | 0 | 0 | 681,317,278 | 2.00% | 2,838,822 | 681,317,278 | 14,662,345 | 17,380,122 | 698,697,400 | 698,697,400 |
| 698,697,400 | 30/09/2019 | 31/12/2019 | 91 | 27/09/2019 | - | - | 2.10% | 2.10% | 6.00% | 8.10% | 14,303,410 | 0 | 0 | 698,697,400 | 2.00% | 3,532,304 | 698,697,400 | 17,835,713 | 17,835,713 | 716,533,113 | 716,533,113 |
| 716,533,113 | 31/12/2019 | 31/03/2020 | 90 | 27/12/2019 | - | - | 1.94% | 1.94% | 6.00% | 7.94% | 14,231,476 | 0 | 0 | 716,533,113 | 2.00% | 3,582,666 | 716,533,113 | 17,814,142 | 17,814,142 | 734,347,255 | 734,347,255 |
| 734,347,255 | 31/03/2020 | 30/06/2020 | 90 | 27/03/2020 | - | - | 1.45% | 1.45% | 6.00% | 7.45% | 13,677,456 | 0 | 0 | 734,347,255 | 2.00% | 3,671,736 | 734,347,255 | 17,349,193 | 17,349,193 | 751,696,447 | 751,696,447 |
| 751,696,447 | 30/06/2020 | 30/09/2020 | 91 | 26/06/2020 | - | - | 0.31% | 0.31% | 6.00% | 6.31% | 11,985,739 | 0 | 0 | 751,696,447 | 2.00% | 3,800,243 | 751,696,447 | 15,785,982 | 15,785,982 | 767,482,429 | 767,482,429 |
| 767,482,429 | 30/09/2020 | 03/12/2020 | 63 | 28/09/2020 | - | - | 0.22% | 0.22% | 6.00% | 6.22% | 8,354,557 | 0 | 17,135,487 | 767,482,429 | 2.00% | 2,686,189 | 750,346,943 | 11,040,745 | 0 | 750,346,943 | 761,387,688 |
| 750,346,943 | 03/12/2020 | 31/12/2020 | 27 | 28/09/2020 | - | - | 0.22% | 0.22% | 6.00% | 6.22% | 3,500,582 | 0 | 0 | 750,346,943 | 2.00% | 1,125,520 | 750,346,943 | 4,626,103 | 15,666,848 | 766,013,791 | 766,013,791 |
| 766,013,791 | 31/12/2020 | 31/03/2021 | 89 | 29/12/2020 | - | - | 0.25% | 0.25% | 6.00% | 6.25% | 11,843,325 | 0 | 0 | 766,013,791 | 2.00% | 3,787,513 | 766,013,791 | 15,630,837 | 15,630,837 | 781,644,628 | 781,644,628 |
| 781,644,628 | 31/03/2021 | 27/04/2021 | 26 | 29/03/2021 | - | - | 0.20% | 0.20% | 6.00% | 6.20% | 3,501,442 | 0 | 22,878,552 | 781,644,628 | 2.00% | 1,129,042 | 758,766,076 | 4,630,484 | 0 | 758,766,076 | 763,396,560 |
| 758,766,076 | 27/04/2021 | 30/06/2021 | 63 | 29/03/2021 | - | - | 0.20% | 0.20% | 6.00% | 6.20% | 8,235,932 | 0 | 0 | 758,766,076 | 2.00% | 2,655,681 | 758,766,076 | 10,891,613 | 15,522,097 | 774,288,173 | 774,288,173 |
| 774,288,173 | 30/06/2021 | 30/09/2021 | 91 | 28/06/2021 | - | - | 0.15% | 0.15% | 6.00% | 6.15% | 12,031,573 | 0 | 0 | 774,288,173 | 2.00% | 3,914,457 | 774,288,173 | 15,946,029 | 15,946,029 | 790,234,203 | 790,234,203 |
| 790,234,203 | 30/09/2021 | 31/12/2021 | 91 | 28/09/2021 | - | - | 0.13% | 0.13% | 6.00% | 6.13% | 12,247,895 | 0 | 0 | 790,234,203 | 2.00% | 3,995,073 | 790,234,203 | 16,242,968 | 16,242,968 | 806,477,170 | 806,477,170 |
| 806,477,170 | 31/12/2021 | 31/03/2022 | 89 | 29/12/2021 | - | - | 0.22% | 0.22% | 6.00% | 6.22% | 12,408,855 | 0 | 0 | 806,477,170 | 2.00% | 3,987,582 | 806,477,170 | 16,396,437 | 16,396,437 | 822,873,607 | 822,873,607 |
| 822,873,607 | 31/03/2022 | 19/04/2022 | 18 | 29/03/2022 | - | - | 1.01% | 1.01% | 6.00% | 7.01% | 2,882,526 | 0 | 21,104,477 | 822,873,607 | 2.00% | 822,874 | 801,769,130 | 3,705,400 | 0 | 801,769,130 | 805,474,530 |
