**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| QATAR NATIONAL BANK,<br><br>*Petitioner*,<br><br>v.<br><br>REPUBLIC OF SOUTH SUDAN et al.,<br><br>*Respondents*. | Civil Action No. 25-1870 (TJK) |

<u>**MEMORANDUM OPINION**</u>

Qatar National Bank ("QNB") petitions the Court to enforce an arbitral award issued in May 2024 by a tribunal established by the International Centre for the Settlement of Investment ("ICSID") against Republic of South Sudan ("South Sudan") and that nation's central bank, the Bank of South Sudan ("BOSS"). South Sudan never appeared to defend, and so QNB now moves for default judgment against it. In contrast, BOSS answered—and QNB and BOSS now cross-move for summary judgment. BOSS argues that flaws in the tribunal's process render the award unenforceable. But given the very limited role that the Court may play in reviewing the tribunal's proceedings, it concludes otherwise. Thus, the Court will grant both of QNB's motions, deny BOSS's cross-motion, and enforce the award.

## I.    Background

### A.    The ICSID Convention

The Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention" or "Convention"), Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159, is a "multilateral treaty aimed at encouraging and facilitating private foreign investment in developing countries." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863

F.3d 96, 100 (2d Cir. 2017) (citing Anthony R. Parra, *The History of ICSID* 11–12, 24–26 (Oxford 2012)).  Articles 1 through 3 of the Convention establish ICSID as the forum to administer arbitral proceedings between investors and "Contracting States," including the proceeding at issue here. ICSID Convention arts. 1–3; *TECO Guat. Holdings, LLC v. Republic of Guatemala* ("*TECO I*"), No. 17-cv-102, 2018 WL 4705794, at *1 (D.D.C. Sept. 30, 2018) (ICSID "has the authority to convene arbitration panels to adjudicate disputes between international investors and host governments in Contracting States" (internal citation omitted)).  Article 25 establishes that ICSID's jurisdiction "extend[s] to any legal dispute arising directly out of an investment between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to [ICSID] by that State) and a national of another Contracting State."  ICSID Convention art. 25.

Either a Contracting State or an investor who is a national of a Contracting State may request that ICSID convene an arbitral tribunal.  *See* ICSID Convention art. 36.  And after considering the dispute, the arbitral tribunal issues a written decision referred to as an "award."  *Id.* art. 48. If either party objects to the award, it may seek an annulment—the equivalent of pursuing an appeal—before an ad hoc committee of three individuals who were not members of the original panel.  *Id.* art. 52.  Any award entered by an arbitral tribunal convened under the Convention, which includes any decision interpreting or annulling the award, is binding on the parties.  *Id.* art. 53.  Once an arbitral tribunal enters an award, "[t]he only route for setting [it] aside" is "through the ICSID Convention's annulment process," found in Articles 52 and 53.  *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 515 (D.C. Cir. 2023).

But ICSID is "not empowered to enforce awards."  *TECO I*, 2018 WL 4705794, at *2. Instead, "a party seeking enforcement must turn to the courts of a Contracting State."  *Valores Mundiales*, 87 F.4th at 515.  Contracting States are required to "recognize an award . . . as binding

and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." ICSID Convention art. 54. Thus, courts in Contracting States are "not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Valores Mundiales*, 87 F.4th at 515 (citation omitted).

The United States is a Contracting State to the Convention, *see List of Contracting States and Other Signatories of the Convention*, ICSID (March 6, 2026), https://perma.cc/H6UG-F27C, and Congress has passed implementing legislation to give effect to the Convention's requirement that Contracting States recognize and enforce ICSID awards. 22 U.S.C. § 1650a(a) provides: "An award of an arbitral tribunal rendered pursuant to [the ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." That section further provides that the Federal Arbitration Act "shall not apply to enforcement of awards rendered pursuant to the convention." *Id.* Finally, § 1650a(b) confers exclusive jurisdiction over these actions on federal district courts.