| 801,769,130 | 19/04/2022 | 08/05/2022 | 18 | 29/03/2022 | - | - | 1.01% | 1.01% | 6.00% | 7.01% | 2,808,597 | 0 | 10,000,000 | 801,769,130 | 2.00% | 801,769 | 791,769,130 | 3,610,366 | 0 | 791,769,130 | 795,379,496 |
| 791,769,130 | 08/05/2022 | 30/06/2022 | 52 | 29/03/2022 | - | - | 1.01% | 1.01% | 6.00% | 7.01% | 8,012,528 | 0 | 0 | 791,769,130 | 2.00% | 2,287,333 | 791,769,130 | 10,299,861 | 17,615,627 | 809,384,757 | 809,384,757 |
| 809,384,757 | 30/06/2022 | 30/09/2022 | 91 | 28/06/2022 | - | - | 2.25% | 2.25% | 6.00% | 8.25% | 16,879,924 | 0 | 0 | 809,384,757 | 2.00% | 4,091,890 | 809,384,757 | 20,971,814 | 20,971,814 | 830,356,571 | 830,356,571 |
| 830,356,571 | 30/09/2022 | 30/12/2022 | 90 | 28/09/2022 | - | - | 3.67% | 3.67% | 6.00% | 9.67% | 20,082,464 | 0 | 0 | 830,356,571 | 2.00% | 4,151,783 | 830,356,571 | 24,234,247 | 24,234,247 | 854,590,818 | 854,590,818 |
| 854,590,818 | 30/12/2022 | 31/03/2023 | 90 | 28/12/2022 | - | - | 4.73% | 4.73% | 6.00% | 10.73% | 22,924,100 | 0 | 0 | 854,590,818 | 2.00% | 4,272,954 | 854,590,818 | 27,197,054 | 27,197,054 | 881,787,872 | 881,787,872 |
| 881,787,872 | 31/03/2023 | 30/06/2023 | 90 | 29/03/2023 | - | - | 5.16% | 5.16% | 6.00% | 11.16% | 24,599,986 | 0 | 0 | 881,787,872 | 2.00% | 4,408,939 | 881,787,872 | 29,008,925 | 29,008,925 | 910,796,797 | 910,796,797 |
| 910,796,797 | 30/06/2023 | 29/09/2023 | 90 | 28/06/2023 | - | - | 5.54% | 5.54% | 6.00% | 11.54% | 26,271,615 | 0 | 0 | 910,796,797 | 2.00% | 4,553,984 | 910,796,797 | 30,825,599 | 30,825,599 | 941,622,396 | 941,622,396 |
| 941,622,396 | 29/09/2023 | 29/12/2023 | 90 | 27/09/2023 | - | - | 5.65% | 5.65% | 6.00% | 11.65% | 27,428,731 | 0 | 0 | 941,622,396 | 2.00% | 4,708,112 | 941,622,396 | 32,136,843 | 32,136,843 | 973,759,238 | 973,759,238 |
| 973,759,238 | 29/12/2023 | 28/03/2024 | 89 | 27/12/2023 | - | - | 5.61% | 5.61% | 6.00% | 11.61% | 27,948,723 | 0 | 0 | 973,759,238 | 2.00% | 4,814,698 | 973,759,238 | 32,763,421 | 32,763,421 | 1,006,522,660 | 1,006,522,660 |
| 1,006,522,660 | 28/03/2024 | 28/06/2024 | 91 | N/A | - | - | 5.61% | 5.61% | 6.00% | 11.61% | 29,538,288 | 0 | 0 | 1,006,522,660 | 2.00% | 5,088,531 | 1,006,522,660 | 34,626,819 | 34,626,819 | 1,041,149,478 | 1,041,149,478 |
| 1,041,149,478 | 28/06/2024 | 30/09/2024 | 93 | N/A | - | - | 5.61% | 5.61% | 6.00% | 11.61% | 31,226,003 | 0 | 0 | 1,041,149,478 | 2.00% | 5,379,272 | 1,041,149,478 | 36,605,276 | 36,605,276 | 1,077,754,754 | 1,077,754,754 |

*Notes:*
*(1) If the end of an Interest Period does not fall on a business day, the Interest Period shall instead end on the next business day in the same month (if there is one) or the preceding business day (if there is not) (Facility Agreement: 9.4)*
*(2) the Quotation Day, which is the date as at which LIBOR is quoted, is defined as 2 business days before start of the Interest Period (Facility Agreement: page 9)*