**B.  Factual Background**

South Sudan gained its independence in 2011. ECF No. 1-2 at 34. BOSS is South Sudan's central bank, which was established shortly afterward. *Id.*; ECF No. 1 ¶ 10. QNB is a "company incorporated under the laws of the State of Qatar" which "provides banking and financial services." ECF No. 1 ¶ 8. QNB registered as a foreign company in South Sudan in 2011 and became

operational the following year.[1]  ECF No. 1-2 at 41.  In 2018, QNB entered into an investment

agreement with both South Sudan and BOSS called the Facility Agreement.  *Id.* at 44.  Under the

Facility Agreement, QNB provided a $700 million loan to South Sudan, with BOSS serving as the

guarantor.  *Id.*  The Facility Agreement provided for a quarterly repayment schedule beginning in

2019.  *Id.* at 18–19.  It also contained an arbitration provision stating that disputes would be re-

solved by a three-arbitrator panel under the ICSID Convention.  *See id.* at 35.  From the beginning,

South Sudan did not make payments as scheduled, causing QNB to "declar[e] a breach of the

Facility Agreement and demand[] immediate repayment."  *Id.* at 48.  From 2019 to 2020, QNB

sent multiple demand letters to South Sudan and BOSS seeking repayment of the loan.  *Id.* at 48–

50.  In 2020, South Sudan made some partial payments on the loan by directing proceeds from oil

sales and repaid about $70 million from 2020 to 2022.  *Id.* at 50–51.

### C.     The Arbitration Proceedings

QNB initiated arbitration proceedings against South Sudan and BOSS under the ICSID

Convention in September 2020.  ECF No. 1-2 at 34.  The parties each appointed arbitrators ac-

cording to the procedures in the ICSID Convention and the Facility Agreement, and the Arbitral

Tribunal was constituted in March 2021.  *Id.* at 35–36.  The Arbitral Tribunal received briefing

from the parties and held a hearing in January 2023 in which it heard the parties' arguments on

both jurisdiction and the merits.  *Id.* at 37–38.

In their submissions to the Arbitral Tribunal, South Sudan and BOSS first argued that the

Arbitral Tribunal lacked jurisdiction for several reasons—first, because the parties' dispute did not

arise out of an investment under the ICSID Convention, and second, because BOSS, as a

---

[1] The Court draws the factual background largely from the Arbitral Tribunal's Decision on
Jurisdiction and Liability and the Arbitral Award.  ECF No. 1-2.

"constituent subdivision or agency" of a Contracting State, was required to be "designated to [IC-SID]" by the Contracting State and receive the State's consent, which purportedly did not happen. ECF No. 1-2 at 32–33, 54.  South Sudan and BOSS also argued on the merits that they did not breach the Facility Agreement—first, because they used QNB's funds as intended; second, because their failure to pay in full was the result of economic difficulties; and third, because they had begun to repay, even if they had fallen behind the Facility Agreement's schedule.  *Id.* at 33.  They requested the Arbitral Tribunal declare it had "NO jurisdiction to here [sic] and determine the dispute therein" and, if the Arbitral Tribunal found that it did have jurisdiction, to declare that South Sudan and BOSS were "**NOT** in breach of the Facility Agreement."  *Id.* at 53 (alterations in quoted text).  QNB, for its part, argued that the Arbitral Tribunal had jurisdiction over the dispute and over all parties, that South Sudan and BOSS had breached the Facility Agreement, and that they were both jointly and severally liable for the outstanding amount of the award plus interest, a management fee, and legal and arbitration costs.  *Id.* at 52.

In January 2024, the Arbitral Tribunal issued its Decision on Jurisdiction and Liability. ECF No. 1-2 at 26.  In it, the Arbitral Tribunal first determined that it had jurisdiction over the parties under the ICSID Convention: over QNB as a "company incorporated under the laws of the State of Qatar"—in other words, a national of Qatar—and over South Sudan as a Contracting State to the ICSID Convention.  *Id.* at 34.  It also determined that it had jurisdiction over BOSS as a "constituent subdivision or agency of a Contracting State" because South Sudan had "designated" BOSS to ICSID and BOSS had consented to submit the dispute to ICSID with South Sudan's approval.[2]  *Id.* at 92 (quoting ICSID Convention art. 25); *see also id.* at 109–10.  The Arbitral

---

[2] "Designation is an act of the Contracting State by which it manifests its intention that a constituent subdivision or agency can be, in abstracto, a party to an ICSID arbitration."  ECF No. 1-2 at 96 (citation modified).

Tribunal also determined that South Sudan and BOSS were liable to QNB for breach of the Facility Agreement. ECF No. 1-2 at 126. It rejected all counterarguments advanced by South Sudan and BOSS, finding that none amounted to a valid defense for their failure to repay QNB on the schedule in the Facility Agreement. *See id.* at 121.