*(3) LIBOR is sourced to: (i) 07/02/2019 to 28/09/2021 - Exhibit FTI-5: LIBOR data, Reuters; (ii) 29/12/2021 to 28/06/2022 - Exhibit FTI-7: Updated LIBOR data, Reuters; (iii) 28/09/2022 - tab 'Reuters 3 M LIBOR Data' of supporting calculations to Mr Johannes's expert report; and (iv) 28/12/2022 to 27/12/2023 - Updated LIBOR data, 28 December 2022 to 27 December 2023, Bloomberg*
*(4) The LIBOR period is consistent with the length of the Interest Period (Facility Agreement: definition of 'Benchmark Rate' on page 2). If no rate is published for a period equal to the Interest Period, the relevant rate shall be derived from linear interpolation of the available rates (Facility Agreement: 10.1(a))*
*This means that:*
*In the first Interest Period, as it is 46 days in length, we interpolate between the 1 month LIBOR (which we assume is equal to 30 days) and the 2 month LIBOR (which we assume is equal to 60 days)*
*In the subsequent Interest Periods, as each period is 3 months in length, we apply the 3 month LIBOR*
*(5) The 'Margin' is defined at Facility Agreement: page 7*
*(6) Interest is calculated by multiplying the start of period capitalised balance by the pro rata interest rate for the Interest Period, based on a year of 360 days (Facility Agreement: 32.3)*
*(7) We are instructed that the quarterly scheduled repayments, as set out in the Amended Repayment Schedule, were not paid*
*(8) See (i) Account statement showing partial repayments, 12 February 2019 to 5 January 2023; and (ii) Account statement showing partial repayments, 6 January 2023 to 17 January 2024*
*(9) Overdue repayments, up to the 'Acceleration' date of 16 July 2019 (C-0007) are calculated by unpaid quarterly repayments less partial repayments*
*(10) After the 'Acceleration' date of 16 July 2019 (C-0007), we are instructed that the entire balance of the Loan is due under clause 21.16(b) of the Facility Agreement*
*(11) The default interest rate is defined in Clause 8.3 of the Facility Agreement*
*(12) Default interest is calculated by multiplying the overdue balance by the pro rata interest rate for the Interest Period, based on a year of 360 days (Facility Agreement: 32.3)*
*(13) Interest is only capitalised at the end of each Interest Period (Facility Agreement: 9.2(a))*
*(14) The capitalised balance is used to calculate the interest which accrues during the next Interest Period*
*(15) The total outstanding balance, which includes interest not capitalised (if not at end of an Interest Period), is what the Respondents owe*
*(16) Highlighted rows are where we have split the Interest Periods into separate rows in Excel to allow for calculation of interest following partial repayments partway through an Interest Period*

## Management fee

| Management fee | Paid |
|---|---|
| USD | Yes/no |
| 300,000 | No |

*Source: Exhibit FTI-4: Letter from South Sudan confirming management fee, dated 5 April 2018*