In May 2024, the Arbitral Tribunal rendered its Arbitral Award. ECF No. 1-2 at 3. It incorporated its prior Decision on Jurisdiction and Liability, again affirmed its jurisdiction over the parties, and again found that South Sudan and BOSS had breached the Facility Agreement and were liable to QNB. *Id.* at 22–23. The Arbitral Tribunal ordered South Sudan and BOSS to pay QNB $1,021,282,210 under the Facility Agreement as of May 5, 2024 (including principal, accrued interest, a management fee, and minus South Sudan and BOSS's partial repayments). *Id.* at 23. It also ordered them to pay post-award interest of "6% + 2% + USD 3-month LIBOR" that would be "payable from the date of dispatch of the Award up to the payment of the Award," as well as £999,329.78 in QNB's legal fees and $266,427.68 in arbitral fees. *Id.*

### D.    Procedural History

QNB filed the instant Petition to Enforce the Arbitral Award against South Sudan and BOSS in June 2025. ECF No. 1. QNB served both South Sudan and BOSS a few months later. ECF Nos. 13, 14. South Sudan did not answer or otherwise appear in the action, and the Clerk of Court entered default against it in November 2025. ECF No. 18. That same month, QNB moved for default judgment against South Sudan. ECF No. 19.

BOSS answered the Petition in October 2025. ECF No. 16. In November 2025, QNB filed a Motion for Judgment on the Pleadings or for Summary Judgment against BOSS. ECF No. 20. BOSS opposed, ECF No. 23, and also moved to strike QNB's Statement of Material Facts Not in Dispute and the accompanying declaration of QNB counsel Jovana Crncevic, ECF No. 26, both of which QNB had attached to its reply in support of its Motion, ECF No. 25. In January 2026, BOSS

cross-moved for summary judgment against QNB.  ECF No. 27.

In April 2026, the Court denied BOSS's Motion to Strike QNB's Statement of Material Facts and the Crncevic Declaration.  Minute Order of April 23, 2026.  BOSS had argued that—because QNB filed its Statement of Material Facts along with its reply, instead of with its Motion for Summary Judgment—that QNB had failed to comply with the Court's Standing Order and the Local Civil Rules.  ECF No. 26 at 9–10.  It also argued that the Crncevic Declaration failed to comply with Federal Rule of Civil Procedure 56(c)(4) because Crncevic did not establish that she was competent to testify to the matters within her declaration.  *See id.* at 8; ECF No. 30 at 10.  The Court denied BOSS's request to strike QNB's Statement of Material Facts, finding that any prejudice to BOSS resulting from QNB's late filing could be cured by allowing BOSS an opportunity to respond.  Minute Order of April 23, 2026.  The Court also denied without prejudice BOSS's request to strike the Crncevic Declaration, allowing BOSS the opportunity to renew its motion alongside its response to QNB's Statement of Material Facts.  *Id.*  Finally, the Court allowed BOSS the opportunity to move for leave to file a surreply.  *Id.*  In May 2026, BOSS again moved to strike the Crncevic Declaration and for leave to file a surreply.  ECF Nos. 36, 37.

Thus, presently before the Court are: (1) QNB's Motion for Default Judgment against South Sudan, ECF No. 19; (2) QNB's Motion for Judgment on the Pleadings or for Summary Judgment against BOSS, ECF No. 20; (3) BOSS's Motion for Summary Judgment, ECF No. 27; (4) BOSS's Motion to Strike, ECF No. 36; and (5) BOSS's Motion for Leave to File Surreply, ECF No. 37.

## II.    QNB's Motion for Default Judgment Against South Sudan

### A.    Legal Standard

When a respondent fails to defend its case, a court has the power to enter default judgment for the petitioner.  *See* Fed. R. Civ. P. 55; *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d

372, 375 n.5 (D.C. Cir. 1980).  Before moving for that relief, a petitioner must first obtain an entry of default from the Clerk of Court.  *See* Fed. R. Civ. P. 55(a), (b)(1).  Even when a respondent fails to respond to a lawsuit and has an entry of default entered by the Clerk, however, "the entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  The non-adversarial posture does not remove the need for the court to "satisfy itself that it has personal jurisdiction" over the "absent defendant," *id.*, as well as subject-matter jurisdiction to hear the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).

In the FSIA context, "[n]o judgment by default shall be entered . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).  Although default judgment might be harder to obtain under the FSIA than in the ordinary case, 28 U.S.C. § 1608(e) "does not 'require the court to demand more or different evidence than it would ordinarily receive.'"  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Marziliano v. Heckler*, 728 F.2d 151, 158 (2d Cir. 1984)), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

### B.      The Court Has Subject-Matter and Personal Jurisdiction

#### 1.      Subject-Matter Jurisdiction

The FSIA "presents the exclusive legal vehicle by which a plaintiff may bring suit against a foreign state."  *Reed*, 845 F. Supp. 2d at 209.  It grants federal district courts subject-matter jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330.  All these requirements are self-evidently fulfilled here, except for whether the foreign state lacks immunity, discussed below.

The FSIA sets out a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). Though the FSIA codified the principle that foreign states are by and large immune from suit in the United States, it provides a set of enumerated exceptions to that general grant of immunity, including when, as here, a case is brought to "confirm an award made pursuant to . . . an agreement to arbitrate" and the award is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6); *NextEra Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024).

The Court has little trouble concluding, under the arbitral award exception, that South Sudan is not entitled to immunity from QNB's claim against it to confirm the Arbitral Award. The Arbitral Award was issued pursuant to the ICSID Convention, an international treaty (1) to which South Sudan and Qatar were both Contracting States, *see List of Contracting States and Other Signatories of the Convention*, ICSID (March 6, 2026), https://perma.cc/H6UG-F27C, (2) that specifically calls for the recognition and enforcement of its awards, *see* ICSID Convention art. 54, and (3) that is in force for the United States, *see* 17 U.S.T. 1270. Courts have routinely reached this conclusion regarding awards issued pursuant to the ICSID Convention. *See Blue Ridge Invs., LLC v. Republic of Argentina*, 735 F.3d 72, 85 (2d Cir. 2013) ("To our knowledge, every court to consider whether awards issued pursuant to the ICSID Convention fall within the arbitral award exception to the FSIA has concluded that they do."); *see also Mobil Cerro Negro*, 863 F.3d at 104–05; *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 277 (D.D.C. 2019). The Court therefore finds that South Sudan is not entitled to immunity under the FSIA, and thus the Court has subject-matter jurisdiction over QNB's claim against it.

9

### 2.    Personal Jurisdiction

Under the FSIA, personal jurisdiction exists where two conditions are met: the Court has subject-matter jurisdiction, and the foreign state has been properly served under § 1608(a).  28 U.S.C. § 1330(b); *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 237 (2025).  As established above, the Court has subject-matter jurisdiction.  And as set forth below, QNB properly served South Sudan.

Section 1608(a) prescribes four methods for serving a foreign state, and "strict adherence" to its terms "is required."  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).  The terms require that a petitioner attempt each of the four methods sequentially, moving on to the next only when the previous method is unavailable.  For South Sudan, the first two methods are unavailable.  Qatar has no "special arrangement for service" with South Sudan, *cf.* 28 U.S.C. § 1608(a)(1), nor is there a relevant "international convention on service of judicial documents" to which both Qatar and South Sudan are parties, *cf. id.* § 1608(a)(2); *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs.*, 414 F. Supp. 3d 109, 121 (D.D.C. 2019).

QNB served South Sudan by the third method of service set out in § 1608: by "sending a copy of the summons and complaint and a notice of suit . . . to the head of the ministry of foreign affairs of the foreign state."[3]  28 U.S.C. § 1608(a)(3).  It  requested the Clerk of Court mail, via DHL, the case documents to the Republic of South Sudan, care of its Ministry of Foreign Affairs and International Cooperation, and it provided a signed receipt of delivery.  ECF Nos. 7, 11, 13.

---

[3] The final requirement in § 1608(a)(3), that the petitioner send a "a translation of [the case materials] into the official language of the foreign state," is inapplicable here because English is the official language of South Sudan.  28 U.S.C. § 1608(a)(3); *About South Sudan*, Ministry of Foreign Affs. & Int'l Coop. of the Republic of S. Sudan, https://perma.cc/8ZF6-UNGL.

Service was effective as of August 14, 2025.  ECF No. 13.  Thus, QNB has satisfied § 1608(a)(3) and the Court has personal jurisdiction over South Sudan.

### C.      QNB is Entitled to Default Judgment

The Court will grant default judgment to QNB and enforce the Arbitral Award against South Sudan.  As discussed above, Congress has provided that ICSID awards are owed full faith and credit.  22 U.S.C. § 1650a(a).  Thus, the Court has an "extremely limited" role in reviewing an Arbitral Award rendered under the ICSID Convention.  *Valores Mundiales*, 87 F.4th at 520 (explaining Congress's intent to "reduc[e] the scope of judicial review of ICSID awards below even the 'extremely limited' review available" to other arbitral agreements under the Federal Arbitration Act).  The Court's role in considering a petition for enforcement of an ICSID award is limited to "examin[ing] the judgment's authenticity and enforc[ing] the obligations imposed by the award." *Valores Mundiales*, 87 F.4th at 522 (citation omitted).

Under this deferential framework, and with no argument from South Sudan to the contrary, it is easy for the Court to conclude that it should enforce the Arbitral Award.  First, QNB has shown that the Arbitral Award is authentic by attaching to the Petition a copy of the Arbitral Award accompanied by a certificate of authenticity signed and stamped by the Secretary-General of ICSID.  ECF No. 1-2 at 2.  Excerpts of the same Arbitral Award are accessible on ICSID's online case database. *Qatar Nat'l Bank (Q.P.S.C.) v. Republic of S. Sudan & Bank of S. Sudan* (ICSID Case No. ARB/20/40), ICSID, https://perma.cc/U2LC-KVWS.  Having determined that the Arbitral Award is authentic, the Court must next determine "whether ICSID would treat the award as binding." *Valores Mundiales*, 87 F.4th at 520.  On review of the Arbitral Award, the Court finds that it would.  The Arbitral Award took effect shortly after having been decided by the Arbitral Tribunal, ICSID Convention art. 49, and the deadline for the South Sudan to request annulment of the award—except on the basis of "corruption on the part of a member of the Tribunal," of which

the Court has no evidence before it—has elapsed, *id.* art. 52.  Therefore, "[b]ased on a straightfor-ward application of Section 1650a," the Arbitral Award is enforceable against South Sudan. *Valores Mundiales*, 87 F.4th at 520.  Thus, the Court will grant QNB's motion, enter default judg-ment against South Sudan, and enforce the Arbitral Award.

## III.    QNB's Motion for Summary Judgment Against BOSS

QNB also moved for summary judgment against BOSS, which contests the Arbitral Award's enforceability.  As explained below, none of BOSS's arguments change the Court's con-clusion that the Arbitral Award is authentic and enforceable against BOSS as well.

### A.    The Court has Subject-Matter and Personal Jurisdiction

As with South Sudan, the Court must satisfy itself that it has subject-matter and personal jurisdiction with respect to BOSS and the claim against it.  BOSS, as the central bank of South Sudan, is ordinarily entitled to sovereign immunity under the FSIA.  28 U.S.C. § 1603(a) ("foreign state[s]" under the FSIA include "agenc[ies] or instrumentalit[ies] of a foreign state"); *cf.* ECF No. 27 at 17.  But, for the same reasons the Court has jurisdiction over QNB's claim against South Sudan to confirm the Arbitral Award, it also has jurisdiction over its identical claim against BOSS. The Arbitral Award was issued pursuant to an applicable international treaty in force in the United States.  Courts have routinely reached this conclusion regarding awards issued under the ICSID Convention.  And BOSS, for its part, does not dispute the Court's subject-matter jurisdiction. Thus, BOSS is not entitled to immunity under the FSIA, and so the Court has subject-matter juris-diction over the claim against it.

The Court also has personal jurisdiction over BOSS because QNB properly served BOSS under the FSIA, just like it properly served South Sudan.  QNB served BOSS by the third method of service set out in § 1608 for service on an agency or instrumentality of a foreign state: by "de-livery of a copy of the summons and complaint . . . by any form of mail requiring a signed receipt

12

. . . to the agency or instrumentality to be served." 28 U.S.C. § 1608(b)(3).  It did so by requesting the Clerk of Court mail, via DHL, the case documents to BOSS at its Governor's Office and provided a signed receipt of delivery.  ECF Nos. 8, 9, 10.  Service was effective as of August 15, 2025.  ECF No. 14.  Thus, QNB has satisfied § 1608(b)(3) and the Court has personal jurisdiction over BOSS.[4]

### B.    QNB is Entitled to Judgment Against BOSS

The Court will enforce the Arbitral Award against BOSS for the same reasons that it did against South Sudan.  QNB has established that the Arbitral Award is authentic and that ICSID would consider it binding.  Given the especially deferential standard by which Congress has directed courts to review awards rendered under the ICSID Convention, the Court's role stops there.

---

[4] For the first time in its proposed surreply, BOSS argues that QNB has not provided satisfactory proof of service as required by Federal Rule of Civil Procedure 4(l).  ECF No. 37-1 at 8–10.  As a general matter, "[a]rguments raised for the first time in a reply brief are waived." *Nippon Shinyaku Co. v. Iancu*, 369 F. Supp. 3d 226, 239 n.8 (D.D.C. 2019), *aff'd*, 796 F. App'x 1032 (Fed. Cir. 2020).  But here, the Court contemplated that BOSS might seek to file a surreply to respond to QNB's late-filed Statement of Material Facts, and QNB consented to BOSS's request to file a surreply for that limited purpose.  Minute Order of April 23, 2026; ECF No. 37-1 at 2–3.  Thus, the Court will grant BOSS's motion to file a surreply but will limit its consideration of the arguments in the surreply to those responsive to QNB's Statement of Material Facts.

BOSS frames its argument about proof of service as responsive to QNB's Statement of Facts, because in it, QNB included a statement that it served BOSS on August 15, 2025.  *See* ECF No. 25-2 ¶ 7; ECF No. 37-1 at 8.  The Court is skeptical of this framing, as QNB's Motion for Summary Judgment set out in detail its argument that it properly served BOSS.  *See* ECF No. 20-1 at 17–19.  Thus, BOSS was on notice of QNB's basis for asserting personal jurisdiction over it, and BOSS failed to argue that QNB's proof of service—or service of process itself—was insufficient or improper.  But in any case, this argument fails on the merits.  On August 1, 2025, the Clerk of Court filed a sworn certificate attesting that the Clerk's office dispatched the case materials via DHL to BOSS in accordance with 28 U.S.C. § 1608(b)(3)(B).  ECF No. 10.  And, on August 18, 2025, counsel for QNB filed a sworn affidavit certifying that DHL had returned proof of delivery on BOSS on August 15, 2025.  ECF No. 14.  These filings satisfy Rule 4(l)'s requirement to provide proof of service.

13

None of BOSS's three arguments to the contrary are persuasive.  First, BOSS argues that the Court should decline to enforce the Arbitral Award because the Arbitral Tribunal lacked jurisdiction over the dispute.  BOSS says that QNB is not a "national of [a] Contracting State," ICSID Convention art. 25(1), but is instead "under the control of a foreign state to such an extent that the dispute was between two states, and [so] was outside the jurisdiction of ICSID," ECF No. 23 at 26.[5]  Thus, according to BOSS, the Arbitral Tribunal engaged in "impermissible, extra-jurisdictional proceeding between two state parties," so the Court should reject the Arbitral Award.  *Id.* at 31.  BOSS relies heavily on a line of cases which it says suggest that a court may consider whether an ICSID tribunal had jurisdiction over a dispute when jurisdiction was not "fully and fairly" litigated in the first instance.  *Id.* at 27 (quoting *Valores Mundiales*, 87 F.4th at 520).

Though the Supreme Court has long recognized that the principle of "jurisdictional finality" in "full faith and credit" review may have some narrow exceptions, *Durfee v. Duke*, 375 U.S. 106, 114–15 (1963), those exceptions do not save BOSS here.  For one thing, the Court finds ample evidence that the Arbitral Tribunal *did* "fully and fairly" consider its own jurisdiction over the parties.  In the proceedings before the Arbitral Tribunal, the parties had the opportunity to fully brief issues of jurisdiction.  ECF No. 1-2 at 37–38 (Arbitral Tribunal received QNB's Memorial in November 2021, South Sudan and BOSS's Counter-Memorial in April 2022, QNB's Reply in August 2022, and South Sudan and BOSS's Rejoinder in December 2022).  From January 17–19, 2022, the Arbitral Tribunal held a hearing on jurisdiction and the merits, during which each party was represented by counsel and permitted to examine witnesses and argue before it.  *Id.* at 38–39.

---

[5] As discussed above, ICSID was created to facilitate "the resolution of disputes between private investors and governments."  *Valores Mundiales*, 87 F.4th at 514.  To that end, the ICSID Convention's jurisdiction is limited to proceedings where one party is a "Contracting State" to the Convention and the other party is an investor that is a "national of another Contracting State."  ICSID Convention art. 25(1).

14

And then, in January 2024, the Arbitral Tribunal released a 107-page Decision on Jurisdiction and Liability, in which it set forth in detail its rationale for concluding that it had jurisdiction over the parties and their dispute. *See generally id.* The Arbitral Tribunal overruled BOSS's jurisdictional objections and explained its reasoning why it had jurisdiction to hear the parties' dispute, devoting over 50 pages of its opinion to its jurisdictional analysis. *See id.* at 54–110. With ample evidence that the Arbitral Tribunal considered whether it possessed jurisdiction over the parties, and fully heard the parties on that issue, and the Court cannot say that the Arbitral Tribunal's jurisdiction was not "fully and fairly" determined.

Still, BOSS argues, the Arbitral Tribunal did not specifically address the argument BOSS makes now—that QNB is "under the control of a foreign state to such an extent that the dispute was between two states," and thus it lacked jurisdiction under Article 25 of the ICSID Convention. ECF No. 23 at 26. This sub-argument fails as well. First, the Arbitral Tribunal *did* consider QNB's status. As part of its Decision on Jurisdiction and Liability, the Arbitral Tribunal made a finding on the nature of each party. As to QNB, it concluded that "[t]he Claimant is Qatar National Bank . . . a company incorporated under the laws of the State of Qatar, and part of the QNB Group . . . [which] provides banking and financial services." ECF No. 1-2 at 34. Second—and more importantly—despite the opportunity to do so, nothing before the Court suggests that BOSS argued before the Arbitral Tribunal that it lacked jurisdiction because QNB was a subdivision or agency of a Contracting State under ICSID Convention Article 25.[6] And a "party cannot escape the

---

[6] To the contrary, it appears that BOSS may have conceded that QNB was *not* a sovereign entity before the Arbitral Tribunal. In its Decision on Jurisdiction and Liability, the Arbitral Tribunal characterized BOSS's argument on jurisdiction as "argu[ing] that the Facility Agreement was signed by three parties. *Two of the parties are subject to ICSID jurisdiction* and one is not." ECF No. 1-2 at 90 (emphasis added). Thus, in the context of BOSS's arguments that it was not subject to the jurisdiction of the Arbitral Tribunal because it was not properly "designated," *see*

requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding." *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 710 (1982). The principles of full faith and credit review and claim preclusion exist to ensure that "a party has his day in court, with opportunity to present his evidence and his view of the law." *Durfee*, 375 U.S. at 114. "After" that, "a collateral attack upon the decision as to jurisdiction there rendered merely retries the issue previously determined." *Id*. So too here.[7]

For these reasons, the Court is satisfied that the Arbitral Tribunal's jurisdiction was fully and fairly litigated before it, and that the Arbitral Tribunal satisfied itself that it had jurisdiction over the parties and the dispute under ICSID Convention Article 25. Having found no "reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation," the Court therefore determines that no "redetermination of issues is warranted." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481 (1982) (citation modified).

BOSS's second argument fails for similar reasons. BOSS argues that the Court should decline to enforce the Arbitral Award because the Arbitral Tribunal lacked jurisdiction, this time over BOSS. According to BOSS, "[a]ny [d]esignation of BOSS to ICSID [b]y QNB [w]as a [n]ullity." ECF No. 23 at 36. But this is an argument, as mentioned above, that BOSS made to the Arbitral Tribunal, where it was fully and fairly litigated—and rejected. *See* ECF No. 1-2 at 54,

---

ECF No. 1-2 at 54, BOSS appears to concede that under Article 25, the other two parties—QNB and South Sudan—*were* subject to its jurisdiction as a "national of another Contracting State" (QNB) and an ICSID Contracting State (South Sudan).

[7] Such a rule is consistent with the ICSID Convention's implementing legislation and Congress's intent to shield arbitral awards from judicial review. Without it, a party could guarantee itself judicial review of an arbitral tribunal's decision by holding its best jurisdictional argument in reserve. *See* 22 U.S.C. § 1650a(a).

89–110. So, for the reasons explained above, it provides no reason for the Court to decline to enforce the Arbitral Award. That the Arbitral Tribunal may have erred—as BOSS asserts—is of no moment.

Third, BOSS points to "[p]lausible [c]laims by Qatar of [c]orruption" in QNB's operations which "appear[] to have taken place at least in substantial part during the course of agreements, actions and inactions which are the basis of QNB's demands." ECF No. 23 at 31–32. BOSS argues, without citation to any legal authority, that "protection of the integrity of US [sic] federal courts mandates that each district court assess the possible taint of material corruption before it allows [sic] the prestige of the American federal courts to be utilized to enforce a corrupt bargain against American and international public policy." *Id.* at 33. Because of this purported "mandate," BOSS argues that the Court should decline to enforce the Arbitral Award lest the Court be "taint[ed]" by what it describes, oddly, as QNB's "ill-gotten demands."[8] *Id.* at 33, 36.

But the sweeping approach that BOSS suggests—for the Court to review potential corruption connected to the parties' underlying dispute when considering whether the enforce the Arbitral Award—is flatly inconsistent with the Court's limited role in reviewing ICSID awards. The Court is not even permitted, under the exceedingly deferential standard set out in 22 U.S.C. § 1650a(a), to disregard an award under the ICSID Convention because of alleged fraud or corruption in the arbitration process itself; internal ICSID procedures address such allegations. *See TECO Guat. Holdings, LLC v. Republic of Guatemala* ("*TECO II*"), 414 F. Supp. 3d 94, 103 (D.D.C. 2019). BOSS's request would go even further, by suggesting that the Court could decline to enforce the

---

[8] In connection with this argument, BOSS requests the Court permit it to take discovery. *See* ECF No. 23 at 32–33. The Court will deny this request, as well as BOSS's request to conduct discovery into "pending foreign parallel litigation," *id.* at 42, because neither seeks information relevant to the Court's limited task in deciding whether to enforce the Arbitral Award.

Arbitral Award on account of vague allegations of corruption stemming from the underlying dispute. *See* ECF No. 23 at 32–33. Not so.

## IV.    BOSS's Remaining Motions

As noted earlier, BOSS also cross-moves for summary judgment. ECF No. 27. BOSS argues that summary judgment in its favor is warranted because the Arbitral Tribunal lacked jurisdiction. *See id.* at 20–29. But as explained, BOSS fully and fairly litigated that issue before the Arbitral Tribunal, which determined that it *did* have jurisdiction. And as also explained, nothing about its determination calls into question whether the Court should enforce the Arbitral Award. Thus, the Court will deny BOSS's Motion for Summary Judgment.

BOSS also filed a Renewed Motion to Strike the Declaration of Jovana Crncevic. ECF No. 36. Recall that BOSS previously moved to strike the Crncevic Declaration—as well as QNB's Statement of Material Facts—which the Court denied. ECF No. 26; Minute Order of April 23, 2026. BOSS now renews its Motion, arguing that the declaration does not comply with Federal Rule of Civil Procedure 56(c)(4) because it does not "show that the affiant or declarant is competent to testify on the matters stated." ECF No. 36 at 7 (quoting Fed. R. Civ. P. 56(c)(4)). BOSS objects to Crncevic's statement that "[t]o date, neither South Sudan nor [BOSS] has paid any part of the Award." *Id.* (quoting ECF No. 25-3 ¶ 3). In response, QNB argues that the declarant *is* competent to testify on that matter, and that, in any case, "the challenged fact is . . . not a required factual finding for the Court to enforce and recognize the Award." ECF No. 38 at 14.

The Court agrees that it need not—and did not—consider the Crncevic Declaration in deciding whether to enforce the Arbitral Award because nothing about the Court's very limited role

in reviewing a petition to enforce an ICSID award required it to do so.  *See Valores Mundiales*, 87

F.4th at 515–20; 22 U.S.C. § 1650a(a).  Thus, the Court will deny the Motion as moot.[9]

## V.    Conclusion

For all the above reasons, the Court will grant QNB's Motion for Default Judgment against

South Sudan and its Motion for Summary Judgment against BOSS.  The Court will also grant

BOSS's Motion to File a Surreply but deny its Motion for Partial Summary Judgment and its

Motion to Strike.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 22, 2026

---

[9] BOSS asserts in its reply that "non-payment is an element of Petitioner's *prima facie* case."  ECF No. 39 at 4.  But none of the cases it cites for this proposition concern petitions to enforce ICSID awards and none are federal cases from this Circuit.  *See id.*  The Court can find no support in the relevant statute or caselaw suggesting that it must find non-payment before granting a petition to enforce an ICSID award, so it declines to do so.  Indeed, the Court is "not permit[ted] . . . 'to add in' to § 1650a an exception that 'Congress left out.'"  *Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. 20-cv-817 (JDB), 2025 WL 2336428, at *10 (D.D.C. Aug. 13, 2025) (quoting *CC/Devas*, 605 U.S. at 233).  When confronted with questions about the exact sum of the judgment to be awarded in similar cases, including whether to credit any partial payments, courts in this District simply request that the parties provide a proposed judgment.  *See id.* at *10 n.13. The Court will do the same here.